IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA18-714

 Filed: 4 February 2020

Davidson County, Nos. 16 CRS 21–24

STATE OF NORTH CAROLINA

 v.

MOLLY MARTENS CORBETT and THOMAS MICHAEL MARTENS

 Appeal by defendants from judgments entered 9 August 2017 and order

entered 4 December 2017 by Judge W. David Lee in Davidson County Superior Court.

Heard in the Court of Appeals 31 January 2019.

 Attorney General Joshua H. Stein, by Special Deputy Attorneys General
 Jonathan P. Babb and L. Michael Dodd, for the State.

 Tharrington Smith, LLP, by Douglas E. Kingsbery and Melissa H. Hill, for
 defendant-appellant Molly Martens Corbett.

 Crumpler Freedman Parker & Witt, by David B. Freedman, Jones P. Byrd, Jr.,
 and Dudley A. Witt, for defendant-appellant Thomas Michael Martens.

 ZACHARY, Judge.

 Defendants Molly Martens Corbett (“Molly”) and Thomas Michael Martens

(“Tom”), daughter and father, appeal from judgments entered upon a jury’s verdicts

finding them guilty of second-degree murder in the death of Jason Corbett (“Jason”),

Molly’s husband. Defendants also appeal the trial court’s order denying their Motion

for Appropriate Relief alleging juror misconduct. After careful review, we affirm the

order denying Defendants’ Motion for Appropriate Relief. However, due to a number
 STATE V. CORBETT & MARTENS

 Opinion of the Court

of prejudicial errors apparent within the record, we reverse the judgments entered

upon Defendants’ convictions for second-degree murder and remand for a new trial.

 Although Defendants raise 13 issues on appeal—many of which are

interconnected and complex—this case is deceptively simple, boiling down to whether

Defendants lawfully used deadly force to defend themselves and each other during

the tragic altercation with Jason. Having thoroughly reviewed the record and

transcript, it is evident that this is the rare case in which certain evidentiary errors,

alone and in the aggregate, were so prejudicial as to inhibit Defendants’ ability to

present a full and meaningful defense. Moreover, the trial court erred in instructing

the jury on the aggressor doctrine as to Tom, given the absence of evidence to support

such an instruction.

 Because these errors are dispositive and warrant a new trial, we need not

address the additional issues raised by Defendants.

 I. Background

 Jason originally lived in Ireland with his first wife, Margaret, and their two

children, Jack and Sarah. After Margaret died unexpectedly in 2004, Jason hired

Molly to work as an au pair. Jason and Molly later began a romantic relationship,

and in 2011, they moved with the children to Davidson County, North Carolina.

Jason and Molly married later that year.

 A. The Altercation

 2
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 On 1 August 2015, Molly’s parents, Tom and Sharon Martens, traveled from

their home in Knoxville, Tennessee, to visit the Corbetts in Davidson County. Tom,

an attorney and retired FBI agent, packed an aluminum Little League baseball bat

and a tennis racket as gifts for Jack. When Tom and Sharon arrived at the Corbetts’

home at around 8:30 p.m., Jason was in the driveway, drinking a beer with a

neighbor, and he walked over to greet Tom and Sharon. That evening, Tom, Sharon,

Jason, Molly, and Sarah had dinner together while Jack attended a party. Jack came

home at around 11:00 p.m. Because of the late hour, Tom decided not to give Jack

the bat and tennis racket that night.

 Tom and Sharon slept in the guest room, which was located just below the

bathroom that adjoined Jason and Molly’s bedroom. Late in the night, Tom was

awakened by noises, including “a scream and loud voices,” above their bedroom.

Wearing only a golf shirt and boxer shorts, Tom jumped out of bed, grabbed the Little

League bat that remained with his luggage by the bed, and rushed upstairs.

 Once he arrived upstairs, Tom determined that the noises were coming from

Jason and Molly’s bedroom. When Tom opened the bedroom door, Molly and Jason

were facing each other, and Jason had his hands around Molly’s neck. As Tom

entered and closed the door behind him, Jason quickly removed his hands from

Molly’s neck, and shifted her into a tight chokehold with her neck in the crook of his

right arm, and her body positioned between himself and Tom.

 3
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 Tom repeatedly told Jason, “Let her go”; Jason repeatedly responded, “I’m

going to kill her.” Jason began to move down the hall toward the bathroom, dragging

Molly with him. Tom feared that if Jason took Molly into the bathroom and closed

the door, Tom would be unable save her, and “that would be the end of that.” To

impede Jason’s progress down the hall, Tom swung the baseball bat at “the back of

the two of them glued together”—hitting Jason in the back of the head, while carefully

avoiding Molly. Jason did not “go down” or even waver, and it seemed to Tom that

the blow only “further enraged” Jason. Nevertheless, Tom continued to hit Jason “as

many times as [he] could to distract him because he now had Molly in a very tight

chokehold,” and “she was no longer wiggling.”

 Despite Tom’s efforts, Jason successfully pulled Molly into the bathroom. Tom

was close behind them, however, and Jason was unable to close the door. Tom had

more room to maneuver inside of the bathroom than in the hallway, and he was able

to hit Jason in the head with the bat again. Yet these efforts “didn’t seem to have

any effect.”

 Jason forced his way out of the bathroom, into the hallway, and back into the

bedroom, pushing Molly and Tom along as he went. The affray resumed in the

bedroom. Tom swung the bat at Jason, who caught the bat in his left hand, enabling

Molly to break free from Jason’s chokehold. While Tom and Jason were struggling

for possession of the bat, Jason “punche[d]” his hand out and shoved Tom across the

 4
 STATE V. CORBETT & MARTENS

 Opinion of the Court

width of the bed, and Tom fell face first onto the floor. As he lay facedown on the

floor, Tom heard Molly scream, “Don’t hurt my dad.”

 When Tom got up, he saw Jason holding the bat, standing in “a good athletic

position . . . looking between [Tom] and Molly.” Seeing that Molly was “trapped”

between the wall and the bed, Tom “rush[ed]” Jason to “try to get ahold of the bat.”

Tom and Jason renewed their struggle for control of the bat, and at some point, Molly

picked up a brick paver that was sitting on her nightstand and used it to strike Jason.

 Tom managed to regain control of the bat. By this point, he was “shaking” and

physically weak from the altercation. However, because Tom remained afraid that

Jason might regain control of the bat and again attempt to kill him or Molly, Tom

continued hitting Jason until he was down, and Tom felt certain that Jason “could

not kill” them.

 Shortly thereafter, Tom called 911 and told the operator, “My, my, uh,

daughter’s husband, uh, my son-in-law, uh, got in a fight with my daughter, I

intervened, and I, I think, um, and, he’s in bad shape. We need help. . . . He, he’s

bleeding all over, and I, I may have killed him.” With the 911 operator’s guidance,

Molly and Tom took turns administering CPR to Jason until the emergency medical

crew arrived.

 B. The Investigation

 5
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 Davidson County EMS paramedics arrived at the scene within ten minutes of

receiving the 911 call. One paramedic quickly determined that Jason had suffered

“severe heavy trauma to the back of the head.” While attempting to lift Jason’s chin

in order to prepare him for intubation, all of the paramedic’s left “fingers went inside

the skull.”

 Inside of the house, first responders observed a significant amount of blood on

the floor and walls of the bedroom, dry blood on portions of Jason’s body, and a brick

paver on the bedroom floor. Deputies from the Davidson County Sheriff’s Office

retrieved the children from their bedrooms, where they found Sarah and Jack asleep

and undisturbed.

 Meanwhile, Deputy David Dillard escorted Molly to his patrol car, where she

remained for approximately one hour. In his written report of the incident, Deputy

Dillard noted that Molly was “very obviously in shock.” He recalled that Molly “was

making crying noises but [he] didn’t see any visible tears. She was also rubbing her

neck. . . . It wasn’t a constant. She would do it and stop and do it and then stop while

continuing to make the crying noises.”

 Molly was “in the fetal position” on the ground beside Deputy Dillard’s car

when two paramedics approached to examine her. Both paramedics observed redness

on Molly’s throat, and when one of them asked Molly whether her neck hurt, she said

yes, and stated that she had been choked. Aside from Molly’s symptoms of shock and

 6
 STATE V. CORBETT & MARTENS

 Opinion of the Court

the redness and soreness to her throat, none of the first responders observed any

apparent injuries to either Molly or Tom.

 Lieutenant Frank Young, III, arrived on the scene later, and took photographs

of Jason’s body. One of the photographs depicted Jason’s right hand with a long

blonde hair in his palm.

 Later that day, Molly submitted the following written statement to the

Davidson County Sheriff’s Office:

 My husband, Jason Corbett, was upset that he awoke and
 an argument ensued with him telling me to “shut up,” (etc.)
 and he applied pressure to my throat/neck and started
 choking me. At some point, I screamed as loud as possible.
 He covered my mouth and then started choking me again
 with his arm. My father, Tom Martens, came in the room
 and I cannot remember if he said something or just hit
 Jason to get him off me. Jason grabbed the bat from him
 and I tried to hit him with a brick (garden decor) I had on
 my nightstand. I do not remember clearly after that.

 On 3 August 2015, a medical examiner at the North Carolina Office of the Chief

Medical Examiner performed an autopsy and determined Jason’s cause of death to

be blunt force head trauma, including “extensive skull fractures” and “two large,

branched, full-thickness lacerations of bilateral parietal scalp,” arising from multiple

blows to the head. The medical examiner found that one laceration on Jason’s head

“ha[d] an appearance of a postmortem injury.” He also noted that Jason had a blood

alcohol level of 0.02% and tested positive for low levels of an antidepressant

medication known to have sedative effects.

 7
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 That day, Sarah and Jack were staying with Molly’s brother in Union County

when they were visited by a social worker from the Union County Department of

Social Services (“DSS”). Pursuant to a request from the Davidson County Sheriff’s

Office, the social worker conducted separate interviews of the children, inquiring

about issues including domestic violence and familial relationships. During his

interview, Jack reported that “his dad gets mad at his mom [Molly] for no good

reason.” He also shared that once, he was accidentally pushed down the stairs while

attempting to intervene in a fight between Jason and Molly. Sarah similarly stated

during her interview that “her dad is angry on a regular basis,” and she described an

incident when Jason pulled Molly’s hair and “smacked her in the face.”

 Upon the referral of Davidson County DSS, on 6 August 2015, four days after

Jason’s death, Jack and Sarah received child medical evaluations at the Dragonfly

House Children’s Advocacy Center in Mocksville, North Carolina. Davidson County

Sheriff’s Detectives Mark Hanna and Nathan Riggs observed the forensic medical

interview portions of the children’s separate, two-part child medical evaluations.

Prior to the interviews, Detectives Hanna and Riggs met with the other members of

the children’s multi-disciplinary team and submitted the following list of questions

related to the investigation of Jason’s death, which they wanted the interviewer to

ask the children:

 QUESTIONS FOR KIDS –

 8
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 1. FIND OUT ABOUT DV IN HOME.
 IS JACK AFRAID OF DAD. DO KIDS LIKE/HATE
 MOLLY.
 2. FIND OUT ABOUT PAVER IN BEDROOM
 3. ASK ABOUT NIGHTMARE THAT WOKE HER UP.
 4. ASK ABOUT HOW THE “EMERGENCY #”
 – WHY WAS IS [sic] SETUP – WHO SETUP – WHEN
 – WHO WROTE#.
 5. ASK WHERE G-MOM + G-DAD USUALLY SLEEP
 WHEN THEY STAY
 6. ASK IF DAD EVER MENTIONED A TRIP TO
 IRELAND THIS MONTH
 7. ASK ABOUT RELATIONSHIP W/ MOLLY
 8. ASK ABOUT SARAH’S SLEEPING IN BED W/MOLLY
 [illegible] DAD.

 During his interview, Jack described how Jason often got angry with Molly

over “simple things” such as “bills” and “leaving lights on.” Jack stated that Jason

“physically and verbally hurt” Molly, and that he had personally witnessed occasions

when Jason punched, hit, and pushed her. According to Jack, Jason’s anger problems

had “gotten worse over the past few months.”

 In addition, Jack explained that the brick paver was present in the master

bedroom because Molly and the children “were going to paint it, because [they] just .

. . got flowers that [they] were going to plant in [their] front yard or back yard[.]” Jack

further explained, however, that it had been raining, and they did not want the brick

paver “getting all wet. So [they] brought it inside, and [Molly] put it at her desk.”

 Like Jack, Sarah similarly stated during her interview that Jason would get

angry for “ridiculous reasons,” such as when he was inadvertently awakened from

 9
 STATE V. CORBETT & MARTENS

 Opinion of the Court

sleep at night. Sarah explained that she sometimes had nightmares and would come

to Molly for comfort, but that Jason would get “very angry” if she accidentally woke

him up. Sarah described one such incident that occurred in the middle of the night

that Jason died. That night, Sarah had a nightmare involving the fairies on her

bedsheets, and she went to Jason and Molly’s bedroom and asked Molly to change her

sheets. When Molly got out of bed to go to Sarah’s bedroom, Jason became angry,

and the ensuing argument between Molly and Jason eventually led to the deadly

affray in this matter.

 C. Defendants’ Trial

 On 18 December 2015, a grand jury indicted Molly and Tom for second-degree

murder and voluntary manslaughter. Defendants pleaded not guilty, and a joint trial

was set for 17 July 2017 in Davidson County Superior Court, the Honorable W. David

Lee, judge presiding.

 By the time of trial, Jack and Sarah were in the custody of Jason’s family in

Ireland, and thus, beyond the subpoena power of the trial court. Accordingly, prior to

trial, Defendants moved to admit the children’s hearsay statements from their

interviews conducted (1) by the Union County DSS social worker on 3 August 2015,

and (2) at the Dragonfly House on 6 August 2015, pursuant to N.C. Gen. Stat. § 8C-

1, Rule 803(4), the medical diagnosis or treatment exception, or in the alternative,

Rules 803(24) and 804(b)(5), the residual exceptions. Following a hearing on 8 and 9

 10
 STATE V. CORBETT & MARTENS

 Opinion of the Court

June 2017, the trial court decided to defer its ruling on Defendants’ motion until trial.

Ultimately, although the trial court found that both children were unavailable to

testify, it nonetheless denied Defendants’ motion to admit the children’s hearsay

statements following Tom’s testimony during Defendants’ case-in-chief.

 At trial, the State relied heavily upon forensic evidence, including photographs

of Jason’s body and the undeniably violent fight scene, as well as the testimony of

first responders and law enforcement officers who were present that night. The State

also presented significant medical evidence, including testimony from the medical

examiner and Jason’s medical records from Kernersville Primary Care, which

established that two weeks before his death, during a 16 July 2015 appointment,

Jason reported that he had been feeling dizzy and “more stressed and angry lately for

no reason.”

 When the State proffered an expert witness in bloodstain pattern analysis,

Defendants requested voir dire, challenging the reliability of the witness’s

conclusions regarding certain evidence that the State had not submitted to the North

Carolina State Crime Laboratory for blood or DNA testing. Following voir dire, the

trial court ruled that the testimony was sufficiently reliable under N.C. Gen. Stat. §

8C-1, Rule 702(a), and admitted the witness’s testimony over Defendants’ objections

at trial.

 11
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 At the charge conference, Defendants requested that the trial court remove all

aggressor language from the proposed pattern jury instructions, arguing that there

was no evidence “that anyone was the aggressor but Jason.” The State had “no

objection” to the trial court’s “declining to instruct on the aggressor issue as to” Molly,

but argued that there was “conflicting evidence” in Tom’s case, which could

reasonably be interpreted to support that he was the aggressor. Following detailed

arguments from the parties, the trial court ruled, as a matter of law, that Molly was

not an aggressor, and properly omitted all aggressor language from the proposed

pattern instructions in her case. As to Tom, however, the trial court ruled in the

State’s favor, and accordingly, instructed the jury on the aggressor doctrine in his

case.

 The State also requested that the trial court instruct the jury that it could find

Molly guilty under an acting-in-concert theory, if it found that she was present during

the incident and acted with Tom in pursuit of a common plan or purpose. The trial

court delivered the State’s requested instruction, over Defendants’ objections.

 On 9 August 2017, the jury returned verdicts finding Defendants guilty of

second-degree murder. That day, the trial court entered separate judgments

sentencing Defendants to 240-300 months each in the custody of the North Carolina

Division of Adult Correction. Defendants gave oral notice of appeal in open court.

 12
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 On 16 August 2017, Defendants filed a joint Motion for Appropriate Relief

asserting that they were entitled to an evidentiary hearing and ultimately, a new

trial, due to alleged juror misconduct. On 4 December 2017, the trial court entered

an order denying Defendants’ Motion for Appropriate Relief, which Defendants

timely appealed to this Court.

 II. Motion for Appropriate Relief

 We first address Defendants’ challenge to the trial court’s order denying their

Motion for Appropriate Relief. Defendants contend that the trial court erred by

failing to grant, or conduct an evidentiary hearing on, Defendants’ requests to set

aside the jury verdicts and judgments and grant them a new trial, “because

competent evidence demonstrates frequent juror misconduct prejudicial to the

defense and harmful to the judicial system.” We disagree.

 A. Standard of Review

 On appeal, we review a trial court’s order denying a motion for appropriate

relief “to determine whether the findings of fact are supported by evidence, whether

the findings of fact support the conclusions of law, and whether the conclusions of law

support the order entered by the trial court.” State v. Frogge, 359 N.C. 228, 240, 607

S.E.2d 627, 634 (2005) (quotation marks and citation omitted). “When a trial court’s

findings on a motion for appropriate relief are reviewed, these findings are binding if

they are supported by competent evidence and may be disturbed only upon a showing

 13
 STATE V. CORBETT & MARTENS

 Opinion of the Court

of manifest abuse of discretion.” State v. Wilkins, 131 N.C. App. 220, 223, 506 S.E.2d

274, 276 (1998) (citation omitted). “Abuse of discretion results where the court’s

ruling is manifestly unsupported by reason or is so arbitrary that it could not have

been the result of a reasoned decision.” State v. Elliott, 360 N.C. 400, 419, 628 S.E.2d

735, 748, cert. denied, 549 U.S. 1000, 166 L. Ed. 2d 378 (2006). “However, the trial

court’s conclusions are fully reviewable on appeal.” Wilkins, 131 N.C. App. at 223,

506 S.E.2d at 276.

 B. N.C. Gen. Stat. § 15A-1414

 “After the verdict but not more than 10 days after entry of judgment,” a

criminal defendant may “by motion . . . seek appropriate relief for any error

committed during or prior to the trial.” N.C. Gen. Stat. § 15A-1414(a) (2019). See

generally id. §§ 15A-1414, -1415 (setting forth the errors that may be asserted, as well

as the time limitations upon, a criminal defendant’s motion for appropriate relief

made in the trial division). However, once the 10-day, post-judgment period expires,

the only errors from which a defendant may seek appropriate relief in the trial court

are those specifically enumerated in N.C. Gen. Stat. § 15A-1415. Id. § 15A-1414(b);

see also id. § 15A-1415.

 Whether the trial court must conduct an evidentiary hearing before ruling on

a motion for appropriate relief depends upon a number of factors, including when the

motion was filed; the complexity of the issues presented, as well as the trial court’s

 14
 STATE V. CORBETT & MARTENS

 Opinion of the Court

familiarity with the underlying record; and whether the allegations involve questions

of law or fact. See id. § 15A-1420(c)(1)-(4). No evidentiary hearing is required “when

the motion is made in the trial court pursuant to [N.C. Gen. Stat. §] 15A-1414, but

the court may hold an evidentiary hearing if it is appropriate to resolve questions of

fact.” Id. § 15A-1420(c)(2).

 Accordingly, where the defendant moves the trial court for appropriate relief

within 10 days following entry of judgment, the decision of whether to hold “an

evidentiary hearing is . . . within the sound discretion of the trial court.” Elliott, 360

N.C. at 419, 628 S.E.2d at 748. “[I]f the trial court can determine from the motion

and any supporting or opposing information presented that the motion is without

merit, it may deny the motion without any hearing either on questions of fact or

questions of law, including constitutional questions.” Id. (original emphasis and

citations omitted). We review the trial court’s decision to deny “an evidentiary

hearing for abuse of discretion.” Id. (citation omitted).

 C. Defendants’ Motion for Appropriate Relief

 In the instant case, after the jury returned verdicts on 9 August 2017 finding

Defendants guilty of second-degree murder, the trial court proceeded to enter

separate judgments and sentences upon Defendants’ convictions. Defendants

entered oral notice of appeal in open court.

 15
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 Seven days later, on 16 August 2017, Defendants filed a Motion for Appropriate

Relief alleging juror misconduct and violations of their constitutional rights, and

requesting that the trial court “set an evidentiary hearing, set aside the jury’s

verdict[s] and grant [Defendants] a new trial.” In support of their motion, Defendants

submitted affidavits and exhibits, including (1) printouts from Facebook on 10 August

2017 showing various individuals discussing the details of Defendants’ trial, and a

few former jurors sharing their personal experiences and opinions about the case; and

(2) an 11 August 2017 report featuring coverage of Defendants’ case and trial in that

evening’s upcoming episode of ABC News “20/20.”

 In the State’s Response to Defendants’ Motion for Appropriate Relief, filed 21

August 2017, the State asserted that Defendants’ allegations of juror misconduct

were “speculative” and could not be proved by admissible evidence; accordingly, the

State requested that the trial court deny Defendants’ motion without conducting an

evidentiary hearing. On 25 August 2017, Defendants filed a Supplemental Motion

for Appropriate Relief and Reply to State’s Response, and submitted additional

supporting affidavits and exhibits including, inter alia, affidavits from two

individuals who attested to having witnessed pre-deliberation conversations between

jurors. The State filed a response to Defendants’ Supplemental Motion for

Appropriate Relief on 8 September 2017.

 16
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 Without conducting an evidentiary hearing, on 4 December 2017, the trial

court entered an order denying Defendants’ Motion for Appropriate Relief,

determining that

 there is neither evidence nor forecast with reasonable
 certainty of evidence that rises above the level of mere
 speculation or conjecture of either (1) any extraneous
 prejudicial information brought to a juror’s attention or (2)
 any outside influence that has violated either defendants’
 [sic] constitutional right of confrontation brought to bear
 on any juror.

 In their filings before the trial court, Defendants advanced numerous

arguments in support of their contention that “frequent juror misconduct prejudicial

to the defense and harmful to the judicial system” occurred in this case. However, we

need only address the three arguments raised in Defendants’ briefs with respect to

this issue.

 On appeal, Defendants contend that the trial court abused its discretion by

denying their Motion for Appropriate Relief, as well as their request for an

evidentiary hearing, because (1) competent evidence demonstrated that certain jurors

“committed gross and pervasive misconduct in their private discussions of the case”;

(2) jurors engaged in “private discussions” amongst themselves prior to deliberations,

thereby violating Defendants’ constitutional right to trial by a jury of twelve qualified

jurors; and (3) several jurors’ statements during post-trial media interviews evinced

 17
 STATE V. CORBETT & MARTENS

 Opinion of the Court

that they improperly considered and formed opinions about Molly’s mental health,

although that issue was not in evidence.

 After careful review, we agree with the State that the trial court did not abuse

its discretion by denying Defendants’ Motion for Appropriate Relief without

conducting an evidentiary hearing. Defendants’ allegations of juror misconduct are,

at best, general, speculative, and conclusory. Furthermore, we conclude that even if

the trial court were to hold an evidentiary hearing on Defendants’ § 15A-1414

motion—which it is not required to do, see N.C. Gen. Stat. § 15A-1420(c)(2)—

precedent prohibiting verdict impeachment would bar Defendants from presenting

any admissible evidence to prove the truth of their allegations.

 The proscription against impeachment of a jury verdict “is well settled in North

Carolina.” State v. Cherry, 298 N.C. 86, 100, 257 S.E.2d 551, 560 (1979), cert. denied,

446 U.S. 941, 64 L. Ed. 2d 796 (1980). “[A]fter a verdict has been rendered and

received by the court, and jurors have been discharged, jurors will not be allowed to

attack or overthrow their verdict, nor will evidence from them be received for such

purpose.” Id.

 The purpose of the “no-impeachment rule” is “to promote freedom of

deliberation, stability and finality of verdicts, and protection of jurors against

annoyance and embarrassment.” Cummings v. Ortega, 365 N.C. 262, 267, 716 S.E.2d

235, 239 (2011), cert. denied, 566 U.S. 993, 182 L. Ed. 2d 1029 (2012). This rule has

 18
 STATE V. CORBETT & MARTENS

 Opinion of the Court

been codified under N.C. Gen. Stat. § 8C-1, Rule 606(b), and N.C. Gen. Stat. § 15A-

1240(a). As our Supreme Court has observed, “Rule 606(b) reflects the common law

rule that affidavits of jurors are inadmissible for the purposes of impeaching the

verdict except as they pertain to extraneous influences that may have affected the

jury’s decision.” Cummings, 365 N.C. at 267, 716 S.E.2d at 239 (internal quotation

marks omitted). See also State v. Lyles, 94 N.C. App. 240, 246, 380 S.E.2d 390, 394

(1989) (“[T]he exceptions to the anti-impeachment rule listed in Section 15A-1240 are

designed to protect the same interests as, and are entirely consistent with, the

exceptions in Rule 606(b).”).

 Whether evidence may be utilized to impeach a verdict depends upon whether

jurors were subjected to “external” or “internal” influences. External influences,

“which generally are admissible to prove the invalidity of a verdict,” may “include

information dealing with the defendant or the case which is being tried, which

reaches a juror without being introduced in evidence.” Cummings, 365 N.C. at 269,

716 S.E.2d at 240 (internal quotation marks, ellipsis, and citation omitted). By

contrast, “internal influences” include “information coming from the jurors

themselves—the effect of anything upon a juror’s mind or emotions as influencing

him to assent to or dissent from the verdict or indictment or concerning his mental

processes in connection therewith.” Id. “Internal influences may include: a juror not

assenting to the verdict, a juror misunderstanding the instructions of the court, a

 19
 STATE V. CORBETT & MARTENS

 Opinion of the Court

juror being unduly influenced by the statements of his fellow-jurors, or a juror being

mistaken in his calculations or judgments.” Id. (internal quotation marks and

citations omitted).

 In the case at bar, it is evident that any notions developed by the jurors

regarding Molly’s mental health relate to “internal influences” of the jury. Therefore,

Rule 606(b) precludes Defendants from presenting juror testimony—or affidavits

regarding the internal influences of the jury—as a means to impeach the verdicts.

See Elliott, 360 N.C. at 420, 628 S.E.2d at 748 (concluding that the trial court did not

abuse its discretion in denying a hearing where the “defendant would have been

unable to present any evidence which would have strengthened the claims made in

the motion for appropriate relief”).

 Nor do Defendants offer any facts to support that their allegations regarding

the jurors’ statements concerning Molly’s mental health are based upon anything

beyond mere speculation or opinion. The interviews appearing on ABC News “20/20,”

in which three jurors made statements that Defendants allege pertained to Molly’s

mental health, were conducted after the verdicts had been rendered. Notably,

Defendants fail to identify, or even suggest, any source from which the jurors might

have improperly gleaned this information prior to rendering a decision at trial. Cf.

State v. Rollins, 224 N.C. App. 194, 201-02, 734 S.E.2d 634, 636-37 (2012) (holding

that the trial court did not abuse its discretion by failing to hold an evidentiary

 20
 STATE V. CORBETT & MARTENS

 Opinion of the Court

hearing on the defendant’s motion that “failed to specify: which news broadcast the

juror in question had seen besides a possible broadcast summary from the News 14

Carolina website; the degree of attention the juror . . . had paid to the broadcast; the

extent to which the juror . . . received or remembered the broadcast; whether the juror

. . . had shared the contents of the news broadcast with other jurors; and the

prejudicial effect, if any, of the alleged juror misconduct” (footnote omitted)), aff’d per

curiam, 367 N.C. 114, 748 S.E.2d 146 (2013).

 The no-impeachment rule similarly defeats Defendants’ arguments regarding

any “private discussions” that allegedly took place between jurors. Again, “Rule

606(b) of the North Carolina Rules of Evidence bars jurors from testifying during

consideration of post-verdict motions seeking relief from an order or judgment about

alleged predeliberation misconduct by their colleagues.” Cummings, 365 N.C. at 270,

716 S.E.2d at 240-41. The Cummings Court concluded that affidavits tending to show

that a juror made statements regarding his opinion about the case were inadmissible

under Rule 606(b) because such statements were internal influences: “Even if [a

juror] had made up his mind before [the] plaintiff introduced any evidence, this state

of mind is precisely the type of information that Rule 606(b) excludes. Consequently,

the affidavits of [two of the jurors] were inadmissible pursuant to Rule 606(b).” Id. at

271, 716 S.E.2d at 241.

 21
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 Here, the no-impeachment rule bars the admission of Defendants’ proffered

affidavits. Moreover, any evidence regarding pre-deliberation conversations would

also be inadmissible under Rule 606(b). See N.C. Gen. Stat. § 8C-1, Rule 606(b) (“Nor

may [a juror’s] affidavit or evidence of any statement by him concerning a matter

about which he would be precluded from testifying be received for these purposes.”).

 Moreover, the affidavit from the non-juror who attested to having witnessed

two jurors conversing in a car prior to the jury’s deliberations contains nothing more

than speculative allegations. See Elliott, 360 N.C. at 420, 628 S.E.2d at 748 (holding

that the trial court did not abuse its discretion in denying a request for an evidentiary

hearing where the “defendant failed to make an adequate threshold showing of juror

misconduct”). Indeed, as Defendants acknowledge in their brief, “the content of this

conversation is unknown.” By Defendants’ own admission, the only parties who could

offer evidence regarding the subject and scope of this conversation are the two jurors

who took part. But as previously explained, their statements would not be admissible

for that purpose. See N.C. Gen. Stat. § 8C-1, Rule 606(b); N.C. Gen. Stat. § 15A-

1240(a); cf. Rollins, 224 N.C. App. at 201, 734 S.E.2d at 636 (“Based on the record,

[the] defendant’s evidence was insufficient to show the existence of the asserted

ground for relief. There is insufficient evidence to determine whether juror

misconduct occurred as [the] defendant’s motion and [a fellow juror’s] affidavit merely

 22
 STATE V. CORBETT & MARTENS

 Opinion of the Court

contained general allegations and speculation.” (citations and internal quotation

marks omitted)).

 For the same reasons, Defendants’ argument that the alleged private

discussion between jurors violated their constitutional right to trial by 12 qualified

jurors must also fail. See Elliott, 360 N.C. at 418, 628 S.E.2d at 747 (“[T]he

documentary evidence [the] defendant submitted to support his motion for

appropriate relief was insufficient to show, by any standard, that juror misconduct

occurred in the form of private deliberations outside the presence of the other jurors.

While [the] defendant’s brief characterizes the prayer between the two jurors as

‘deliberations’ and ‘discussions about the case outside the presence of their ten fellow

jurors,’ there is nothing in the record that indicates a discussion or deliberation of

any kind occurred.”).

 Even assuming, arguendo, that the affidavits were admissible to prove

misconduct, Defendants nevertheless fail to indicate the effect—prejudicial or

otherwise—of the alleged misconduct upon the jury’s verdicts. See N.C. Gen. Stat. §

15A-1420(c)(6) (“Relief must be denied unless prejudice appears, in accordance with

[N.C. Gen. Stat. §] 15A-1443.”); see also Cummings, 365 N.C. at 271-73, 716 S.E.2d

at 241-42 (reversing this Court’s decision upholding the trial court’s grant of a new

trial due to jury misconduct, despite allegations from multiple jurors that pre-

deliberation statements by one juror “inhibited jurors from engaging in full

 23
 STATE V. CORBETT & MARTENS

 Opinion of the Court

deliberations” and “interfered with [another juror’s] thought process”); Elliott, 360

N.C. at 419, 628 S.E.2d at 748 (affirming the trial court’s denial of the defendant’s

“inadequately supported motion for appropriate relief” because the defendant “failed

to shed light on any prejudice to [the] defendant which arose from [the alleged juror]

discussions”).

 Absent the required showing of prejudice, we conclude that the trial court did

not err in denying Defendants’ Motion for Appropriate Relief without conducting an

evidentiary hearing.

 III. Motion to Dismiss

 Defendants next argue that the trial court erred by denying their motions to

dismiss for insufficient evidence the charges of second-degree murder and voluntary

manslaughter. Defendants contend that this case is analogous to State v. Carter, 254

N.C. 475, 119 S.E.2d 461 (1961), in which our Supreme Court held, inter alia, that

“[w]hen the State introduces in evidence exculpatory statements of the defendant

which are not contradicted or shown to be false by any other facts or circumstances

in evidence, the State is bound by these statements.” 254 N.C. at 479, 119 S.E.2d at

464. Accordingly, Defendants assert that the State failed to present substantial

evidence to rebut or contradict Molly’s exculpatory handwritten statement

establishing that Molly and Tom acted in lawful self-defense and defense of others,

which was introduced by the State and by which the State was bound. We disagree.

 24
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 “In ruling on a motion to dismiss, the trial court need determine only whether

there is substantial evidence of each essential element of the crime and that the

defendant is the perpetrator.” State v. Chekanow, 370 N.C. 488, 492, 809 S.E.2d 546,

549 (2018) (citation omitted). “Substantial evidence is that amount of relevant

evidence necessary to persuade a rational juror to accept a conclusion.” Id. The trial

court “must consider all evidence admitted, whether competent or incompetent, in

the light most favorable to the State, giving the State the benefit of every reasonable

inference and resolving any contradictions in its favor.” Id. at 492, 809 S.E.2d at 549-

50 (citation omitted). “Whether the State presented substantial evidence of each

essential element of the offense is a question of law; therefore, we review the denial

of a motion to dismiss de novo.” State v. Crockett, 368 N.C. 717, 720, 782 S.E.2d 878,

881 (2016).

 “Second-degree murder is defined as (1) the unlawful killing, (2) of another

human being, (3) with malice, but (4) without premeditation and deliberation.” State

v. Arrington, 371 N.C. 518, 523, 819 S.E.2d 329, 332 (2018) (quotation marks and

citation omitted). By contrast, voluntary manslaughter is defined as “the unlawful

killing of a human being without malice, express or implied, and without

premeditation and deliberation.” State v. Rinck, 303 N.C. 551, 565, 280 S.E.2d 912,

923 (1981). Malice sufficient to support a conviction of second-degree murder is either

actual, express malice, or acting in a manner “which is inherently dangerous to

 25
 STATE V. CORBETT & MARTENS

 Opinion of the Court

human life . . . [in that it is] so reckless[ ] and wanton[ ] as to manifest a mind utterly

without regard for human life and social duty and deliberately bent on mischief.”

State v. Reynolds, 307 N.C. 184, 191, 297 S.E.2d 532, 536 (1982). “[T]he burden of

showing an unlawful killing . . . rest[s] with the State.” Carter, 254 N.C. at 479, 119

S.E.2d at 464 (citation omitted).

 When a defendant raises a self-defense claim on a motion to dismiss, the State

must “present sufficient substantial evidence which, when taken in the light most

favorable to the State, is sufficient to convince a rational trier of fact that [the]

defendant did not act in self-defense.” State v. Kirby, 206 N.C. App. 446, 453, 697

S.E.2d 496, 501 (2010) (citation and quotation marks omitted). The four elements of

self-defense are:

 (1) it appeared to [the] defendant and he believed it to be
 necessary to kill the deceased in order to save himself from
 death or great bodily harm; and

 (2) [the] defendant’s belief was reasonable in that the
 circumstances as they appeared to him at that time were
 sufficient to create such a belief in the mind of a person of
 ordinary firmness; and

 (3) [the] defendant was not the aggressor in bringing on the
 affray, i.e., he did not aggressively and willingly enter into
 the fight without legal excuse or provocation; and

 (4) [the] defendant did not use excessive force, i.e.[,] did not
 use more force than was necessary or reasonably appeared
 to him to be necessary under the circumstances to protect
 himself from death or great bodily harm.

 26
 STATE V. CORBETT & MARTENS

 Opinion of the Court

State v. Presson, 229 N.C. App. 325, 328, 747 S.E.2d 651, 654-55 (citations omitted),

disc. review denied, 367 N.C. 274, 752 S.E.2d 150 (2013).

 Defendants rely heavily on State v. Carter to support their contention that the

trial court erred by denying their motion to dismiss the second-degree murder

charges. The salient facts in Carter came entirely from a county sheriff’s testimony.

At 9:00 p.m. on 7 July 1960, the defendant came to the home of the sheriff and said,

“I think I have killed my daddy.” Carter, 254 N.C. at 476, 119 S.E.2d at 462. Earlier

that night, when the defendant’s father came home from work, he noticed that a

screen door was damaged. He became angry and “jumped on [the defendant’s] 9 and

1/2-year-old brother . . . about it.” Id. The defendant’s mother and father began to

argue, which led to the defendant’s father beating her mother with a wine bottle. Id.

at 477, 119 S.E.2d at 462. When the defendant tried to intervene, the defendant’s

father “grabbed [the defendant’s] arm and started twisting it.” Id. After the

defendant’s father released her, he began beating her mother again. Id. at 477, 119

S.E.2d at 463. The defendant retrieved a bumper jack and hit her father on the head

with it numerous times until he went down, at which time the defendant left her

father on the ground and took her mother to the hospital. Id. The defendant’s father

died two days later. Id. at 478, 119 S.E.2d at 463.

 In Carter, “the State introduced statements of the accused to the effect that the

defendant was trying to stop the deceased from assaulting her mother with a broken

 27
 STATE V. CORBETT & MARTENS

 Opinion of the Court

bottle.” Id. at 479, 119 S.E.2d at 464. The State limited its evidence in this regard

to the accused’s statements, and there was “no evidence from which a jury could

reasonably find that either the defendant or her mother was at fault in starting the

altercation described in the record.” Id. Our Supreme Court explained that “[w]hile

the State by offering this evidence was not precluded from showing that the facts

were different, no such evidence was offered, and the State’s case was made to rest

entirely on the statements of the defendant, which the State presented as worthy of

belief.” Id. Thus, the Court concluded that “[t]his evidence plainly negatives the

existence of an unlawful killing,” and reversed the trial court’s denial of the

defendant’s motion for judgment of nonsuit. Id. at 479-80, 119 S.E.2d at 464.

 We conclude that Carter is not analogous to the case before us. This Court has

repeatedly distinguished self-defense cases from Carter where there is circumstantial

or physical evidence contradicting exculpatory evidence. See, e.g., State v. Stafford,

66 N.C. App. 440, 443, 311 S.E.2d 64, 66 (“While there was evidence tending to show

that [the] defendant acted in self-defense, there was also substantial circumstantial

evidence tending to show an intentional shooting done without legal excuse. The

credibility and sufficiency of [the] defendant’s evidence to establish his plea of self-

defense were for the jury to evaluate in the light of the court’s instructions.” (citation

and internal quotation marks omitted)), disc. review denied, 311 N.C. 406, 319 S.E.2d

279 (1984); State v. Lane, 3 N.C. App. 353, 355, 164 S.E.2d 618, 619 (1968) (“The

 28
 STATE V. CORBETT & MARTENS

 Opinion of the Court

evidence did not completely exculpate the defendant because accidental death was

not conclusively shown. There was some intimation of ill will or a quarrel between

the defendant and the deceased, and the defendant was holding the knife in such a

manner as to indicate an intentional use thereof.”).

 Likewise, the instant case was not entirely predicated on Molly’s statement

that she and Tom acted in self-defense and defense of each other. Here, the State

presented substantial circumstantial evidence from which a rational juror could

reach a contrary conclusion, including that: (1) Jason suffered at least twelve blows

to the head; (2) Tom had no visible injuries and Molly had only a “light redness” on

her neck; (3) Jason was unarmed when the altercation occurred; (4) the children

remained asleep throughout the entire altercation; (5) EMS, paramedics, and law

enforcement responders observed that some of the blood on Jason’s body had dried,

and that Jason’s body felt cool; (6) Tom told a coworker that he hated Jason; and (7)

Jason had a life insurance policy, of which Molly was the named beneficiary.

 Viewed in the light most favorable to the State, there was sufficient evidence

from which a rational juror could conclude that Defendants did not act in self-defense,

or defense of each other. Accordingly, the trial court did not err by denying

Defendants’ motions to dismiss the charges of second-degree murder and voluntary

manslaughter.

 IV. Evidentiary Errors

 29
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 A. Sarah and Jack’s Interview Statements

 We next consider Defendants’ arguments that the trial court erred by

excluding hearsay statements made by Sarah and Jack (1) during their child medical

evaluations at the Dragonfly House on 6 August 2015, and (2) during their 3 August

2015 interviews with a social worker employed by the Union County DSS.

 On 3 August 2015, the day after Jason’s death, both children were interviewed

by a Union County DSS social worker, after an urgent request from the Davidson

County Sheriff’s Office. Later that week, on 6 August 2015, Jack and Sarah visited

the Dragonfly House, a nationally accredited children’s advocacy center in

Mocksville, North Carolina. The children were referred to the Dragonfly House by

the Davidson County Sheriff’s Office, due to concerns of abuse in the home.

 Prior to trial, Defendants moved to admit hearsay statements made by the

children during their interviews (1) by Union County DSS on 3 August 2015; and (2)

at the Dragonfly House on 6 August 2015, pursuant to N.C. Gen. Stat. § 8C-1, Rule

803(4), or in the alternative, Rules 803(24) and 804(b)(5).1 Defendants further moved

the trial court “to declare the minor witnesses, Jack Corbett and Sarah Corbett,

unavailable for purposes of testifying at” trial, noting the defense’s inability “to

 1Defendants also moved to admit statements made by the children on 13 August 2015 during
interviews conducted by Union County DSS personnel, at the request of Davidson County DSS.
However, on appeal, Defendants do not argue that the exclusion of these statements was erroneous.
Accordingly, we do not consider the 13 August 2015 statements in our analysis. See N.C.R. App. P.
28(b)(6) (“Issues not presented in a party’s brief, or in support of which no reason or argument is stated,
will be taken as abandoned.”).

 30
 STATE V. CORBETT & MARTENS

 Opinion of the Court

procure the presence of” Jack and Sarah, who “are citizens and residents of the

country of Ireland which is outside the jurisdiction of the subpoena power of the state

of North Carolina.” The State sought to exclude all of the proffered statements.

Following an extensive hearing with numerous witnesses on 8 and 9 June 2017, the

trial court decided to “defer an absolute ruling” on Defendants’ hearsay motion until

trial.

 The trial court delivered its ruling on Friday, 4 August 2017, shortly after Tom

testified during Defendants’ case-in-chief. The court properly found “that both Jack

Corbett and Sarah Corbett are unavailable for purposes of this proffer of evidence. . .

. [T]hey are beyond the jurisdiction and process of th[e] Court[,]” in that they “have

been and remain in Ireland.” The trial court concluded, however, that none of the

proffered statements were admissible under either (1) the medical diagnosis or

treatment exception, Rule 803(4), or (2) the residual exception, pursuant to Rule

803(24). The trial court subsequently entered a written order memorializing its

ruling.

 1. Medical Diagnosis or Treatment Exception

 Defendants first contend that the trial court erroneously concluded that the

children’s statements were not admissible under Rule 803(4). We agree.

 Rule 803 provides, in pertinent part:

 The following are not excluded by the hearsay rule, even
 though the declarant is available as a witness:

 31
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 ....

 (4) Statements for Purposes of Medical Diagnosis or
 Treatment. – Statements made for purposes of medical
 diagnosis or treatment and describing medical history, or
 past or present symptoms, pain, or sensations, or the
 inception or general character of the cause or external
 source thereof insofar as reasonably pertinent to diagnosis
 or treatment.

N.C. Gen. Stat. § 8C-1, Rule 803(4).

 The medical diagnosis or treatment exception to the hearsay rule is based upon

the common-law rationale “that a patient has a strong motivation to be truthful in

order to obtain appropriate medical treatment.” State v. Hinnant, 351 N.C. 277, 287,

523 S.E.2d 663, 669 (2000). For this reason, statements admitted under Rule 803(4)

are considered “inherently trustworthy and reliable[.]” Id. at 284, 523 S.E.2d at 668.

 In Hinnant, our Supreme Court established a two-part test for admissibility

under Rule 803(4):

 First, the trial court must determine that the declarant
 intended to make the statements at issue in order to obtain
 medical diagnosis or treatment. The trial court may
 consider all objective circumstances of record in
 determining whether the declarant possessed the requisite
 intent. Second, the trial court must determine that the
 declarant’s statements were reasonably pertinent to
 medical diagnosis or treatment.

Id. at 289, 523 S.E.2d at 670-71. A trial court’s determination of the admissibility of

hearsay statements pursuant to Rule 803(4) is reviewed de novo on appeal. State v.

 32
 STATE V. CORBETT & MARTENS

 Opinion of the Court

Norman, 196 N.C. App. 779, 783, 675 S.E.2d 395, 399, disc. review denied, 363 N.C.

587, 683 S.E.2d 382 (2009).

 In order to satisfy the first prong of the Hinnant test—the intent inquiry—the

proponent of Rule 803(4) evidence must “demonstrat[e] that the declarant made the

statements understanding that they would lead to medical diagnosis or treatment.”

Hinnant, 351 N.C. at 287, 523 S.E.2d at 669. As our courts have repeatedly

recognized, however, it is not always easy to ascertain “whether a declarant

understood the purpose of his or her statements[,]” id., particularly in cases involving

child-declarants. See, e.g., id.; State v. Blankenship, __ N.C. App. __, __, 814 S.E.2d

901, 915-16 (2018), disc. review denied, 372 N.C. 295, 827 S.E.2d 98 (2019); State v.

Isenberg, 148 N.C. App. 29, 36-37, 557 S.E.2d 568, 573 (2001), appeal dismissed and

disc. review denied, 355 N.C. 288, 561 S.E.2d 268 (2002).

 The trial court may consider a number of factors in determining whether a

child’s statements were motivated by the necessary intent, including “whether an

adult explained to the child the need for treatment and the importan[ce] of

truthfulness; with whom and under what circumstances the declarant was speaking;

the setting of the interview; and the nature of the questions.” Blankenship, __ N.C.

App. at __, 814 S.E.2d at 916 (citation omitted). But again, “the trial court should

consider all objective circumstances of record surrounding [the] declarant’s

 33
 STATE V. CORBETT & MARTENS

 Opinion of the Court

statements in determining whether he or she possessed the requisite intent under

Rule 803(4).” Hinnant, 351 N.C. at 288, 523 S.E.2d at 670 (emphasis added).

 “The second inquiry under Rule 803(4) is whether the statements of the

declarant are reasonably pertinent to diagnosis or treatment.” Id. (citations omitted).

Here, it is important to note that a “statement need not have been made to a

physician” in order to satisfy Rule 803(4)’s requirements for admission. N.C. Gen.

Stat. § 8C-1, Rule 803(4) cmt. Indeed, our Supreme Court has recognized that the

exception could “include ‘statements to hospital attendants, ambulance drivers, or

even members of the family.’ ” Hinnant, 351 N.C. at 288, 523 S.E.2d at 670 (quoting

State v. Smith, 315 N.C. 76, 84, 337 S.E.2d 833, 839 (1985) (quoting N.C. Gen. Stat.

§ 8C-1, Rule 803(4) cmt.)).

 The common-law rationale underlying the medical diagnosis or treatment

exception is “equally relevant during the second inquiry under Rule 803(4). If the

declarant’s statements are not pertinent to medical diagnosis, the declarant has no

treatment-based motivation to be truthful.” Id. at 289, 523 S.E.2d at 670. The Court

in Hinnant thus determined that although statements to nonphysicians made before

the declarant obtains treatment might be covered by the exception, “Rule 803(4) does

not include statements to nonphysicians made after the declarant has already

received initial medical treatment and diagnosis.” Id. Nor does the Rule apply where

the declarant “was interviewed solely for purposes of trial preparation.” Id. (emphasis

 34
 STATE V. CORBETT & MARTENS

 Opinion of the Court

added) (citations omitted). But cf. Isenberg, 148 N.C. App. at 38-39, 557 S.E.2d at 574

(concluding that statements were properly admitted under Rule 803(4) where the

trial court found from the evidence that “the purpose of the examination was ‘dual,

in that it was both for the purpose of medical intervention and for the purpose of

future prosecution,’ which meets the first prong of the [Hinnant] test”).

 In the instant case, the trial court concluded that the children’s interview

statements were inadmissible under Rule 803(4) because:

 3. None of the proffered statements of Jack Corbett and
 Sarah Corbett satisfy the first prong of the Hinnant
 analysis as they were not intended to obtain a medical
 diagnosis or treatment.

 4. Likewise, none of the proffered statements of Jack
 Corbett and Sarah Corbett satisfy the second prong of the
 Hinnant analysis as they were not pertinent to any medical
 diagnosis or treatment.

 Following similar reasoning, our dissenting colleague concludes that the

children’s statements fail the first prong of the Hinnant test because (1) the forensic

medical interviews were conducted in a child-friendly environment, separate and

distinct from the physical examinations that the children received at the Dragonfly

House; and (2) the objective circumstances of record do not indicate that the children

understood that the purpose of the interviews was to obtain medical diagnosis or

treatment. We disagree.

 35
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 Here, the child-friendly setting in which the interviews were conducted favors

admission, rather than exclusion, of Jack’s and Sarah’s statements. Brandi Reagan,

Executive Director of the Dragonfly House, testified at the pretrial hearing on

Defendants’ motion to admit the children’s statements. Reagan explained that the

Dragonfly House is an independent, nationally accredited, non-profit children’s

advocacy center “that provides all-inclusive services to children who have either

disclosed abuse or are suspected of experiencing abuse, which is physical abuse,

sexual abuse, neglect or witnessed violence.” The Dragonfly House provides myriad

services, including a “child medical evaluation,” which Reagan explained is “a type of

exam that is very detailed and thorough that is set forth from the [State] Department

of Social Services . . . us[ing] a program . . . that was established by UNC Chapel

Hill.” The purpose of a child medical evaluation is to determine the child’s needs, and

to diagnose and treat the child accordingly.

 A child medical evaluation at the Dragonfly House begins with a meeting of

the child, his or her caregivers, and Heydy Day, child advocate for the Dragonfly

House. Day conducts intake paperwork, answers questions, and informs the parties

what to expect during all stages of the appointment. Reagan testified that “[a]fter

[Day] explains that to the caregiver, she does explain that to the child at their level

so if it’s a younger child, she will explain it in a different way than she would a

teenager. She makes sure that they understand and they know what to expect.”

 36
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 Day described how she typically explains the child medical evaluation process

to the parties during intake:

 I start off talking to the child and the caregiver saying, “you
 will be talking with one of my friends today,” whether
 that’s our interviewer Kim or interviewer Brandi, you will
 be talking to that lady.

 Her job is just to talk with you. That’s all she will
 do. But while she is talking with you there are cameras set
 up in the room. I typically point out the camera to them in
 the lobby. We have security cameras just for security
 purposes in the lobby. Outside I will say, “Can you find the
 camera in this room?” They will point to it. I say, “Miss
 Kim and Miss Brandi have cameras just like that in that
 room. The cameras in that room are to record what you
 and her talk about because this is really important. This
 way I don’t have to talk to all of these different people that
 you don’t know.” I usually ask them, “Do you have any
 questions? Are you okay with that?” And I will answer
 their questions. After that I say, “While you are talking
 with Miss Brandi or Miss Kim your caregiver will be
 talking with our doctor. Our doctor will be asking
 questions about your health throughout your whole life.”

 I typically give kids examples of those questions
 such as, have you ever been in the hospital, have you ever
 had surgeries, broken bones, allergies, take medicine
 regularly, just to give the child an idea what the doctor is
 going to be talking to their caregiver about. I say, “Once
 you finish talking with Miss Kim or Miss Brandi and the
 doctor finishes talking with the caregiver, then the doctor
 will call you back to do a head to toe check-up of you.” I
 say, “there is a nurse, . . . she’s going to help you pick out a
 T-shirt and a blanket for the medical exam.”

 ....

 “Once you come out of the bathroom, the nurse and

 37
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 doctor will ask you how much you weigh, how tall you are.”
 I usually say, “The thing that gives you a hug for your blood
 pressure, your vision, your hearing, your height, your head
 check, back, bottom, private area, legs and feet.” I do a
 head to toe of myself to give them an overview of what is to
 be expecting [sic]. I say, “Is that okay with you?” I get a
 variety of responses on that from different children. I say,
 “Do you have any questions for me about that?” I answer
 the questions if they have any. Then I say, “Okay I will go
 ahead and let everybody know I have spoken with you and
 then Miss Kim or Miss Brandi will come and get you.”
 Then I will defer them.

 The Dragonfly House is “set into an old home.” Forensic medical interviews2

and physical examinations are conducted in separate bedrooms across the hall from

one another. The interview room is “intentionally designed and laid out to be . . .

‘child friendly’ ”: there is an easel “in case the child needs to draw,” along with

anatomically correct dolls, Play-Doh, and tissues, among other items.

 Nonetheless, the room’s child-friendly design does not negate its clinical

purpose. Reagan testified that the room’s two “chairs are positioned so that they can

be seen from two cameras on the wall; one is – you can see everything in the room

from both cameras; one is primarily focused on one chair. The other is focused on the

other chair.” Members of the child’s “multi-disciplinary team”3 may view the forensic

 2 According to Reagan, a “forensic interview” is “an interview done by someone who is trained
to talk to children in a non-leading manner in a format that is approved on a national level while being
recorded.”
 3 Davidson County Sheriff’s Detective Mark Hanna explained, “We have what’s called an MDT,

multi-disciplinary team, which involves law enforcement, DSS and the Dragonfly House. Each of those
entities work together to figure out what’s going on in the child’s life, how to properly treat the child,
and get services for the child.”

 38
 STATE V. CORBETT & MARTENS

 Opinion of the Court

medical interview in an adjacent “observation room,” via a one-way, live audio-visual

feed.

 In the instant case, the child-friendly atmosphere and the separation of the

examination rooms do not indicate that the children’s statements during the

interviews were not intended for medical purposes. The children were informed

before their interviews that they would be receiving medical interviews together with

physical examinations as part of their full evaluations at the Dragonfly House. See

Hinnant, 351 N.C. at 289, 523 S.E.2d at 670 (“Rule 803(4) does not include statements

to nonphysicians made after the declarant has already received initial medical

treatment and diagnosis.”).

 Day testified that during intake, she informed Jack and Sarah that they

“[we]re going to be interviewed and . . . have a medical exam.” Day did not recall

either child asking any questions during intake; in her view, the children “seem[ed]

to understand” both components of the child medical evaluation. Contra State v.

Bates, 140 N.C. App. 743, 746-47, 538 S.E.2d 597, 600 (2000) (concluding that the

record failed to demonstrate that the child possessed the requisite intent under Rule

803(4) where the child “did not know why she was there” and the psychologist “never

made it clear that the child needed treatment”; neither the psychologist nor the “

‘child-friendly’ room” in which the interview was conducted “emphasize[d] the need

for honesty”; and “the child’s statements lack[ed] inherent reliability because of the

 39
 STATE V. CORBETT & MARTENS

 Opinion of the Court

nature of [the psychologist’s] leading questions”), disc. review denied, 353 N.C. 383,

547 S.E.2d 20 (2001).

 Moreover, Reagan testified that the Dragonfly House is child-friendly by

design: the intention is to ease any anxiety that the child may be experiencing upon

arrival, and to encourage open and frank discussions. Day testified that in her

experience, “the lobby is the most comfortable place” for families to conduct intake

procedures, likely due to the child-friendly décor and the presence of many toys,

children’s books, and puzzles. Children come to the Dragonfly House because they

are either confirmed or suspected victims of some type of abuse or other trauma; they

are more likely to be truthful with an unknown interviewer if they are at ease and

feel safe and comfortable with their surroundings. Cf. State v. McLaughlin, 246 N.C.

App. 306, 321, 786 S.E.2d 269, 281 (rejecting the defendant’s contention that some of

the nurse’s interview questions, “such as the importance of telling the truth, were not

pertinent to medical diagnosis or treatment[,]” because “these questions were crucial

to establishing a rapport with the victim and impressing upon him the need to be

open and honest about very personal and likely embarrassing details pertinent to his

well-being”), appeal dismissed and disc. review denied, 368 N.C. 919, 787 S.E.2d 29

(2016).

 Both the dissent and the trial court focus heavily on the children’s responses

to one of Reagan’s initial inquiries: “Tell me why you’re here.” Sarah replied,

 40
 STATE V. CORBETT & MARTENS

 Opinion of the Court

“Because my dad died.” Jack responded, “[M]y dad died, and people are trying—my

aunt and uncle from my dad’s side are trying to take away—take me away from my

mom.” The trial court gleaned from these responses that “[t]he children understood

the impetus of these interviews was to affect future legal custody determinations and

not to obtain medical evaluation or treatment.” The dissent concludes that

Defendants fail “to affirmatively establish that Sarah or Jack had the requisite intent

to make statements” for medical diagnosis or treatment purposes during their

forensic interviews. Dissent at 21. Both analyses under Rule 803(4) miss the point.

 Under the first prong of the Hinnant test, the focus is not whether the children

independently sought out medical treatment, nor even whether their statements

evince that they might do so if they were able. Instead, the focus must be on whether

all of the objective circumstances of record demonstrate that the children understood

the overall medical purpose and significance of their interviews at the Dragonfly

House, and were accordingly motivated to be truthful. See State v. Lewis, 172 N.C.

App. 97, 104, 616 S.E.2d 1, 5 (2005) (concluding that the first part of the Hinnant

inquiry was satisfied where “the children were old enough to understand the

interviews had a medical purpose, and they indicated as such[,]” and “the

circumstances surrounding the interviews created an atmosphere of medical

significance”—even though “the interviews took place in a ‘child-friendly’ room, not a

 41
 STATE V. CORBETT & MARTENS

 Opinion of the Court

medical examination room”—because they were conducted “at a medical center, with

a registered nurse, immediately prior to a physical examination”).

 Here, the objective circumstances of record support the conclusion that the

children had the requisite intent under Rule 803(4). Reagan asked non-leading, open-

ended questions, and she instructed the children that they should not “guess at

anything.” Both Day and Reagan emphasized the overall significance of the child

medical evaluations that Jack and Sarah would be receiving at the Dragonfly House.

Day testified that during intake, she points to the security cameras in the lobby and

tells children that there will be similar cameras in the interview room “to record what

you and [Miss Kim or Miss Brandi] talk about because this is really important.”

(Emphasis added).

 Reagan testified that before she begins interviewing a child, she explains her

“rules” for the interview. Reagan first establishes that the child knows the difference

between the truth and a lie. Reagan also instructs the child to correct her if she

makes a mistake, and explains that if she asks a question that the child cannot

answer, “it’s okay to say you don’t know.”

 Jack and Sarah were of sufficient age and maturity to understand the medical

significance of the overall evaluations. See id. (“[T]he children were old enough to

understand the interviews had a medical purpose, and they indicated as such.”).

Furthermore, it is evident from the children’s conduct and responses—both during

 42
 STATE V. CORBETT & MARTENS

 Opinion of the Court

Reagan’s statement of the “rules” and throughout their interviews—that they

understood the importance of honesty. Sarah self-corrected when she misspoke;

when her answer was unclear, Reagan gently redirected Sarah to the previous topic

until she provided a clear answer. Moreover, not only did Reagan convey the

importance of honesty, when asked whether anyone had told them what to say during

their interviews prior to their arrival at the Dragonfly House, both children

affirmatively stated that they had only been instructed to “tell the truth.”

 Jack was initially reluctant to speak about his father’s death during his

interview with Reagan. Who could blame him? It would be a rare ten-year-old boy

indeed who relished the opportunity to speak openly with a complete stranger about

what must be deeply painful, complicated feelings regarding the violent, tragic death

of his father—and in Jack’s case, his last remaining biological parent—mere hours

after attending his funeral. But this is precisely why Jack required the Dragonfly

House’s services, and why he and Sarah were referred for examinations: they were

present during an extremely traumatic event involving the death of their father, and

they may have been witnesses to, or victims of, domestic abuse. See McLaughlin, 246

N.C. App. at 321, 786 S.E.2d at 281 (“[H]aving the victim relate the details from

beginning to end helped the medical practitioners to evaluate the extent of the mental

and physical trauma to which the victim was exposed, inquire as to whether the

 43
 STATE V. CORBETT & MARTENS

 Opinion of the Court

victim was out of danger, and discover whether other abusers or victims may have

been involved.”).

 There is no requirement under the Rule or the Hinnant test that children

independently seek medical treatment, nor even request it. Children do not have the

ability to seek medical assistance without the resources, financial or otherwise, of

their parents or caregivers. See Smith, 315 N.C. at 84, 337 S.E.2d at 840 (“[Y]oung

children cannot independently seek out medical attention, but must rely on their

caretakers to do so.”). Nor do they have the emotional acumen or the language

necessary to effectively seek help when the medical need involves mental health.

Indeed, this is an area with which many adults struggle. In asking children who lack

sufficient knowledge even to verbalize the trauma that they have experienced to

independently seek medical assistance, the trial court demands too much.

 Our courts have a strong precedent of allowing this type of evidence in cases

involving children. Most often it is the State seeking its admission. See, e.g.,

McLaughlin, 246 N.C. App. at 321, 786 S.E.2d at 281; State v. Burgess, 181 N.C. App.

27, 34-35, 639 S.E.2d 68, 74 (2007), cert. denied, 365 N.C. 337, 717 S.E.2d 384 (2011);

Lewis, 172 N.C. App. at 105, 616 S.E.2d at 6; State v. Thornton, 158 N.C. App. 645,

649-51, 582 S.E.2d 308, 310 (2003); Isenberg, 148 N.C. App. at 36, 557 S.E.2d at 573.

 The Dragonfly House is just one of many similar team-oriented children’s

advocacy centers statewide. Excluding the evidence in this case runs counter to

 44
 STATE V. CORBETT & MARTENS

 Opinion of the Court

existing precedent and muddies the law moving forward. Cf. McLaughlin, 246 N.C.

App. at 322 n.5, 786 S.E.2d at 282 n.5 (“We do not posit that the [children’s advocacy

center] interview is a substitute for in-court testimony, but, where, as here, the

declarant is unavailable, his video recorded medical interview is sufficiently reliable

to be admissible. Therefore, the jury is able to assess the testimony, to observe the

demeanor of the declarant, to determine the credibility and trustworthiness of his

statements, and thereby perform their function as a jury.”).

 Having determined that the children possessed the requisite intent under Rule

803(4), we proceed to the second inquiry of the Hinnant test. We conclude that the

children’s statements were reasonably pertinent to medical treatment or diagnosis,

and therefore, should have been admitted pursuant to Rule 803(4).

 Following their forensic medical interviews, Sarah and Jack received physical

examinations by Dr. Amy Suttle, the pediatrician for the Dragonfly House. Based

upon the results of the examinations, Dr. Suttle diagnosed both children as “victim[s]

of child abuse based on exposure to domestic violence” and recommended that they

“receive mental health services” as treatment. The children attended one therapy

session in North Carolina on 10 August 2015, following a referral by the Dragonfly

House personnel, and they began attending counseling for grief and trauma in early

September 2015, after they were taken to Ireland.

 45
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 As Defendants argued at the pretrial hearing on the admissibility of these

statements, Jack and Sarah were referred to the professionals at Dragonfly House in

order to obtain examinations “primarily for their health, safety, and welfare.” The

medical interviews and the physical examinations were conducted for the same

purpose and as part of the same overall child medical evaluation. Both parts were

used to inform the ultimate conclusion in each child’s medical evaluation, and

conducting one part without the other would render the evaluation incomplete.

 The children’s statements evince the requisite intent under Rule 803(4), and

the statements clearly pertain to medical treatment or diagnosis. Thus, the trial

court erred in excluding these statements.

 2. Residual Exception

 Even if the children’s Dragonfly House forensic medical interview statements

were inadmissible under the medical diagnosis or treatment exception to the rule

against hearsay, these statements are admissible under the residual exception.

 The residual exception to the rule against the admission of hearsay is codified

by N.C. Gen. Stat. § 8C-1, Rules 803(24) and 804(b)(5). Rules 803(24) and 804(b)(5)

are “substantively nearly identical”: “Rule 804(b)(5) is a verbatim copy of Rule

803(24), except that Rule 804(b)(5) also requires that the declarant be unavailable

before the hearsay may be admitted and Rule 803(24) does not.” State v. Triplett, 316

N.C. 1, 7, 340 S.E.2d 736, 740 (1986). For purposes of Rule 804, a declarant is

 46
 STATE V. CORBETT & MARTENS

 Opinion of the Court

“unavailab[le] as a witness” if, inter alia, he “[i]s absent from the hearing and the

proponent of his statement has been unable to procure his attendance . . . by process

or other reasonable means.” N.C. Gen. Stat. § 8C-1, Rule 804(a)(5).

 As set forth under either Rule, the residual exception permits admission of

 [a] statement not specifically covered by any of the
 foregoing exceptions but having equivalent circumstantial
 guarantees of trustworthiness, if the court determines that
 (A) the statement is offered as evidence of a material fact;
 (B) the statement is more probative on the point for which
 it is offered than any other evidence which the proponent
 can procure through reasonable efforts; and (C) the general
 purposes of these rules and the interests of justice will best
 be served by admission of the statement into evidence.
 However, a statement may not be admitted under this
 exception unless the proponent of it gives written notice
 stating his intention to offer the statement and the
 particulars of it, including the name and address of the
 declarant, to the adverse party sufficiently in advance of
 offering the statement to provide the adverse party with a
 fair opportunity to prepare to meet the statement.

N.C. Gen. Stat. § 8C-1, Rules 803(24), 804(b)(5).

 In order for hearsay statements to be admissible under Rule 803(24) or Rule

804(b)(5), the trial court must determine:

 (1) whether proper notice has been given, (2) whether the
 hearsay is not specifically covered elsewhere, (3) whether
 the statement is trustworthy, (4) whether the statement is
 material, (5) whether the statement is more probative on
 the issue than any other evidence which the proponent can
 procure through reasonable efforts, and (6) whether the
 interests of justice will be best served by admission.

State v. Valentine, 357 N.C. 512, 518, 591 S.E.2d 846, 852 (2003).

 47
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 We review a trial court’s ruling on the admissibility of hearsay statements

under the residual exception for abuse of discretion. State v. Sargeant, 365 N.C. 58,

62-63, 707 S.E.2d 192, 195 (2011); Smith, 315 N.C. at 97, 337 S.E.2d at 847. The trial

court must “make adequate findings of fact and conclusions of law sufficient to allow

a reviewing court to determine whether the trial court abused its discretion in making

its ruling.” Sargeant, 365 N.C. at 65, 707 S.E.2d at 196 (citing Smith, 315 N.C. at 97,

337 S.E.2d at 847). “If the trial court either fails to make findings or makes erroneous

findings, we review the record in its entirety to determine whether th[e] record

supports the trial court’s conclusion concerning the admissibility of a statement

under a residual hearsay exception.” Id. “If we conclude that the trial court erred in

excluding [Jack’s and Sarah’s] hearsay statement[s], we consider whether

[D]efendant[s] w[ere] prejudiced.” Id. at 65, 707 S.E.2d at 197.

 Defendants contend that the trial court committed prejudicial error by

concluding that the following evidence was inadmissible under the residual

exception: (1) the children’s statements during their interviews with the Union

County DSS social worker on 3 August 2015; and (2) Jack’s and Sarah’s statements

during their child medical evaluations at the Dragonfly House on 6 August 2015.4

We agree.

 4Contrary to their arguments at trial, Defendants do not contend on appeal that the 3 August
2015 Union County DSS interview statements were admissible under the medical diagnosis or
treatment exception; consequently, we limit our consideration of the admissibility of those statements

 48
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 In its written order, the trial court determined, in relevant part:

 1. The declarant minor children, Jack Corbett and Sarah
 Corbett, are unavailable for purposes of N.C.G.S. 8C-1,
 Rule 803.

 ....

 6. Admissibility of hearsay statements offered pursuant to
 the residual exception, N.C.G.S. 8C-1, Rule 803(24) is
 governed by the six-prong test set out by our Supreme
 Court in State v. Smith, 315 N.C. 76 (1990).

 7. This court must first consider whether proper notice has
 been given. The defendant provided written notice to the
 State more than 60 days in advance of trial. This notice
 was proper and timely.

 8. This court next considers whether each proffered
 statement is specifically covered under one of the other
 hearsay exceptions. The defendants’ only contention of
 another applicable exception is the medical treatment or
 diagnosis exception, Rule 803(4). The court has
 determined the statements are not admissible pursuant to
 that exception. The court has reviewed all other exceptions
 set out in the Rule and finds that none are applicable.

 9. This court must next consider whether the proffered
 statements are trustworthy. “[A] hearsay statement . . .
 may be admissible under the residual exception if it
 possesses ‘circumstantial guarantees of trustworthiness’
 equivalent to those required for admission under the
 enumerated exceptions.” Smith, at 93.

to the residual exception, in accordance with N.C.R. App. P. 28(b)(6). Furthermore, as explained in
Section IV(A)(1) above, the children’s Dragonfly House statements should have been admitted under
the medical diagnosis or treatment exception. But even assuming, arguendo, that Sarah’s and Jack’s
statements from the child medical evaluations conducted at the Dragonfly House on 6 August 2015
were inadmissible under Rule 803(4), for the reasons set forth herein, the trial court nevertheless erred
by excluding the statements under the residual exception.

 49
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 ....

 14. The proffered statements do not have circumstantial
 guarantees of trustworthiness. Further, this court having
 concluded the statements are not trustworthy, the court
 need not continue to the additional prongs of the Smith
 analysis.

(Alteration in original).

 The third inquiry of the trial court’s analysis, which asks whether the proffered

statement possesses “circumstantial guarantees of trustworthiness” akin to those

required for admission under other exceptions, “has been called ‘the most significant

requirement’ of admissibility” under the residual exception to the rule against the

admission of hearsay. Smith, 315 N.C. at 93, 337 S.E.2d at 844-45. In evaluating

the “circumstantial guarantees of trustworthiness” of a statement pursuant to Rules

803(24) and 804(b)(5), the trial court must consider “(1) assurances of the declarant’s

personal knowledge of the underlying events, (2) the declarant’s motivation to speak

the truth or otherwise, (3) whether the declarant has ever recanted the statement,

and (4) the practical availability of the declarant at trial for meaningful cross-

examination.” Triplett, 316 N.C. at 10-11, 340 S.E.2d at 742. “Also pertinent to this

inquiry are factors such as the nature and character of the statement and the

relationship of the parties.” Id. at 11, 340 S.E.2d at 742.

 Here, the trial court concluded that the proffered statements lack

circumstantial guarantees of trustworthiness because:

 50
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 11. The court is not assured of the personal knowledge of
 the declarants as to the underlying events described in that
 both children identified the source of their knowledge being
 nothing more than statements of a defendant and that
 defendant’s mother. The declarations contain no reference
 to seeing, hearing or perceiving anything about the events
 described except these statements of others.

 12. The court is not assured of the children’s motivation to
 speak the truth, but instead finds the children were
 motivated, in the near immediate aftermath of the death of
 their father, to preserve a custody environment with the
 only mother-figure they could remember having known
 during their lives. The children appear to have known that
 if they were not in the custody of defendant Molly Corbett
 they would be taken to live in the Republic of Ireland with
 relatives of their father.

 13. The proffered statements were specifically recanted
 and disavowed.

 Defendants challenge the following findings of fact underlying the above

conclusions: (1) findings #15 and #20, which pertain to the children’s personal

knowledge; (2) finding #21, that the statements “were not made at a time when the

children were motivated to speak the truth but were rather motivated to affect future

custody arrangements”; and (3) finding #22, that the statements regarding Molly and

Jason’s relationship “have been specifically recanted” by the children in diary entries

and a Skype interview between Jack and a member of the district attorney’s office.

We consider each of Defendants’ arguments in turn.

 Findings of fact #15 and #20 provide:

 15. The children’s statements did not describe actual

 51
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 knowledge of the events surrounding the homicide of Jason
 Corbett. Jack identified the source of the information in
 his statements by saying “my mom told me” and “she
 (defendant Molly Corbett) told us.” Sarah similarly
 described the source of her knowledge, saying the [sic] her
 grandmother “told [me] first and then her mother [told
 me].” When speaking of her “grandmother,” Sarah was
 referring to the mother of defendant Molly Corbett and the
 wife of defendant Thomas Martens.

 ....

 20. The statements of the children which the defense
 proffers were not made out of the personal knowledge of
 the declarant children but are instead double hearsay
 declarations of the defendant Molly Corbett and her
 mother.

(Alterations in original).

 Insofar as the trial court limited its consideration of the children’s statements

during their interviews with Union County DSS and Dragonfly House personnel on

3 and 6 August 2015, respectively, to “the events surrounding the homicide of Jason

Corbett” alone, findings of fact #15 and #20 are erroneous. See Sargeant, 365 N.C. at

65, 707 S.E.2d at 196 (“If the trial court either fails to make findings or makes

erroneous findings, we review the record in its entirety to determine whether th[e]

record supports the trial court’s conclusion concerning the admissibility of a

statement under a residual hearsay exception.” (emphasis added)).

 As explained in Section IV(A)(1) above, the Davidson County Sheriff’s Office

referred the children to the Dragonfly House, due to concerns that they may have

 52
 STATE V. CORBETT & MARTENS

 Opinion of the Court

witnessed or experienced domestic abuse. Similarly, Union County DSS personnel

interviewed the children at the request of Davidson County DSS, to which this matter

had been referred by the Davidson County Sheriff’s Office, following allegations of

domestic violence and substance abuse in the home. On 3 August 2015, Davidson

County DSS faxed a letter to Union County DSS, stating, inter alia:

 To Whom This May Concern:

 Our agency received and accepted a [Child Protective
 Services] referral in reference to [Jack and Sarah Corbett]
 on 08/02/2015 with a 72 hours [sic] response time, however
 due to the nature of this report and the concerns that Molly
 Corbett, step-mother, may leave to Tennessee with the
 children we asked that you assist us in initiating this case
 TODAY (08/03/2015). Please interview each children [sic]
 privately to address the [Child Protective Services]
 concerns as well as questions surround [sic] SEEMAPS.
 Please interview the mother and her parents, Mr. and Mrs.
 Martens, regarding the incident that was alleged in the
 [Child Protective Services] referral.

 Due to the death of the children’s father, our Sheriff’s
 Office has scheduled a [child medical evaluation] for both
 children. This [child medical evaluation] have [sic] been
 schedule [sic] for Thursday (08/06/2015) at 1:00 pm. Please
 provide the family with the attached brochure regarding
 our [child advocacy center]. I’ve informed Mrs. Corbett that
 she cannot be present during the children’s [child medical
 evaluation] due to the nature of the allegations. Mrs.
 Corbett reported that her mother can transport the
 children to and from their appointment. Please address
 this in the safety plan with Mrs. Corbett and her mother.

(Emphases added).

 53
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 This letter plainly states that the primary purpose of the Union County DSS

interviews—like the Dragonfly House interviews—was to ensure the immediate

safety and well-being of the children. Indeed, as the trial court observed in finding of

fact #16, the Union County DSS interviews were conducted “in regard to alleged

alcohol and/or substance abuse by the defendant Molly Corbett and concern about

physical abuse of Jack Corbett.” Moreover, it is also clear from this letter that the

utmost care was taken to protect the objectivity, integrity, and confidentiality of the

children’s interviews, both those conducted by DSS personnel as well as those

conducted at the Dragonfly House. Davidson County DSS requested that Union

County DSS interview each child privately, and specifically noted that Molly had

already been instructed that her presence was not permitted during the children’s

Dragonfly House interviews.

 The trial court’s findings of fact #21 and #22 are similarly flawed in their

reasoning:

 21. These same statements were not made at a time when
 the children were motivated to speak the truth but were
 rather motivated to affect future custody arrangements –
 specifically the children feared that they were going to be
 “taken away from their mother” and removed to another
 country by their father’s relatives.

 22. The statements of the children that are offered by the
 defense as pertinent to the relationship between Molly
 Corbett and Jason Corbett have been specifically recanted.
 Sarah Corbett, the younger of the two children, recanted
 her statements in diary entries made after her return to

 54
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 Ireland. Jack Corbett recanted his statements in diary
 entries and during a recorded interview with members of
 the District Attorney’s Office.

 Finding of fact #21 is erroneous in that it overlooks the overwhelming evidence

that both children understood the seriousness of the proceedings and the importance

of truthfulness, as well as the temporal proximity of the children’s statements to

Jason’s death. Although both children indicated that they loved Molly and desired to

remain in her custody, this, alone, is not indicative of a dishonest motive, particularly

where there is substantial evidence to the contrary.

 Moreover, this finding discounts statements by Jack and Sarah that tend to

refute that “the children feared that they were going to be ‘taken away from their

mother’ and removed to another country by their father’s relatives.” Jack told

Reagan that he was “[a]ngry and upset” about what had happened, and he wondered,

“How can people be so mean?” When Reagan asked him what he meant, Jack

clarified, “How my dad could get so angry. How my grandpa could hit him with a bat

and my mom hit him with a brick.” Sarah explained to Reagan that she held Molly’s

hand at Jason’s funeral earlier that day on 6 August 2015, “[b]ecause my aunt, she’s

– she’s real nice, but she gets emotional, and she doesn’t want me and Jack to have a

bad life. She wants us to have the best life that she can make for us. But my mom

wants the same.”

 55
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 As for the children’s alleged recantations, it is unclear from finding of fact #22

why the trial court deemed the “diary entries” or the circumstances of Jack’s Skype

interview with a member of the district attorney’s office to be more trustworthy than

either of the objective and impartial interviews at issue here. The diary entries were

never authenticated before the trial court. Moreover, while Molly was explicitly

prohibited from attending the children’s interviews with Union County DSS and

Dragonfly House personnel, Jack’s Skype interview with the district attorney’s office

was conducted from his home in Ireland, with his aunt—Jason’s sister—and uncle

upstairs and within earshot. Cf. Sargeant, 365 N.C. at 66, 707 S.E.2d at 197 (“We

emphasize again that the issue is not whether [the declarant’s] statement is

objectively accurate; the determinative question is whether [the declarant] was

motivated to speak truthfully when he made it. The agreement between [the

defendant’s co-conspirator] and the State, reached when [the co-conspirator] provided

his statement, appears designed to ensure his truthfulness.”).

 Both the Union County DSS and the Dragonfly House interviews covered much

more information than just the specific “events surrounding the homicide of Jason

Corbett,” to wit: Jason’s worsening anger management issues; Molly and Jason’s

ongoing relationship troubles, including alleged verbal, emotional, and physical

abuse; and, perhaps most importantly, the children’s awareness and perception of

these issues. Furthermore, the most probative of the children’s statements are all

 56
 STATE V. CORBETT & MARTENS

 Opinion of the Court

clearly based upon their own personal knowledge. For example, during her 3 August

2015 Union County DSS interview, Sarah told the social worker that “what she likes

most about home” is “being with her mom when her dad is not there . . . because her

dad fights her mom and sometimes he brings it out on her. She stated sometimes she

will get in trouble for saying stop.” Sarah told the social worker that “her father

screams and yells” and “is angry on a regular basis”; when her parents’ fighting “is

really bad, . . . she has to stay in her room for a long time.” Sarah “has seen her dad

hit her mom and pull her hair.” Sarah shared that, on one occasion, she “saw her dad

smack her mom. [Sarah] stated that her mom fell, got up and then went to the car.”

 Similarly, Jack told the social worker “that what he does not like [about] being

at home is his parents fighting. Jack stated physically and verbally.” Jack said “that

his dad gets mad at his mom for no good reason; . . . she can do nothing right.”

According to Jack, Jason “curses his mom; [Jack] stated that he has seen his dad a

few times hit his mom with his fist anywhere on her body that he can.”

 The children’s Dragonfly House interviews are lengthy and broadly

substantive. But perhaps the most material of evidence that may be gleaned from

the Dragonfly House interviews are statements that the children made based upon

their personal knowledge and never recanted, and which unquestionably pertained

to “the events surrounding the homicide of Jason Corbett.”

 57
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 Sarah told Reagan that she often experienced difficulty sleeping through the

night, and in such instances, she would approach Molly for comfort. Jason, however,

disliked it when Sarah got out of bed and Molly attended to her in the middle of the

night, and he would get angry with them both. The evidence shows that Sarah’s

nightmare and her consequent appearance in Jason and Molly’s bedroom on 2 August

2015 was the precipitating event that caused Jason to grow angry with Molly, thereby

starting the fight that led to the fatal altercation:

 Ms. Reagan: Okay. And had there ever been any times that
 you did wake up during the night in the past?

 Sarah Corbett: Yeah.

 Ms. Reagan: Okay. What would happen when you do wake
 up during the night?

 Sarah Corbett: I would go downstairs because I usually had
 a nightmare. But I think what caused my dad being really
 mad that night was because, um, my mom kept on coming
 upstairs because I – like I have fairies on my bed, and I
 really get scared of those things, because they like look like
 there are spiders and lizards on my bed. So that’s why my
 mom had to keep on coming up. I couldn’t fall asleep until
 my mom put another sheet on my bed, and then my dad got
 mad.

 Ms. Reagan: Okay. So you told me that you had fallen
 asleep downstairs and someone carried you upstairs. Did
 you wake up at any point after that?

 Sarah Corbett: Nope.

 Ms. Reagan: Okay. So you said your mom had to put
 another sheet on. How did you know that?

 58
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 Sarah Corbett: Because before I went to sleep, she –
 because I woke up, like, in the middle – like not in the
 middle, but like – I’m sorry I said that I didn’t wake up.

 Ms. Reagan: It’s okay.

 Sarah Corbett: I woke up just a little bit. Um, because it’s
 like I just woke up before my mom put me in my bed, and
 I put – and I put the – I put the covers on me, and I tried
 to go to bed, but I couldn’t.

 Ms. Reagan: Okay.

 Sarah Corbett: And at first I thought I had a big lizard in
 my room. And it freaked me out.

 Ms. Reagan: And you said she kept coming and checking
 on you?

 Sarah Corbett: Uh-huh.

 Ms. Reagan: And why do you think that’s what they were
 arguing about?

 Sarah Corbett: Because my dad, like, doesn’t like my mom
 sleeping, like, with me. He wants her to be upstairs with
 him.

 Ms. Reagan: Have you ever heard them argue about that
 before?

 Sarah Corbett: Yes.

 Bedsheets matching those described by Sarah are visible on the floor in State’s

Ex. 62, a photograph of Sarah’s bedroom.

 59
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 Jack’s Dragonfly House interview also contains statements, based upon his

personal knowledge, that are both material and highly probative to Defendants’

claims of self-defense and defense of a family member. The State established that

there were two possible murder weapons: the baseball bat, which Tom brought with

him from the basement upon hearing the commotion upstairs, and the brick paver,

which was already sitting on Molly’s dresser in the bedroom when the affray began.

The brick paver’s presence in the master bedroom was never explained to the jury.

The admission of Jack’s Dragonfly House statements would therefore have provided

a reasonable answer to a significant and unanswered question:

 Ms. Reagan: Okay. And then tell me about this cinder
 block that you were talking about. Like a brick that your
 mom used?

 Jack Corbett: Um, we were going to paint it, because we
 just – we just got flowers that we were going to plant in our
 front yard or back yard, and we were going to paint it so it
 would look pretty, and that – it was in my mom’s room,
 because it was raining earlier, and we already – we were
 going to paint it. We didn’t want it getting all wet. So we
 brought it inside, and my mom put it at her desk. And then
 that’s where it was.

(Emphasis added).

 Like Sarah’s statements about Jason’s anger following her nightmare and

appearance in Jason and Molly’s bedroom, Jack’s statement about the brick paver

tends to corroborate Molly’s written statement from 2 August 2015. Moreover, no

 60
 STATE V. CORBETT & MARTENS

 Opinion of the Court

other evidence admitted at trial is as material or as probative of Defendants’ version

of events, and thus their defense, as either of these statements.

 After finding that the children were unavailable to testify for purposes of N.C.

Gen. Stat. § 8C-1, Rule 803, the trial court failed to consider the practical effect of

that finding in conducting the rest of its analysis under the residual exception. See

Triplett, 316 N.C. at 9, 340 S.E.2d at 741 (observing that “the necessity for use of the

hearsay testimony often will be greater” and “the inquiry . . . may be less strenuous”

under Rule 804(b)(5) than Rule 803(24), “since the declarant will be unavailable”).

The trial court’s determination that there were insufficient “circumstantial

guarantees of trustworthiness” to support admission of the children’s statements was

“made on the basis of inaccurate and incomplete findings of fact used to reach

unsupported conclusions of law.” Sargeant, 365 N.C. at 67, 707 S.E.2d at 198.

 Accordingly, the trial court erred by excluding the children’s statements during

their interviews by Union County DSS personnel on 3 August 2015, and at the

Dragonfly House on 6 August 2015. Moreover, for the reasons more fully explained

in Section VI below, the trial court’s exclusion of this evidence prejudiced Defendants’

ability to present a complete and meaningful defense. See id. at 68, 707 S.E.2d at 198

(“As a matter of fundamental fairness, the exclusion of [the co-conspirator’s]

statement deprived the jury of evidence that was relevant and material to its role as

finder of fact.”).

 61
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 B. Bloodstain Pattern Analysis

 We next address Defendants’ challenge to the testimony of Stuart James, the

State’s expert witness in bloodstain pattern analysis. Defendants contend that

James’s testimony regarding the untested blood spatter on the underside hem of

Tom’s boxer shorts and the bottom of Molly’s pajama pants was not sufficiently

reliable for admission under N.C. Gen. Stat. § 8C-1, Rule 702(a). We agree.

 1. Issue Preservation

 During voir dire, Defendants raised a targeted challenge to the reliability of

James’s proposed testimony concerning his analysis of certain bloodstains on the

underside of Tom’s boxer shorts and the bottom of Molly’s pajama pants. Wendell

Ivory, a forensic scientist with the North Carolina State Crime Laboratory, had

testified the previous day that, unlike stains appearing elsewhere on these and other

articles of clothing worn by Defendants during the altercation with Jason, the stains

at issue never received even basic, or “presumptive,” testing to confirm the presence

of blood.

 Defendants questioned James about several of the conclusions in his

“Supplementary Report of Bloodstain Pattern Analysis,” which James drafted on 16

February 2016 after traveling to North Carolina to examine certain bloodstained

evidence, including Tom’s boxer shorts and Molly’s pajamas. Defendants challenged

the following conclusions from James’s three-page Supplementary Report:

 62
 STATE V. CORBETT & MARTENS

 Opinion of the Court

  The impact spatters on the front underside hem of
 the left leg of the shorts are consistent with the
 wearer of the shorts close to and above the source of
 spattered blood. The source of the impact spatters
 is most likely the head of Jason Corbett while it was
 close to the floor in the bedroom.

 ....

  The impact spatters on the front lower legs and cuff
 of . . . the pajama bottoms are consistent with the
 wearer in proximity to Jason Corbett when he was
 close to the floor when blows were struck to his head.

 James acknowledged that because none of the stains underlying these

conclusions were ever submitted for testing—a fact that he did not learn until the day

before he testified in court—James could not state “with a scientific certainty” that

the stains on either garment were, in fact, blood. James also conceded that he had

never seen—neither in person nor via photograph—Tom wearing the boxer shorts,

and consequently, he did not know how the boxer shorts “laid on [Tom’s] body” or

whether “the cuff was flipped up or down or anything along those lines[.]”

Nevertheless, James was permitted to testify that the State’s failure to test the

evidence in question did not “really . . . change much of [his] opinion. It is still impact

spatter with the wearer of the shorts in proximity with the source of the blood.” When

the trial court asked whether James “consider[ed] the opinions that [he’s] offered and

as outlined in both of these reports to be the product of reliable principles and

methods in bloodstain pattern analysis[,]” James responded, “Yes, I do.”

 63
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 Noting that James’s own peer-reviewed treatise, The Analysis of Blood and

Forensic Serology, mandates that “an identification of blood be established to a

scientific certainty before it can be presented in court[,]” Defendants asserted that

the proposed expert testimony was not “properly before this Court, pursuant to 702-

(a).” More specifically, Defendants contended that (1) the challenged testimony was

not “based on sufficient facts or data,” in that James had not been provided with the

necessary information “to render that particular opinion within the broader scope of

his other opinions”; and (2) as a result, James was not provided “the opportunity to

apply the principles and methods reliabl[y] to the facts in this case.”

 At the conclusion of voir dire, the trial court ruled that, notwithstanding the

failure to identify the stains as blood to “a scientific certainty,” James would be

permitted to testify to his expert opinion before the jury.

 Our dissenting colleague concludes that Defendants waived appellate review

of this issue because, despite their careful and extensive objections during voir dire,

Defendants failed to object in the presence of the jury when the evidence was actually

introduced at trial. Dissent at 43. However, the transcript reveals that Defendants

did, in fact, timely object, and did so on multiple occasions before the jury throughout

James’s testimony. This issue was properly preserved for appellate review.

 Tom’s counsel first objected when the State tendered James as an expert in the

field of bloodstain pattern analysis. Defendants did not object throughout James’s

 64
 STATE V. CORBETT & MARTENS

 Opinion of the Court

testimony providing a general overview of the field of bloodstain pattern analysis, nor

did they raise any substantive objections while James began to testify to his

conclusions regarding the blood spatter at the scene in the instant case.

 However, Defendants immediately objected when the State proffered James’s

“Supplementary Report of Bloodstain Pattern Analysis” containing his comments and

conclusions concerning, inter alia, Tom’s boxer shorts and Molly’s pajamas, which

were the subject of Defendants’ objections during voir dire. The trial court admitted

James’s Supplementary Report as State’s Ex. 200 over Defendants’ explicit objections

to James’s conclusions and supporting testimony. Additionally, Defendants later

objected when the State submitted photographs of Tom’s boxer shorts and Molly’s

pajamas, which James enhanced under his digital microscope; the trial court

overruled Defendants’ objections and admitted the photos as State’s Ex. 201-215 and

216-237, respectively. Moreover, when the State’s direct examination of James

continued to a second day, Defendants renewed their previous objections for the

record in the presence of the jury before his testimony resumed.

 It is, therefore, clear that Defendants properly objected and preserved this

issue for appeal, and we proceed to the merits of their argument.

 2. Rule 702(a)

 Defendants contend that the trial court erred by admitting James’s expert

testimony regarding the untested stains on the underside of Tom’s boxer shorts and

 65
 STATE V. CORBETT & MARTENS

 Opinion of the Court

the bottom of Molly’s pajama pants, because the testimony did not satisfy Rule

702(a)’s reliability test or the expert’s own admitted standards for reliability. We

agree.

 “Whether expert witness testimony is admissible under Rule 702(a) is a

preliminary question that a trial judge decides pursuant to” N.C. Gen. Stat. § 8C-1,

Rule 104(a). State v. McGrady, 368 N.C. 880, 892, 787 S.E.2d 1, 10 (2016) (citations

omitted).

 In answering this preliminary question, the trial judge is
 not bound by the rules of evidence except those with respect
 to privileges. To the extent that factual findings are
 necessary to answer this question, the trial judge acts as
 the trier of fact. The court must find these facts by the
 greater weight of the evidence. As with other findings of
 fact, these findings will be binding on appeal unless there
 is no evidence to support them.

Id. at 892-93, 787 S.E.2d at 10-11 (internal quotation marks and citations omitted).

 The trial court must then determine, from its findings of fact, “whether the

proffered expert testimony meets Rule 702(a)’s requirements of qualification,

relevance, and reliability.” Id. at 893, 787 S.E.2d at 11. On appeal, we review the

trial court’s ruling for abuse of discretion. Id. “[A] trial court may be reversed for

abuse of discretion only upon a showing that its ruling was manifestly unsupported

by reason and could not have been the result of a reasoned decision.” Id. (citation

omitted).

 Rule 702(a) provides:

 66
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 (a) If scientific, technical or other specialized knowledge
 will assist the trier of fact to understand the evidence or to
 determine a fact in issue, a witness qualified as an expert
 by knowledge, skill, experience, training, or education, may
 testify thereto in the form of an opinion, or otherwise, if all
 of the following apply:
 (1) The testimony is based upon sufficient facts or
 data.
 (2) The testimony is the product of reliable principles
 and methods.
 (3) The witness has applied the principles and
 methods reliably to the facts of the case.

N.C. Gen. Stat. § 8C-1, Rule 702(a).

 As noted above, “Rule 702(a) has three main parts, and expert testimony must

satisfy each to be admissible.” McGrady, 368 N.C. at 889, 787 S.E.2d at 8. First, the

witness must be “qualified as an expert,” such that the witness is “in a better position

than the trier of fact to have an opinion on the subject[.]” Id. at 889, 787 S.E.2d at 9.

 Second, the expert testimony must be relevant, and must “assist the trier of

fact to understand the evidence[.]” Id. at 889, 787 S.E.2d at 8. “But relevance means

something more for expert testimony. In order to ‘assist the trier of fact,’ expert

testimony must provide insight beyond the conclusions that jurors can readily draw

from their ordinary experience.” Id. (internal citation omitted).

 Third, and most pertinent to our analysis here, the expert testimony must be

reliable. When evaluating the reliability of expert testimony, “[t]he primary focus of

the inquiry is on the reliability of the witness’s principles and methodology, not on

the conclusions that they generate[.]” Id. at 890, 787 S.E.2d at 9 (internal quotation

 67
 STATE V. CORBETT & MARTENS

 Opinion of the Court

marks and citations omitted). “However, conclusions and methodology are not

entirely distinct from one another, and . . . the court is not required to admit opinion

evidence that is connected to existing data only by the ipse dixit of the expert.” Id.

(internal quotation marks and citations omitted).

 “The precise nature of the reliability inquiry will vary from case to case[,]” and

“determining how to address the three prongs of the reliability test” is within the trial

court’s discretion. Id. In the context of scientific testimony, McGrady delineates the

following additional factors “from a nonexhaustive list” that may bear upon

reliability:

 (1) whether a theory or technique can be (and has been)
 tested; (2) whether the theory or technique has been
 subjected to peer review and publication; (3) the theory or
 technique’s known or potential rate of error; (4) the
 existence and maintenance of standards controlling the
 technique’s operation; and (5) whether the theory or
 technique has achieved general acceptance in its field.

Id. at 890-91, 787 S.E.2d at 9 (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S.

579, 593-94, 125 L. Ed. 2d 469, 482-83 (1993)) (internal quotation marks omitted).

 Again, these “factors are part of a flexible inquiry, so they do not form a

definitive checklist or test[.]” Id. at 891, 787 S.E.2d at 9-10 (citations and internal

quotation marks omitted). “Whatever the type of expert testimony, the trial court

must assess the reliability of the testimony to ensure that it complies with the three-

pronged test in Rule 702(a)(1) to (a)(3).” Id. at 892, 787 S.E.2d at 10.

 68
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 3. Analysis

 Defendants do not challenge James’s qualifications to testify as an expert in

the field of bloodstain pattern analysis. Indeed, the record shows that James is

unquestionably qualified to provide expert testimony on the subject. Rather,

Defendants contend that James’s conclusions regarding the untested stains on the

underside of Tom’s boxer shorts and the bottom of Molly’s pajama pants are not the

product of reliable principles and methods applied reliably to the facts of this case.

We agree.

 James coauthored a peer-reviewed treatise on the subject of bloodstain pattern

analysis, which sets forth the methodology and standards governing the field. As

established at trial, James’s treatise provides, inter alia: “Although it might seem

that visual identification of a stain is blood, it would be sufficient to warrant further

analysis of the material, proper scientific approach and legal requirements dictate

that such an identification be established to a scientific certainty before it can be

presented in court[.]” And when asked about the routine protocol and procedures

used in conducting bloodstain pattern analysis, James testified, consistent with his

treatise, that the stains should be subject to presumptive, confirmatory, and DNA

testing—in that order—before an analysis of the spatter is conducted.

 Yet, James’s analysis of the challenged evidence clearly contravened the

reliability protocol established in his own treatise. James testified that he was able

 69
 STATE V. CORBETT & MARTENS

 Opinion of the Court

to reach his ultimate conclusions concerning the stains on the underside of Tom’s

boxer shorts and the bottom of Molly’s pajama pants, despite the State’s failure to

submit those stains for even the most basic testing for the presence of blood

(presumptive testing). James testified that he reached his conclusions based on the

“physical characteristics” of the stains; he determined that their “location, size, shape,

and distribution” were “very characteristic of blood spatter[.]” But again, James

acknowledged that he could not testify to a scientific certainty that these stains were,

indeed, blood.

 James also testified that in conducting an analysis of bloodstained clothing, it

is the “best practice” for an analyst to view a photograph of the person wearing the

blood-spattered clothes. However, during cross-examination, James conceded that

contrary to the best practice set forth in his treatise, he never viewed a photograph

of Tom “wearing just the boxer shorts.” In fact, “the only photographs that [he]

received of [Tom] with his clothing was a different pair of shorts that he was wearing.

Apparently the boxer shorts were beneath that. These shorts were given to him to

wear.” As for Molly, James testified that the State provided him with just one

photograph of her wearing the pajama pants. James agreed, however, that it was not

readily apparent from that photograph how the pants actually fit Molly on the night

of the incident. In the photograph, the pajama pants seem “longer than how pants

 70
 STATE V. CORBETT & MARTENS

 Opinion of the Court

would typically fit a person[,]” and “[t]he rear portion . . . appears to be dragging on

the ground or between her leg and flip flop[.]”

 Notwithstanding James’s expertise in bloodstain pattern analysis,

noncompliance with the reliability standards and protocol prescribed in one’s own

treatise is inherently suspect, particularly when the treatise propounds that “proper

scientific approach and legal requirements dictate that such an identification be

established to a scientific certainty before it can be presented in court.” Cf. McGrady,

368 N.C. at 891, 787 S.E.2d at 10 (noting that “[t]he federal courts have articulated

additional reliability factors that may be helpful in certain cases, including . . .

[w]hether the expert has unjustifiably extrapolated from an accepted premise to an

unfounded conclusion”).

 The State argues, and James similarly testified during voir dire, that testing

the stains on the underside of Tom’s boxer shorts was unnecessary to James’s

conclusions because the appropriate testing was performed on certain other stains

appearing on the front side of the boxer shorts. However, these assertions are

inconsistent with James’s other testimony during voir dire that the spatters on the

underside of Tom’s boxer shorts “have to be” the result of a separate blow “because

on the inside of the hem – it’s not a soak-through from the outside so they would have

to be coming up from down below.”

 71
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 Moreover, Defendants have never challenged the trial court’s admission of

James’s testimony regarding those stains that received full presumptive,

confirmatory, and DNA testing before James rendered his analysis. Without such

testing, it seems nearly impossible to escape questions of how the testimony could be

“based upon sufficient facts or data,” N.C. Gen. Stat. § 8C-1, Rule 702(a)(1), and

whether “[t]he witness has applied the principles and methods reliably to the facts of

the case,” id. § 8C-1, Rule 702(a)(3). See State v. Babich, 252 N.C. App. 165, 168, 797

S.E.2d 359, 362 (2017) (“[E]ven if expert scientific testimony might be reliable in the

abstract . . . the trial court must assess whether that reasoning or methodology

properly can be applied to the facts in issue.” (citation and internal quotation marks

omitted)).

 In the present case, the State failed to enable James to testify in any reliable

manner concerning his analysis of the blood spatter. James readily admitted that

the underside of Tom’s boxer shorts had not received presumptive testing for the

presence of blood, proper protocol per James’s treatise. He also conceded that the

State never informed him that these stains had not been tested; indeed, he did not

learn this information until the day before he testified.

 Nevertheless, James testified that he concluded:

 With respect to the small spatters on the front underside
 of the left leg of the shorts, these were consistent with the
 wearer of the shorts close to and above the source of the
 spattered blood. To what extent, I can’t really say. In order

 72
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 for the stains to get to that location on the inside of the leg,
 they would have to be traveling, you know, at least
 somewhat upward in order to do that. My conclusion there
 was the source of the impact spatters is most likely the head
 of Jason Corbett while it was close to the floor in the
 bedroom.

(Emphases added).

 This unsupported conclusion is more emphatic than even that which James

provided regarding the tested bloodstains on the front of Tom’s boxer shorts:

 [M]y conclusions are that the spatters on the front of these
 boxer shorts were confirmed as impact spatters. . . . [T]he
 stains were embedded within the weave of the fabric, which
 is pretty much the definition of impact spatter on clothing.
 And this had me – my conclusions then are these impact
 spatters are consistent with the wearer of these boxer
 shorts in proximity to the victim Jason Corbett when blows
 were struck to his head. The head being the source of the
 blood in this particular case.

 Although James referenced other stains on Defendants’ clothing and concluded

that they were consistent with the wearer being in Jason’s general proximity at the

time of impact, the untested stains on the underside of Tom’s boxer shorts and Molly’s

pajama pants were the only stains that allowed James to specifically conclude that

Jason’s head was near or on the floor at the time of impact. Given how critical these

particular stains were to supporting James’s ultimate conclusions, it is reasonable to

expect the State to ensure that this evidence received all of the necessary and

recommended testing before expert testimony regarding the source and content of the

stains could be admitted at trial.

 73
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 To be sure, it would certainly be excessive and unreasonable to require that

the State test every trace of forensic evidence discovered at a crime scene in order for

expert testimony to pass muster under Rule 702. As James explained during voir

dire, “DNA laboratories often . . . only allow maybe five or six samples to be

submitted” because of the burden that testing additional samples would have on

laboratories. In this case, however, the central value of James’s testimony—that

which is most probative of the State’s theory of the case, and consequently, the most

prejudicial to Defendants’ cases—specifically relates to the untested stains on the

underside of Tom’s boxer shorts and the bottom of Molly’s pajama pants, which James

opined tend to show impacts to Jason’s head while it was near the floor. Moreover,

the State had ample opportunity to ensure that these stains were among those

submitted for testing for the presence and source of the purported blood, but failed to

do so.

 At trial, Ivory testified that he was responsible for testing certain evidence at

the request of the Davidson County Sheriff’s Office. Ivory explained that he routinely

tests materials in accordance with a “submission form,” in which the submitting

agency “detail[s] specifics of the case as well as any items to be submitted for testing

and the type of testing that is requested[.]” According to Ivory, “In this particular

case certain areas were asked to be tested.” When asked whether anyone requested

that he test the stains underneath the hem of Tom’s boxer shorts or the bottom of

 74
 STATE V. CORBETT & MARTENS

 Opinion of the Court

Molly’s pajama pants, Ivory responded that no one requested that those areas be

tested. James, however, testified that he had previously suggested that the State test

“at least some of the stains that [he] had marked. . . . They did some but not all.”

 By failing to ensure that suspected blood stains are appropriately tested for

the presence of human blood, the State knowingly risked depriving its expert witness

of the ability to conduct a blood spatter analysis in accordance with established and

reliable principles and methods. This risk is exacerbated in cases where, as here, the

expert testimony regarding those specific stains is both a crucial element of the

State’s case, and highly prejudicial to Defendants.

 Here, James simply was not provided with all the necessary information to

provide reliable expert testimony that satisfied the requirements of Rule 702(a). As

Defendants asserted during voir dire, James’s inability to “state to a scientific

certainty that [it] is blood” was “not his fault[,]” but the State’s:

 [I]f we don’t even have presumptive testing on a different
 set of stains, on a completely different side of this pair of
 underwear that’s coming from a different event, that
 reaches a different conclusion, then if we don’t even have
 presumptive testing on that, let alone confirmatory. I
 think, according to [James’s] book, that’s not something
 that’s properly before this Court, pursuant to 702-(a). I just
 don’t think that it is. Again, that’s not Mr. James’[s] fault.
 He was not provided that piece of information. I’m
 assuming that could have been tested at some point over
 the last couple of years. Again, it wasn’t – that’s not his
 fault. His own words, he cannot state to a scientific
 certainty that is blood. If you can’t, that’s not proper
 evidence before this Court and before this jury.

 75
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 For the foregoing reasons, James’s testimony regarding the untested stains on

Tom’s boxer shorts and Molly’s pajama pants was based upon insufficient facts and

data, and accordingly, could not have been the product of reliable principles and

methods applied reliably to the facts of this case. Id. § 8C-1, Rule 702(a)(3).

Therefore, the trial court abused its discretion by admitting this testimony.

 4. Prejudice

 “An error is not prejudicial unless there is a reasonable possibility that, had

the error in question not been committed, a different result would have been reached

at the trial.” State v. Mason, 144 N.C. App. 20, 27, 550 S.E.2d 10, 16 (2001) (citation

and internal quotation marks omitted). “[T]he erroneous admission of evidence is

reversible if it appears reasonably possible that the jury would have reached a

different verdict without the challenged evidence.” Id. at 28, 550 S.E.2d at 16.

 Ultimately, the only part of James’s testimony that could have possibly

assisted the jury in reaching its verdict is James’s erroneously admitted conclusion

that the untested stains on Tom’s boxer shorts and Molly’s pajama pants were

consistent with a strike to Jason’s head “while it was close to the floor in the

bedroom.” However, it is difficult to view this testimony as anything “more than mere

conjecture[,]” given that James’s analysis was grounded neither in actual data nor

the principles and methods outlined in his treatise and testimony to establish

reliability. See Babich, 252 N.C. App. at 172, 797 S.E.2d at 364 (“[W]here, as here,

 76
 STATE V. CORBETT & MARTENS

 Opinion of the Court

the expert concedes that her opinion is based entirely on a speculative assumption

about the defendant—one not based on any actual facts—that testimony does not

satisfy the Daubert ‘fit’ test because the expert’s otherwise reliable analysis is not

properly tied to the facts of the case.”).

 If this is the bedrock of James’s scientific inquiry concerning the challenged

evidence, then it is unclear why he was in a better position to make this ultimate

determination than the lay members of the jury. Without viewing a photograph of

Tom wearing the boxer shorts, as James testified was the appropriate practice in his

field, James was unable to discern the position of Tom’s body relative to Jason at the

time of impact. And given the State’s failure to ensure that the stains were

appropriately tested and verified as Jason’s blood, James was no better positioned

than the jury to decide with any scientific certainty whether the relevant stains were,

in fact, blood—or its source. Mere observations of the “physical characteristics” of the

stains and their locations are not determinations that the jury is incapable of making

on its own. Cf. McGrady, 368 N.C. at 895, 787 S.E.2d at 12 (“Though [the] defendant

served in the military, he did not testify that he relied on any specialized training in

threat assessment when he evaluated the threat that [the victim] posed to his life

and the life of his son. Nor was there any evidence that he relied on anything other

than common experience and instinct when he did so. Jurors possess this experience

 77
 STATE V. CORBETT & MARTENS

 Opinion of the Court

and instinct as well, which is exactly why they are tasked with deciding whether a

defendant has acted in self-defense.” (emphasis added)).

 Lastly, it is important to note that North Carolina’s 2011 amendment to Rule

702 substantially “chang[ed] the level of rigor that our courts must use to scrutinize

expert testimony before admitting it.” Id. at 892, 787 S.E.2d at 10; see also id.

(observing that our previous Howerton standard “was decidedly less rigorous than

the Daubert approach” incorporated with the 2011 adoption of the language from the

federal rule (internal quotation marks and citation omitted)). Rule 702 as amended

“necessarily strikes a balance between competing concerns since the testimony can

be both powerful and quite misleading to a jury because of the difficulty in evaluating

it.” Id. (citation and internal quotation marks omitted).

 In this case, James’s testimony had the powerful effect of bolstering the State’s

claim that Jason was struck after and while he was down and defenseless. However,

given that James’s testimony failed to assist the jury in determining whether this

was, in fact, the case, the testimony could only serve to unduly influence the jury to

reach a conclusion that it was fully capable of reaching on its own. Given this undue

influence, as explained in Section VI below, “it appears reasonably possible that the

jury would have reached a different verdict without the challenged evidence.” Mason,

144 N.C. App. at 28, 550 S.E.2d at 16.

 C. Tom’s Stricken Testimony

 78
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 Defendants next argue that the trial court erred in striking Tom’s testimony

that he “hear[d] Molly scream[,] ‘Don’t hurt my dad.’ ” The challenged exchange

occurred on direct examination, during Tom’s account of the fatal altercation with

Jason:

 [DEFENSE COUNSEL:] And what happened after that?

 [TOM:] And that’s – you know, if I can get any more afraid,
 that was it. I can’t see him. It’s dark in the bedroom. I’m
 thinking the next thing is going to be a bat in the back of
 the head. I’m on the ground. I hear Molly scream “Don’t
 hurt my dad.”

 [THE STATE:] Objection, move to strike.

 THE COURT: That’s sustained. Don’t consider that,
 ladies and gentlemen.

 As an initial matter, we note that although the State did not “stat[e] the

specific grounds” for its objection to Tom’s testimony, the parties nevertheless seem

to agree that the basis for the State’s objection—hearsay—was “apparent from the

context.” N.C.R. App. P. 10(a)(1) (“In order to preserve an issue for appellate review,

a party must have presented to the trial court a timely request, objection, or motion,

stating the specific grounds for the ruling the party desired the court to make if the

specific grounds were not apparent from the context.”).

 The trial court erroneously sustained the State’s objection to Tom’s testimony

because Molly’s out-of-court statement was either non-hearsay, or alternatively,

admissible hearsay. The prohibition against the admission of hearsay “does not

 79
 STATE V. CORBETT & MARTENS

 Opinion of the Court

preclude a witness from testifying as to a statement made by another person when

the purpose of the evidence is not to show the truth of such statement but merely to

show that the statement was, in fact, made.” State v. Holder, 331 N.C. 462, 484, 418

S.E.2d 197, 209 (1992) (citation omitted). Thus, when an out-of-court “statement is

offered for a purpose other than proving the truth of the matter asserted, it is not

hearsay” at all. Id.

 “The probative value of a nonhearsay statement does not depend, in whole or

in part, upon the competency and credibility of any person other than the witness.”

Valentine, 357 N.C. at 524, 591 S.E.2d at 856 (citations and internal quotation marks

omitted). “Further, a nonhearsay statement does not put the truth or falsity of the

statement at issue.” Id.; see also id. at 521, 524, 591 S.E.2d at 854, 856 (explaining

that the statement “You know where we are from and if somebody pulls a knife or a

gun out on you, you are supposed to get smoked” was offered not for its truth—“that

this was in fact the custom in the area where [the] defendant and [his brother] were

raised”—but instead “to show that [the] defendant intended to shoot the victim”).

 Here, Tom’s testimony was not offered to prove the truth of Molly’s

statement—i.e., that Jason was, in fact, attempting to “hurt [her] dad.” Nor did the

relevance of this statement depend upon its truth. See State v. Alston, 131 N.C. App.

514, 517, 508 S.E.2d 315, 317 (1998) (rejecting the defendant’s hearsay challenge to

the admission of his child’s statement “Daddy’s got a gun,” where the evidence was

 80
 STATE V. CORBETT & MARTENS

 Opinion of the Court

admitted solely for its effect on the officer’s state of mind and to “explain his

subsequent conduct”), superseded by statute in part on other grounds, as stated in

State v. Gaither, 161 N.C. App. 96, 103, 587 S.E.2d 505, 510 (2003), disc. review

denied, 358 N.C. 157, 593 S.E.2d 83 (2004).

 Molly’s statement was offered and admissible for the non-hearsay purpose of

illustrating Tom’s then-existing state of mind—a particularly relevant issue, given

Defendants’ claims of self-defense and defense of another. See State v. Faucette, 326

N.C. 676, 683, 392 S.E.2d 71, 74 (1990) (concluding that the victim’s statements

regarding the defendant’s threats were admissible under Rule 803(3) because they

revealed the victim’s “then-existing fear of [the] defendant” and explained “why she

did not want [him] visiting her home,” which was relevant to show that the defendant

“knew he was entering the . . . home without consent,” and “to rebut [the] defendant’s

self-defense inferences that he did not start shooting until he saw her reach for her

gun” (quotation marks omitted)); see also N.C. Gen. Stat. § 8C-1, Rule 803(3)

(excepting from the rule against hearsay a “statement of the declarant’s then existing

state of mind, emotion, sensation, or physical condition”).

 The State, however, contends that “[t]he alleged statement, while self-serving,

was not relevant. . . . Immediately prior to his stricken testimony of what [Molly]

allegedly said, [Tom] testified that Jason had just shoved him across the bed. The

alleged statement of [Molly] added nothing to [Tom]’s state of mind.” Our dissenting

 81
 STATE V. CORBETT & MARTENS

 Opinion of the Court

colleague echoes this sentiment, concluding that “[e]ven assuming, arguendo, that

the trial court erred by sustaining the State’s objection,” Defendants are unable to

show prejudice, because “Tom had already testified about circumstances illustrating

the reasonableness of his fear and apprehension, and Molly’s statement – made after

the altercation had been well underway – was of mild, if any, additional value.”

Dissent at 49. These assertions miss the point.

 Despite the number and complexity of the issues presented, the outcome of this

case ultimately turns on whether Defendants’ use of deadly force was lawful under

the circumstances. Pursuant to N.C. Gen. Stat. § 14-51.3, our statute governing self-

defense and defense of others:

 (a) A person is justified in using force, except deadly force,
 against another when and to the extent that the person
 reasonably believes that the conduct is necessary to
 defend himself or herself or another against the other’s
 imminent use of unlawful force. However, a person is
 justified in the use of deadly force and does not have a
 duty to retreat in any place he or she has the lawful right
 to be if . . . the following applies:

 (1) He or she reasonably believes that such force is
 necessary to prevent imminent death or great bodily
 harm to himself or herself or another.

 ....

 (b) A person who uses force as permitted by this section is
 justified in using such force and is immune from civil or
 criminal liability for the use of such force . . . .

N.C. Gen. Stat. § 14-51.3 (emphases added).

 82
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 Each of the central issues of this appeal ultimately concerns whether the trial

court properly admitted or “excluded evidence that was relevant to [Defendants’]

belief that [their] li[ves] w[ere] threatened in relation to [their] plea[s] of self-defense”

and defense of others. State v. Webster, 324 N.C. 385, 389, 378 S.E.2d 748, 751 (1989).

“In determining whether there was any evidence of self-defense presented, the

evidence must be interpreted in the light most favorable to [the] defendant.” Id. at

391, 378 S.E.2d at 752.

 It is the jury, not the trial court, which must determine the reasonableness of

the defendant’s belief under the circumstances, “unless there is no evidence from

which a jury could conclude [the] defendant’s belief is reasonable.” Id. at 393, 378

S.E.2d at 753; cf. State v. Harvey, 372 N.C. 304, 309, 828 S.E.2d 481, 484 (2019)

(“Despite his extensive testimony recounting the entire transaction of events from his

own perspective, [the] defendant never represented that [the victim’s] actions in the

moments preceding the killing had placed [the] defendant in fear of death or great

bodily harm such that [the] defendant reasonably believed that it was necessary to

fatally stab [the victim] in order to protect himself.”). “A jury should, as far as

possible, be placed in [the] defendant’s situation and possess the same knowledge of

danger and the same necessity for action, in order to decide if [the] defendant acted

under reasonable apprehension of danger to his person or his life.” Webster, 324 N.C.

at 392, 378 S.E.2d at 753.

 83
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 Here, when viewed in the light most favorable to Defendants, “[t]he excluded

testimony went to the heart of [Tom’s] self-defense claim[,]” as well as his claim of

defense of Molly. Id. at 393, 378 S.E.2d at 753. In order to fully appreciate the extent

to which “sustaining the objection . . . prevented [Tom] from completing his side of

the story[,]” id., it is necessary to review the challenged testimony in full context:

 [DEFENSE COUNSEL:] What happened after you came
 down the hallway?

 [TOM:] Okay. Then we come back down the hallway and
 we emerged from the hallway. We are back in the bedroom
 and so I get what I think is a chance to hit him, as I have
 before, in the back of the head, only this time he’s ready for
 me. And he puts up his left hand and catches the bat
 perfectly right in his palm as I swing the bat at the back of
 his head. But in the process, Molly goes free. She escapes
 to his right or he let’s [sic] her go. Anyway, the two of them
 separate. But now he’s got the bat. And I’m still holding
 the bat. But he cocks his arm like this (demonstrated).
 Jason is right-handed, that’s my experience. This is with
 his left hand. He cocks his hand and he punches out
 (demonstrating) and shoves me across the entire bed, the
 width of the bed, and I’m on the floor with my back to him
 and face down on the carpet. And –

 Q. And what happened after that?

 A. And that’s – you know, if I can get any more afraid, that
 was it. I can’t see him. It’s dark in the bedroom. I’m
 thinking the next thing is going to be a bat in the back of
 the head. I’m on the ground. I hear Molly scream “Don’t
 hurt my dad.”

 [THE STATE:] Objection, move to strike.

 THE COURT: That’s sustained. Don’t consider that,

 84
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 ladies and gentlemen.

 [DEFENSE COUNSEL:] All right.

 [TOM:] And I’m scrambling. I remember thinking
 irrationally now that I lost my glasses in this exchange and
 that I need to find my glasses. You know, I’m shook up,
 and then I realize how stupid that is. I’m better off without
 my glasses. Because if you are in a fight, you don’t want
 your glasses jammed into your eyes. But I don’t know how
 long it took me. It was a shock to get thrown across the
 bedroom. But I get up. And I turn over and I get up and
 now I see Jason essentially where he was, which is
 essentially where we started, inside the door to the
 bedroom, just a step or two toward that door from the
 hallway to the right of the bed as you enter the bedroom,
 and he’s got the bat, and Molly is by the nightstand in the,
 you know – it’s between the wall on that side and the bed,
 so she’s over there. She’s trapped. She can’t get past him.

 [THE STATE:] Objection to what Molly may or may
 not be able to do.

 [DEFENSE COUNSEL:] His observations.

 THE COURT: That’s overruled. He may continue.

 [TOM:] And I’m on the other side of the room at the end of
 the bed. And things look pretty bleak. He’s got the bat.
 He’s in a good – looks like he’s in a good athletic position.
 He has his weight down on the balls of his feet. He’s kind
 of looking between me and Molly. And so I decided there’s
 – well, I decided to rush him and try to get ahold of the bat.

 Viewed in full context, the significance of Tom’s testimony regarding Molly’s

statement “Don’t hurt my dad” is manifest. Not only was this statement directly

“relevant to [Tom]’s belief that his life was threatened in relation to his plea of self-

 85
 STATE V. CORBETT & MARTENS

 Opinion of the Court

defense[,]” Webster, 324 N.C. at 389, 378 S.E.2d at 751, but for reasons more fully

explained below, the exclusion of this testimony also bore upon the question of Tom’s

ultimate role in the affray—i.e., whether the evidence supported a jury instruction on

the aggressor doctrine, see State v. Holloman, 369 N.C. 615, 628, 799 S.E.2d 824, 833

(2017) (holding that the provisions of N.C. Gen. Stat. § 14-51.4(2)(a) “allowing an

aggressor to regain the right to use defensive force under certain circumstances do

not apply in situations in which the aggressor initially uses deadly force against the

person provoked”).

 “In light of the circumstances of this case and the trial court’s instructions on

self-defense,” Webster, 324 N.C. at 393, 378 S.E.2d at 753, as explained in Section VI,

we conclude that the trial court committed prejudicial error in striking Tom’s

testimony that he “hear[d] Molly scream[,] ‘Don’t hurt my dad.’ ” Cf. id. at 392-94,

378 S.E.2d at 753-54 (awarding the defendant a new trial where the trial court

“erroneously sustained the State’s objection to the question about whether [the]

defendant felt that his life was threatened because that evidence was highly relevant

to the crucial question of [the] defendant’s statement of mind at the time of the

shooting, his knowledge and belief of danger, and his knowledge and belief of the

necessity for action in relation to his plea of self-defense”).

 V. Instructional Error

 86
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 We next address the trial court’s decision to instruct the jury on the aggressor

doctrine with respect to Tom’s claim that he was, at all times, acting in self-defense

and in defense of his daughter, Molly. Tom argues that the trial court committed

reversible error by instructing the jury that he would not be entitled to the full benefit

of self-defense or defense of a family member if the jury found that he were the initial

aggressor in the altercation with Jason. We agree.

 A. Standard of Review

 “The jury charge is one of the most critical parts of a criminal trial.” State v.

Lee, 370 N.C. 671, 674, 811 S.E.2d 563, 565 (2018) (citation omitted). The trial court’s

duty is momentous: to deliver a clear instruction on the law arising from all of the

evidence presented, and to do so “in such manner as to assist the jury in

understanding the case and in reaching a correct verdict.” Holloman, 369 N.C. at

625, 799 S.E.2d at 831 (citation omitted). We review de novo parties’ challenges to

the trial court’s decisions regarding jury instructions. State v. Osorio, 196 N.C. App.

458, 466, 675 S.E.2d 144, 149 (2009).

 “The jury must not only consider the case in accordance with the State’s theory

but also in accordance with [the] defendant’s explanation.” State v. Guss, 254 N.C.

349, 351, 118 S.E.2d 906, 907 (1961) (per curiam). Consequently, “[w]here there is

evidence that [the] defendant acted in self-defense, the court must charge on this

aspect even though there is contradictory evidence by the State or discrepancies in

 87
 STATE V. CORBETT & MARTENS

 Opinion of the Court

[the] defendant’s evidence.” State v. Dooley, 285 N.C. 158, 163, 203 S.E.2d 815, 818

(1974); see also Lee, 370 N.C. at 677, 811 S.E.2d at 568 (Martin, C.J., concurring)

(asserting that the principle articulated in Dooley “should apply equally to defense of

another” where the evidence supports such an instruction).

 In considering whether to deliver a jury instruction on self-defense, the trial

court generally must view the evidence in the light most favorable to the defendant.

State v. Mumma, 372 N.C. 226, 239 n.2, 827 S.E.2d 288, 297 n.2 (2019) (citing

Holloman, 369 N.C. at 625, 799 S.E.2d at 831). However,

 this principle does not apply to the determination of
 whether the trial court erred by addressing the “aggressor”
 doctrine in the course of instructing the jury concerning the
 law of self-defense. In determining whether a self-defense
 instruction should discuss the “aggressor” doctrine, the
 relevant issue is simply whether the record contains
 evidence from which the jury could infer that the defendant
 was acting as an “aggressor” at the time that he or she
 allegedly acted in self-defense.

Id. (citing State v. Cannon, 341 N.C. 79, 82-83, 459 S.E.2d 238, 241 (1995)).

 “When there is no evidence that a defendant was the initial aggressor, it is

reversible error for the trial court to instruct the jury on the aggressor doctrine of

self-defense.” State v. Juarez, 369 N.C. 351, 358, 794 S.E.2d 293, 300 (2016). Where

the trial court delivers an aggressor instruction “without supporting evidence, a new

trial is required.” State v. Vaughn, 227 N.C. App. 198, 202, 742 S.E.2d 276, 278

(citation and quotation marks omitted), disc. review denied, 367 N.C. 221, 747 S.E.2d

 88
 STATE V. CORBETT & MARTENS

 Opinion of the Court

526 (2013).

 B. Aggressor Doctrine

 Simply stated, the aggressor doctrine denies a defendant “the benefit of self-

defense if he was the aggressor in the situation.” Juarez, 369 N.C. at 358, 794 S.E.2d

at 300. An individual who “aggressively and willingly enter[s] into the fight without

legal excuse or provocation” is properly deemed “the aggressor in bringing on the

difficulty[.]” State v. Mize, 316 N.C. 48, 51-52, 340 S.E.2d 439, 441 (1986).

 Courts consider a variety of factors in determining which party was the

aggressor, including the circumstances that precipitated the altercation; the presence

or use of weapons; the degree and proportionality of the parties’ use of defensive force;

the nature and severity of the parties’ injuries; or whether there is evidence that one

party attempted to abandon the fight. See, e.g., State v. Spaulding, 298 N.C. 149,

155, 257 S.E.2d 391, 395 (1979) (determining that the victim was the aggressor in a

fatal prison-yard knife fight where the victim continued to advance upon the

defendant “with his hand jammed into his pocket,” while the defendant, who

anticipated the attack and “arm[ed] himself as a precaution,” used no “language

tending to incite an affray” and “made no show of force”); State v. Washington, 234

N.C. 531, 534, 67 S.E.2d 498, 500 (1951) (“All the evidence offered at the trial below

shows that the deceased, and not the defendant, was the aggressor. The defendant’s

evidence indicates that she was entirely free from fault and never fought willingly

 89
 STATE V. CORBETT & MARTENS

 Opinion of the Court

and unlawfully. Her evidence further shows that the deceased made a violent attack

upon her. . . . She begged the deceased to stop beating her, and it was only after he

announced his intention to take her elsewhere and kill her that she stabbed him in a

vital spot.”).

 The State’s arguments, and the dissent’s conclusion with respect to this issue,

heavily rely upon the disparity of injuries suffered by the parties. The State disputes

Tom’s contention that the State failed to introduce any evidence to contradict

Defendants’ version of events, and counters that “the lack of any injuries to [Tom],

compared with the devastating injuries to Jason, is sufficient evidence to support the

aggressor instruction.” According to the State, this Court “held exactly that” in State

v. Presson, 229 N.C. App. 325, 747 S.E.2d 651 (2013). For support, the State cites the

following portion of our Court’s opinion in Presson: “Further, the lack of injuries to

[the] defendant, compared to the nature and severity of the wounds on [the victim] at

his death, is sufficient evidence from which a jury could find that [the] defendant was

the aggressor or that [the] defendant used excessive force.” 229 N.C. App. at 330, 747

S.E.2d at 656.

 This portion of Presson, however, addresses the sufficiency of the State’s

evidence to withstand the defendant’s motion to dismiss the charges, based on his

claim of perfect self-defense. See id. Although the defendant in Presson also

contended that the trial court erred by instructing the jury that he “would lose the

 90
 STATE V. CORBETT & MARTENS

 Opinion of the Court

right to self-defense if he was the aggressor,” id., review of this issue was limited to

plain error, due to the defendant’s failure to object to the jury instructions at trial, id.

at 331, 747 S.E.2d at 656. See id. (“[The d]efendant bases this claim on similar

grounds as those stated in his first argument, arguing that there is insufficient

evidence to support the finding that [he] was in any way the aggressor in the fatal

confrontation. But, as we have set forth above, the State did put forth sufficient

evidence from which a reasonable jury could find that [the] defendant was the

aggressor or used excessive force. Accordingly, we find no error with the jury

instruction explaining that [the] defendant was not entitled to perfect self-defense if

he was found to be the aggressor.”).

 The distinction between the standard of review of a motion to dismiss and that

of plain error is significant. Compare id. at 329, 747 S.E.2d at 655 (noting that a

motion to dismiss based on perfect self-defense requires the trial court to consider

“whether the State has presented substantial evidence which, when taken in the light

most favorable to the State, would be sufficient to convince a rational trier of fact that

the defendant did not act in [perfect] self-defense”), and State v. Smith, 300 N.C. 71,

78-79, 265 S.E.2d 164, 169 (1980) (“Substantial evidence is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion.”), with Mumma,

372 N.C. at 241, 827 S.E.2d at 298 (“As a result of [the] defendant’s failure to object

to the delivery of an ‘aggressor’ instruction to the jury before the trial court, [the]

 91
 STATE V. CORBETT & MARTENS

 Opinion of the Court

defendant is only entitled to argue that the delivery of the ‘aggressor’ instruction

constituted plain error, under which [the] defendant is not entitled to an award of

appellate relief on the basis of the alleged error unless he can demonstrate that a

fundamental error occurred at trial that had a probable impact on the jury’s finding

that the defendant was guilty[.]” (citations, quotation marks, and footnote omitted)),

and Juarez, 369 N.C. at 358-59, 794 S.E.2d at 300 (concluding that it was “not

necessary . . . to decide whether an instruction on the aggressor doctrine was

improper,” because the defendant failed to meet his burden, under plain error review,

of showing that “absent the erroneous instruction, it is probable that the jury would

have found that he acted in perfect self-defense” and “would not have rejected his

claim of self-defense for other reasons”).

 The cases that the dissent and the State cite for the proposition that a disparity

in injuries is, standing alone, sufficient evidence to support an instruction on the

aggressor doctrine were reviewed for plain error. See Mumma, 372 N.C. at 241-42,

827 S.E.2d at 298; Juarez, 369 N.C. at 357-58, 794 S.E.2d at 299-300; Presson, 229

N.C. App. at 330-31, 747 S.E.2d at 656. However, the State cites no case, and we are

unaware of any, to so hold upon review for preserved error. Tom’s challenge to the

inclusion of the aggressor instructions was properly preserved at trial; therefore,

Mumma, Juarez, Presson, and other plain error cases with a heightened review for

prejudice are inapposite here.

 92
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 At the charge conference in the instant case, defense counsel requested that

the trial court remove all aggressor language from the proposed pattern instructions,

asserting that there was no evidence to support “that anyone was the aggressor but

Jason.” The State conceded that it had “no objection to the Court declining to instruct

on the aggressor issue as to Defendant Molly Corbett.” As to Tom, however, the State

contended that there was “conflicting evidence as to which party was the aggressor,”

because “there was comment about when the bat entered the equation[.]” The State

noted that Tom “brought the one physical deadly weapon” into the fight, in that “the

bat entered the equation when [Tom] was standing outside the room, heard an

argument, and decided to barge in[.]”

 To the extent that the trial court based its ruling on Tom’s decision to arm

himself with the baseball bat before joining the affray, this ruling was in error. The

mere fact that a defendant was armed is not evidence that he was the aggressor if he

made no unlawful use of his weapon. See Spaulding, 298 N.C. at 155, 257 S.E.2d at

395 (“In going out into the yard, [the] defendant was going to a place where he had a

right to be. In arming himself as a precaution, in the context of this case, [the]

defendant was not at fault vis-à-vis the law of homicide so long as he did not use the

knife or threaten [the] decedent with it until it became necessary or apparently

necessary to do so in self-defense.” (internal citation omitted)); State v. Alston, 228

N.C. 555, 557-58, 46 S.E.2d 567, 568-69 (1948) (awarding a new trial due to the trial

 93
 STATE V. CORBETT & MARTENS

 Opinion of the Court

court’s erroneous denial of the defendant’s request for an instruction “that the fact

that the defendant had a pistol in his pocket, but had made no unlawful use of it prior

to the attack upon him by the deceased, would not deprive the defendant of his legal

right of self-defense”); Vaughn, 227 N.C. App. at 203, 742 S.E.2d at 279-80

(concluding that the “[d]efendant’s decision to arm herself and leave the vehicle, while

perhaps unwise, was not, in and of itself, evidence that she brought on the difficulty,

‘aggressively and willingly’ entered the fight, or intended to continue the

altercation”); State v. Tann, 57 N.C. App. 527, 531, 291 S.E.2d 824, 827 (1982)

(rejecting the State’s argument that the “defendant, who anticipated the

confrontation, armed himself with a .38 caliber pistol, and failed to avoid the fight,

was somehow responsible for causing the altercation. These observations do not in

any way suggest that [the] defendant was the provocator . . . .” (citation omitted)).

 The State also argued at the charge conference that Tom “assumed some

degree of aggression after there was a pause when he was no longer under a

continuous assault,” but nonetheless opted to rejoin the affray. In support of this

argument, the State cited the portion of Tom’s testimony from which the State

successfully moved to strike Molly’s statement, “Don’t hurt my dad”:

 [THE STATE:] . . . The testimony from [Tom] from
 his direct and cross-examination was that after there had
 been strikes against [Jason] in the bedroom, in the hallway
 to the bath, in the bathroom, and then back into the
 bedroom, that [Jason] had caught the bat in his left hand,
 had then moved [Tom] claims, to have been flung all the

 94
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 way across the room even to the ground. He went as far as
 to say he was expecting to get hit in the head with the bat,
 which was his perception that [Jason] had time to advance
 upon him and hit him with the bat. Instead he had enough
 time to realize he had lost his glasses and finds his glasses,
 then stands up and turns around and in this confined space
 sees [Jason]. Yes, holding the bat, but not advanced on him
 having not attacked him, having not advanced on [Molly],
 who [Tom] said escaped [Jason’s] grasp moments earlier
 and had moved over to the side away from him.

 [Tom] describes very deliberating [sic] everything,
 evaluated the situation and made the choice, in his words,
 to rush [Jason]. He then arrested, in his testimony, the bat
 from [Jason] and proceeded to hit him in the head
 repeatedly. That would be some indication certainly at
 least as to [Tom] that at that point in time he assumed
 some degree of aggression after there was a pause when he
 was no longer under a continuous assault. Since we believe
 that’s a reasonable interpretation of the evidence, we ask
 that that instruction be kept.

 Insofar as the trial court based its ruling upon the above argument, that

decision was erroneous for two reasons. First, as discussed in Section IV(C) above,

Tom’s testimony that he heard Molly scream, “Don’t hurt my dad,” was admissible

and should not have been excluded. Proper admission of this testimony would have

foreclosed the State’s argument during the charge conference that “there was a pause

when [Tom] was no longer under a continuous assault.” Second, Jason was the initial

aggressor, and the first person to use deadly force; therefore, Jason could not regain

the right to use defensive force unless he first withdrew from the affray.

 95
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 “Historically, . . . North Carolina law did not allow an aggressor using deadly

force to regain the right to exercise the right of self-defense in the event that the

person to whom his or her aggression was directed responded by using deadly force

to defend himself or herself.” Holloman, 369 N.C. at 626, 799 S.E.2d at 831; see also

id. at 626, 799 S.E.2d at 831-32 (explaining the limits of the common-law rule—that

“if one takes life, though in defense of his own life, in a quarrel which he himself has

commenced with intent to take life or inflict serious bodily harm, the jeopardy into

which he has been placed by the act of his adversary constitutes no defense whatever,

but he is guilty of murder” (citations and quotation marks omitted)).

 In 2011, however, “the General Assembly amended the law of self-defense in

North Carolina to clarify that one who is not the initial aggressor may stand his

ground, regardless of whether he is in or outside the home.” Lee, 370 N.C. at 675 n.2,

811 S.E.2d at 566 n.2 (internal citation omitted). Our amended defensive force

“statutes provide two circumstances in which individuals are justified in using deadly

force, thus excusing them from criminal culpability.” Id. at 674, 811 S.E.2d at 566.

Pursuant to N.C. Gen. Stat. § 14-51.3(a),

 a person is justified in the use of deadly force and does
 not have a duty to retreat in any place he or she has the
 lawful right to be if either of the following applies:

 (1) He or she reasonably believes that such force is
 necessary to prevent imminent death or great bodily
 harm to himself or herself or another.

 96
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 (2) Under the circumstances permitted pursuant to
 [N.C. Gen. Stat. §] 14-51.2.

N.C. Gen. Stat. § 14-51.3(a)(1)-(2).5

 “Both sections provide that individuals using force as described are immune

from civil or criminal liability and that such individuals have no duty to retreat before

using defensive force.” State v. Bass, 371 N.C. 535, 541, 819 S.E.2d 322, 325-26 (2018)

(citations and internal footnote omitted). Accordingly, “wherever an individual is

lawfully located . . . the individual may stand his ground and defend himself from

attack when he reasonably believes such force is necessary to prevent imminent

death or great bodily harm to himself or another.” Id. at 541, 819 S.E.2d at 326.

 As under the common law, the right to use defensive force is not unlimited

under N.C. Gen. Stat. §§ 14-51.2 and 14-51.3. Indeed, the statutory justification is

not available to an individual who uses defensive force, and:

 (2) Initially provokes the use of force against himself or
 herself. However, the person who initially provokes the
 use of force against himself or herself will be justified in
 using defensive force if either of the following occur:

 a. The force used by the person who was provoked is so
 serious that the person using defensive force reasonably
 believes that he or she was in imminent danger of death
 or serious bodily harm, the person using defensive force
 had no reasonable means to retreat, and the use of force

 5 N.C. Gen. Stat. § 14-51.2, “Home, workplace, and motor vehicle protection; presumption of
fear of death or serious bodily harm,” provides a rebuttable presumption in favor of the “lawful
occupant of a home, motor vehicle, or workplace” who uses deadly defensive force under the
circumstances set forth by subsection (b). “This presumption does not arise” under N.C. Gen. Stat. §
14-51.3(a)(1). Lee, 370 N.C. at 675, 811 S.E.2d at 566.

 97
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 which is likely to cause death or serious bodily harm to
 the person who was provoked was the only way to
 escape the danger.

 b. The person who used defensive force withdraws, in good
 faith, from physical contact with the person who was
 provoked, and indicates clearly that he or she desires to
 withdraw and terminate the use of force, but the person
 who was provoked continues or resumes the use of force.

N.C. Gen. Stat. § 14-51.4(2).

 In Holloman, our Supreme Court, construing N.C. Gen. Stat. § 14-51.4(2)(a)

for the first time, considered “the extent, if any, to which North Carolina law allows

an aggressor to regain the right to utilize defensive force based upon the nature and

extent of the reaction that he or she provokes in the other party.” 369 N.C. at 626,

799 S.E.2d at 831. Our Supreme Court first observed that, unlike the common-law

rule, the plain language of subsection (2)(a) “does not, when read literally, appear to

distinguish between situations in which the aggressor did or did not utilize deadly

force.” Id. at 627, 799 S.E.2d at 832.

 Nevertheless, the Supreme Court declined to adopt the defendant’s proposed

construction—“which would allow an aggressor to utilize defensive force in the event

that his conduct caused the person provoked to lawfully utilize deadly force in his

own defense”—concluding that such an interpretation “cannot be squared with the

likely legislative intent motivating the enactment of” N.C. Gen. Stat. § 14-51.4(2)(a):

 Simply put, the adoption of [the] defendant’s construction
 of [N.C. Gen. Stat.] § 14-51.4(2)(a) would create a situation

 98
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 in which the aggressor utilized deadly force in attacking
 the other party, the other party exercised his or her right
 to utilize deadly force in his or her own defense, and the
 initial aggressor then utilized deadly force in defense of
 himself or herself, thereby starting the self-defense merry-
 go-round all over again. We are unable to believe that the
 General Assembly intended to foster such a result, under
 which gun battles would effectively become legal, and hold
 that the provisions of [N.C. Gen. Stat.] § 14-51.4(2)(a)
 allowing an aggressor to regain the right to use defensive
 force under certain circumstances do not apply in
 situations in which the aggressor initially uses deadly force
 against the person provoked.

Id. at 628, 799 S.E.2d at 833.

 In the instant case, the undisputed evidence—viewed in the light most

favorable to the State—simply does not support that anyone but Jason was the

aggressor in the altercation on 2 August 2015. That night, Tom and Sharon were

staying in the guest bedroom in the basement, below the master bedroom occupied

by Jason and Molly. Tom “had been asleep for a while” when he “was awakened from

a sound sleep” by noises upstairs. Tom testified that he “heard thumping, like loud

foot falls on the floor above [him] and . . . a scream and loud voices.”

 Tom surmised from these noises that “[t]here was an obvious disturbance going

on above [him] somewhere in the house.” According to Tom, “it sounded bad . . . like

a matter of urgency.” Tom testified that he instinctively “got out of bed, grabbed that

baseball bat” off the floor beside his luggage, where he had left it earlier that evening,

and—without getting dressed or putting on shoes—headed upstairs. Tom explained

 99
 STATE V. CORBETT & MARTENS

 Opinion of the Court

that although he “did not know at that time what . . . was” causing the commotion

upstairs, “[i]t seemed like a good idea” to bring the bat with him, because he “was

going up to something that sounded confrontational and [he]’d rather have the

baseball bat in [his] hand than not.”

 Once he arrived upstairs, Tom determined that the noises were coming from

inside of Jason and Molly’s bedroom. At trial, Tom described the scene he witnessed

when he opened the door:

 [TOM:] In front of me, I would say seven or eight feet in
 front of me, in front of the door as I opened the door, Jason
 had his hands around Molly’s neck. They were facing each
 other. She was a little to the right. He was a little to the
 left (indicating).

 [DEFENSE COUNSEL:] Where were they in the bedroom?

 A. They were, as I’m entering the door, they were to the
 right of the bed and maybe a step out from the bed closer
 to the bedroom, the exit from the bedroom.

 Q. What happened next?

 A. Um – I closed the door.

 Q. Why?

 A. I don’t know. I don’t. I did. I know that I did. And I
 said, “Let her go.” And he said, “I’m going to kill her.” And
 I said, “Let her go.” And he said, “I’m going to kill her.”
 And I said, “Let her go.” (Witness starting to cry.) And he
 said, “I’m going to kill her.” And I don’t know how many
 times that happened. But it happened several times. But
 I left something out. When I entered, he had his hands up
 around her neck, and as soon as I entered, he reversed

 100
 STATE V. CORBETT & MARTENS

 Opinion of the Court

himself so that he had her neck in the crook of his right
arm (demonstrating). And she was in front of him between
me and him.

Q. What happened then?

A. And he was really angry.

 [THE STATE:] Objection.

 THE COURT: Overruled.

[TOM:] And I was really scared. And he took a step back
toward the hallway that goes to the bathroom. And I was
afraid that he would get to the bathroom and close the door
and that would be the end of that. (Witness crying.)
Because I would not be able to save her behind the
bathroom door. So I took a step to my right and I hit him
in the head, the back of the head with the baseball bat.
That seemed like the most effective place to hit him. I
didn’t want to hit Molly. So I tried to hit the back of the
two of them glued together. His head was taller than hers
and I know that I hit him that time. But it didn’t have any
effect except seemingly further enraged him. He didn’t
waiver [sic]. He didn’t go down.

[DEFENSE COUNSEL:] How tall are you?

A. About 5,11 [sic].

Q. How much do you weigh?

A. I weigh about 160 pounds.

Q. So after – what happened after you hit him the first
time?

A. Then he did, as I feared, he continued to edge down
toward into the hallway leading to the bathroom. And I
didn’t have as much room in that hallway to maneuver as

 101
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 I did in the bedroom. But I tried. And I tried to hit him as
 many times as I could to distract him because he now had
 Molly in a very tight chokehold with his forearm on this
 side (indicating) and his bicep on this side (demonstrating).
 She was no longer – she was no longer wiggling. She was
 just weight, being dragged back into the hallway. So I tried
 to hit him. I don’t know how effective those hits were
 because I didn’t have room to maneuver and to – but I tried.
 And I was determined that he was not going to close that
 bedroom door between me and her. And he did get to the
 bathroom but I was too close for him to close the door.

 And we got into the bathroom and now I had room
 to maneuver again and I did what I did before in the
 bedroom, I took a step to the right, and was able to get the
 little angle on him behind him and I hit him. So I know of
 two times that I hit him in the back of the head and
 whatever happened in the hallway. (Long pause.) And
 again, it didn’t seem to have any effect. And so he changed
 tactics at that point. I mean, he had gone into the
 bathroom. I had followed him into the bathroom and so
 now he started to push back down the hallway and I was
 able to get into the hallway before him, but he’s pushing
 me down the hallway – I mean, he’s not literally touching
 me. He’s pushing Molly down in front of him and he’s
 getting away. I really don’t think I hit him in that trip, in
 the return trip in the hallway, because he was initiating
 the action toward me and I was scared and – anyway, that’s
 what I remember.

 In this contest, the parties were not equally positioned. Jason was 39 years

old, 6’0” tall, and weighed 262 lbs. Tom was 65 years old, 5’11” tall, and weighed 160

lbs. Molly was 31 years old, 5’6” tall, and weighed 110 lbs.

 The State offered no evidence to refute Tom and Molly’s account of the events,

nor does the disparity in the parties’ injuries, alone, tend to do so. Furthermore, in

 102
 STATE V. CORBETT & MARTENS

 Opinion of the Court

focusing solely on the absence of obvious injuries to Defendants, the dissent and the

State fail to acknowledge other evidence that tends to corroborate their version of

events, including the long blonde hair that is visible in the palm of Jason’s right hand

in State’s Ex. 172, a photograph taken at the scene of the incident and admitted at

trial; and evidence that Molly was suffering from shock when first responders arrived

to the scene. Deputy David Dillard testified that Molly was “visibly upset” and “very

obviously in shock” when he interviewed her that night. Sergeant Barry Alphin

testified that when he left the ambulance to check on Molly, he found her lying on the

ground in the fetal position, covered with a blanket. At some point, he noticed that

her throat was red.

 Moreover, as to the aggressor determination, it is significant that Jason was

the first to employ deadly force. Tom testified that from the moment he opened the

bedroom door, “Jason had his hands around Molly’s neck,” and he was stating his

intention to kill her. As Tom entered the room, Jason “reversed himself so that he

had her neck in the crook of his right arm[,]” and he kept Molly in a “very tight

chokehold” in front of him while the fight moved from room to room. At some point,

Tom noticed that Molly “was no longer wiggling. She was just weight, being dragged

back into the hallway.”

 As a retired FBI agent, Tom knew the potential dangers of Jason’s “very tight

chokehold.” Tom testified on cross-examination that he was “pretty familiar with this

 103
 STATE V. CORBETT & MARTENS

 Opinion of the Court

chokehold[,]” which works to “subdue someone by restricting their blood flow,” due to

its previous popularity with the Los Angeles Police Department. And Tom testified

that Molly was subdued quickly: “Initially she was wiggling. When he put her into

the chokehold, but as we got down and into the hallway she was pretty limp.”

 All of the evidence supports that Jason was the initial aggressor in the affray,

and the first person who used deadly force. In that Tom “did not aggressively and

willingly enter into the fight without legal excuse or provocation[,]” Mize, 316 N.C. at

51, 340 S.E.2d at 441, the trial court erred by instructing the jury on the aggressor

doctrine with respect to Tom’s claims of self-defense and defense of another.

 VI. Prejudice

 Finally, we consider the extent to which Defendants were prejudiced by the

errors analyzed above. Again, “[a]n error is not prejudicial unless there is a

reasonable possibility that, had the error in question not been committed, a different

result would have been reached at the trial.” Mason, 144 N.C. App. at 27, 550 S.E.2d

at 16; see also N.C. Gen. Stat. § 15A-1443(a). As explained below, we agree with

Defendants that “there is a reasonable possibility that, had the error[s] in question

not been committed, a different result would have been reached at” trial. N.C. Gen.

Stat. § 15A-1443(a).

 First, as explained in Section IV(A)(1), the children’s interview statements

contained significant material evidence that went to the heart of Defendants’ claims

 104
 STATE V. CORBETT & MARTENS

 Opinion of the Court

of self-defense and defense of another. Sarah was a fact witness, as her nightmare

was the event that precipitated Jason and Molly’s fight, which led to the fatal

altercation. During the multi-disciplinary team meeting preceding the children’s

medical evaluations at the Dragonfly House, Detectives Hanna and Riggs specifically

requested that Reagan inquire about Sarah’s nightmare during the children’s

forensic interviews.

 Moreover, Jack’s Dragonfly House interview is the only evidence that could

have explained the presence of the brick paver in the bedroom. This evidence was

extremely important to the Defendants’ cases as well as the State’s case: for

Defendants, Jack’s statement would have provided a reasonable explanation for the

existence of an otherwise out-of-place brick paver in Molly and Jason’s bedroom. The

State, on the other hand, benefited from the unexplained presence of one of two

potential murder weapons in the master bedroom, and in fact, raised this very

question during its opening statement, noting: “There is a brick paver in the master

bedroom and there is nothing else having to do with landscaping or gardening or

building walls inside that bedroom.”

 Defendants requested that the trial court consider the State’s reference to the

brick paver during its opening argument when the court eventually ruled upon

Defendants’ motion to admit the children’s hearsay statements:

 [DEFENSE COUNSEL:] A brief matter, nothing to rule on
 at this time. During [the State’s] opening statement he

 105
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 made reference to the paving stone and indicated there
 were no gardening implements in the room. We made a
 pretrial motion to be able to get in the statements from
 Jack Corbett he made at the Dragonfly House. One of the
 things he talked about in that statement is how the paving
 stone got into the bedroom in the first place. I believe that
 would be relevant on that issue. And would ask at the time
 the Court consider that as well not for diagnosis or
 treatment in terms of the State is raising an issue and their
 investigation at least, you know, showed that Jack Corbett
 said how the paving stone got there. They left a question
 for the jury. I want the Court to take that into
 consideration when the time comes if we offer evidence and
 before that to the Court.

 Following the trial court’s exclusion of the children’s hearsay statements,

Defendants made a motion in limine to preclude the State from “arguing to the jury

how did that paving stone get in there when they have evidence from an individual

who is taken to the Dragonfly House and made that statement . . . to ask that evidence

be suppressed, then argue to the contrary, I would say would be inappropriate[.]” The

State assured the trial court and Defendants that it would avoid the issue during

closing arguments. Nevertheless, the damage was already done.

 Included in the evidence Defendants submitted in support of their Motion for

Appropriate Relief are numerous screenshots of Facebook comments showing

individuals—including multiple members of the jury—discussing the case.6

 6 As discussed in Section II, the no-impeachment rule bars the admission of “evidence of any
statement by [a juror] concerning a matter about which he would be precluded from testifying . . . for
the[ ] purpose[ ]” of impeaching the jury’s verdict. N.C. Gen. Stat. § 8C-1, Rule 606(b); see also id. §
15A-1240(a). For this reason, the evidence Defendants submitted in support of their Motion for

 106
 STATE V. CORBETT & MARTENS

 Opinion of the Court

According to jury foreman Tom Aamland, the jurors “had many unanswered

questions while deliberating[,]” but “ ‘how and why’ the paver made it into the home”

was the “#1 question that was talked about when deliberations started[.]” (Emphasis

added). Jack’s statement from his Dragonfly House interview would have answered

this question, and its exclusion clearly prejudiced Defendants’ ability to present a

meaningful defense. Cf. Lee, 370 N.C. at 676, 811 S.E.2d at 567 (“[T]he record reflects

a reasonable possibility that, had the trial court given the required stand-your-

ground instruction, a different result would have been reached at trial. During

closing argument the State contended that [the] defendant’s failure to retreat was

culpable. As such, the omission of the stand-your-ground instruction permitted the

jury to consider [the] defendant’s failure to retreat as evidence that his use of force

was unnecessary, excessive, or unreasonable.” (internal citation omitted)).

 Similarly, the children’s statements regarding Jason’s worsening issues with

anger management, along with their statements concerning the relationship between

Jason and Molly, would have corroborated and provided significant context for the

written statement that Molly provided at the Davidson County Sheriff’s Office on 2

August 2015. Moreover, the children’s statements would also have corroborated

Appropriate Relief is inadmissible to impeach the verdicts rendered by the jury in this matter.
However, there is no prohibition on this Court’s consideration of this evidence for the purposes of
assessing whether Defendants suffered actual prejudice by the errors discussed herein, and
determining the likelihood that, absent these errors, “a different result would have been reached at”
trial. Id. § 15A-1443(a).

 107
 STATE V. CORBETT & MARTENS

 Opinion of the Court

testimony from Katie Wingate, nurse practitioner at Kernersville Primary Care,

where both Molly and Jason were patients. Wingate testified that when Jason visited

Kernersville Primary Care on 16 July 2015, approximately two weeks prior to his

death,

 [h]e reported he had been feeling faint and dizzy, this
 started six months ago, was now occurring more
 frequently. Now occurring at least once a week and at
 random times. No relation to exercise or walking. He said
 he had been more stressed and angry lately for no reason.
 He had also not been taking his thyroid medication for six
 or seven weeks, had not had follow-up with his cardiologist
 in at least a year.

(Emphasis added).

 The State had just successfully moved to admit into evidence Jason’s medical

records from his 16 July 2015 visit to Kernersville Primary Care when Wingate

provided the testimony above. However, neither the State nor Defendants were

aware that these records even existed until the morning before Wingate testified.

Where the State opens the door by proffering medical records and a testifying witness

to explain their contents, fundamental fairness demands that Defendants be

permitted to offer evidence to corroborate that Jason had been “more stressed and

angry lately for no reason.” The children’s interview statements would have served

this purpose.

 Defendants argue that, in addition to corroborating Jason’s medical records,

the children’s statements also describe specific “instances of [Jason’s] irrational anger

 108
 STATE V. CORBETT & MARTENS

 Opinion of the Court

toward [Molly] and themselves[,]” which “would have been admissible when offered

to demonstrate [Jason’s] angry and violent nature,” and to establish Jason’s “role in

the altercation as the aggressor.” However, this argument is foreclosed by our

Supreme Court’s decision in State v. Bass, 371 N.C. 535, 819 S.E.2d 322 (2018), which

was released during the parties’ briefing period to our Court. See Bass, 371 N.C. at

544, 819 S.E.2d at 327 (“To say that a person is the aggressor on a specific occasion

is not to say that he has a violent character: a generally peaceful person may

experience a moment of violence, and a normally aggressive or violent person might

refrain from violence on a specific occasion. . . . Accordingly, with regard to a claim of

self-defense, the victim’s character may not be proved by evidence of specific acts.”

(emphasis added)).

 Nonetheless, Bass does not foreclose the admission of all evidence regarding a

victim’s character for violence. Even where specific violent acts would be

inadmissible, the victim’s character for violence may still be proved through evidence

of his reputation in the community, or statements offered in the form of an opinion.

See State v. Watson, 338 N.C. 168, 188, 449 S.E.2d 694, 706 (1994) (holding that,

“[b]ecause the jury was instructed on self-defense and was required to determine who

was the aggressor in the affray,” the trial court erred by excluding a defense witness

who would have provided opinion testimony regarding the victim’s violent character),

disavowed in part on other grounds by State v. Richardson, 341 N.C. 585, 461 S.E.2d

 109
 STATE V. CORBETT & MARTENS

 Opinion of the Court

724, cert. denied, 514 U.S. 1071, 131 L. Ed. 2d 569 (1995); see also Bass, 371 N.C. at

544, 819 S.E.2d at 328 (distinguishing Watson on the basis that “Watson dealt only

with opinion evidence—not evidence of specific acts” and thus “it sheds little light on

the issue presented” in Bass).

 Assuming, arguendo, that the children’s statements regarding Molly and

Jason’s relationship, as well as Jason’s “angry and violent nature,” might be

admissible as opinion evidence, and not as evidence of specific violent acts committed

by Jason against Molly, the record supports that there is a reasonable possibility that

the exclusion of this evidence affected the jury’s verdicts. In support of their Motion

for Appropriate Relief, Defendants included a news report that was released prior to

televised coverage of the case on ABC News “20/20,” in which jurors challenged

Molly’s claim, during her pretrial interview with 20/20, that she was a victim of abuse.

As one juror explained, “The defense did not once suggest any of that[.] So we as

jurors, or me as a juror, cannot take that into consideration because it was never

presented as a possibility.” (Emphasis added). Aamland echoed this sentiment: “We

had to go by what we heard[.]”

 Furthermore, for the reasons explained in Section IV(B), James’s expert

testimony on bloodstain pattern analysis failed to satisfy the reliability requirements

set forth under N.C. Gen. Stat. § 8C-1, Rule 702(a)(1)-(3), as interpreted by our

 110
 STATE V. CORBETT & MARTENS

 Opinion of the Court

Supreme Court in the seminal case of State v. McGrady, 368 N.C. 880, 787 S.E.2d 1

(2016).

 We emphasize that we do not hastily arrive at our conclusion on this issue:

that, not only did the trial court err by admitting James’s testimony regarding the

untested stains on Tom’s boxer shorts and Molly’s pajama pants, but also, that it

“appears reasonably possible that the jury would have reached a different verdict

without the challenged evidence.” Mason, 144 N.C. App. at 28, 550 S.E.2d at 16.

 Abuse of discretion is certainly a high bar to overcome, with the burden of

demonstrating prejudice even more cumbersome. Here, however, James’s testimony

and conclusions regarding the untested stains on Tom’s boxer shorts and Molly’s

pajama pants were not based upon sufficient facts and data to reliably pass muster

under N.C. Gen. Stat. § 8C-1, Rule 702(a)(1). Moreover, notwithstanding James’s

unchallenged qualifications in the field of bloodstain pattern analysis, a careful

review of his testimony raises serious questions concerning the extent to which he

“applied his own methodology reliably in this case.” McGrady, 368 N.C. at 899, 787

S.E.2d at 14.

 Here, the erroneous admission of James’s testimony was significantly

prejudicial to Defendants. This was the only evidence offered as direct proof that

Defendants hit Jason in the head from above. James’s testimony thus bolstered the

State’s case to show that Defendants administered blows while Jason was down on

 111
 STATE V. CORBETT & MARTENS

 Opinion of the Court

the ground and defenseless. And yet, because James’s conclusions about the untested

stains were supported by neither sufficient data nor reliable methodology, his

testimony about the “physical characteristics” of the stains—including their “location,

size, shape, and distribution”—could not have assisted the jury in rendering its

verdicts, “because these matters were within the jurors’ common knowledge.” Id. at

895, 787 S.E.2d at 12; see also id. (“The factors that [the defendant’s proposed expert

witness] cited and relied on to conclude that [the] defendant reasonably responded to

an imminent, deadly threat are the same kinds of things that lay jurors would be

aware of, and would naturally consider, as they drew their own conclusions.”).

 Additionally, as explained in Section IV(C), Tom’s testimony regarding Molly’s

statement “Don’t hurt my dad” was admissible and should not have been excluded.

The trial court’s error in sustaining the State’s objection to this testimony was

prejudicial. Tom’s testimony was directly relevant to the reasonableness of his belief

that the use of deadly force was necessary to prevent imminent death or great bodily

harm to himself or Molly—that is, whether his use of deadly force was lawful under

the circumstances, the central issue of the case. Moreover, the trial court’s erroneous

exclusion of this testimony made way for the State’s argument for jury instructions

on the aggressor doctrine, contending that “at that point in time [Tom] assumed some

degree of aggression after there was a pause when he was no longer under a

continuous assault.”

 112
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 The trial court committed reversible error in Tom’s case by delivering

unsupported jury instructions on the aggressor doctrine. Juarez, 369 N.C. at 358,

794 S.E.2d at 300. This error alone entitles Tom to a new trial. However, the record

evinces that the trial court’s error very likely prejudiced Molly, as well.

 The trial court ruled, as a matter of law, that Molly was not the aggressor, but

instructed the jury that it could find her guilty under an acting-in-concert theory of

culpability. “We have long held that a jury is presumed to follow the instructions

given to it by the trial court.” State v. Wiley, 355 N.C. 592, 637, 565 S.E.2d 22, 52

(2002) (citation omitted), cert. denied, 537 U.S. 1117, 154 L. Ed. 2d 795 (2003). Here,

however, the record clearly demonstrates that the jury did not follow the trial court’s

instructions. In the Facebook comments proffered by Defendants in support of their

Motion for Appropriate Relief, Aamland stated, “[W]e decided on 2nd degree for both,

but feel Molly was the aggressor, and her dad wanted to take the heat for her actions…

he admitted participating, so ‘in concert’ means equal responsibility to both.”

(Emphasis added). Accordingly, while the trial court reversibly erred by delivering

unsupported jury instructions on the aggressor doctrine in Tom’s case, whether due

to confusion or some other reason, the record also clearly establishes that the jury did

not follow the trial court’s instructions with regard to Molly.

 For these reasons, we conclude and hold that Defendants satisfied their burden

of demonstrating prejudice—that “there is a reasonable possibility that, had the

 113
 STATE V. CORBETT & MARTENS

 Opinion of the Court

error[s] in question not been committed, a different result would have been reached

at” trial. N.C. Gen. Stat. § 15A-1443(a).

 Specifically, Defendants have established a reasonable possibility that the jury

might have reached a different result, but for (1) the erroneous exclusion of the

children’s hearsay statements during their interviews conducted by Union County

DSS personnel on 3 August 2015, and at the Dragonfly House Children’s Advocacy

Center on 6 August 2015; (2) the improper admission of expert testimony regarding

the untested stains on Tom’s boxer shorts and Molly’s pajama pants, which failed to

satisfy N.C.R. Evid. 702(a)’s reliability requirements; and (3) the trial court’s error in

sustaining the State’s motion to strike Tom’s testimony that he heard Molly scream,

“Don’t hurt my dad.” In addition, the trial court committed reversible error in Tom’s

case by delivering unsupported jury instructions on the aggressor doctrine. Although

Tom, alone, is entitled to a new trial on this basis, for the reasons explained above,

the record indicates that this instructional error very likely confused the issues for

the jury in Molly’s case as well.

 Accordingly, we hold that both Defendants are entitled to a new trial in this

matter. Moreover, because the issues discussed herein are dispositive of Defendants’

appeals, we need not and do not address the additional arguments raised in their

briefs.

 VII. Conclusion

 114
 STATE V. CORBETT & MARTENS

 Opinion of the Court

 “The jury is the lie detector in the courtroom and is the only proper entity to

perform the ultimate function of every trial—determination of the truth.” State v.

Kim, 318 N.C. 614, 621, 350 S.E.2d 347, 351 (1986). The tragic and unusual

circumstances of this case are a humble reminder of the importance of the jury’s vital

role in our delicate system of justice. Due to the compounding evidentiary and

instructional errors that occurred both before and throughout the three-week trial in

this matter, Defendants were prevented from presenting a meaningful defense, or

from receiving the full benefit of their claims of self-defense and defense of a family

member. As a result, the jury was denied critical evidence and rendered incapable of

performing its constitutional function. Defendants are therefore entitled to a new

trial.

 For the reasons stated herein, we affirm the trial court’s order denying

Defendants’ Motion for Appropriate Relief. However, due to the numerous preserved,

prejudicial errors apparent within the record, we reverse the judgments entered upon

Defendants’ convictions for second-degree murder and remand for a new trial.

 NEW TRIAL.

 Judge TYSON concurs.

 Judge COLLINS concurs in part and dissents in part by separate opinion.

 115
 No. COA18-714 – State v. Corbett & Martens

 COLLINS, Judge, concurring in part and dissenting in part.

 I concur in the majority opinion that the trial court did not err by (1) denying

Defendants’ request for an evidentiary hearing on their Motion for Appropriate Relief

(“MAR”), (2) denying Defendants’ MAR, or (3) denying Defendants’ motions to dismiss

for insufficient evidence. I respectfully dissent from the remainder of the majority

opinion that leads to its conclusion that Defendants are entitled to a new trial.

 I. Factual Background

 Although the majority opinion includes a recitation of the facts, I include a

recitation of the facts as well.

 Jason was a native of the Republic of Ireland, where he originally lived with

his first wife, Margaret, and their children, Sarah and Jack. Margaret died of an

asthma attack in 2003. After Margaret’s death, Jason employed Molly as an au pair.

After several weeks, Jason and Molly established a romantic relationship. In 2011,

Jason, Molly, Sarah, and Jack (collectively, the “Corbetts”) moved to Davidson

County, North Carolina. Jason and Molly got married that same year.

 Tom Martens’ testimony

 On 1 August 2015, Tom and his wife Sharon, Molly’s mother, decided to visit

the Corbetts. Tom, an attorney and retired FBI agent, packed a Little League

baseball bat and a cut-down tennis racket for Jack. Tom and Sharon left their home

in Knoxville, Tennessee and arrived at the Corbetts’ home at 8:30 pm. When they
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

arrived, Jason was sitting in a lawn chair in the driveway having a beer with his

neighbor. Jason got up and greeted Tom and Sharon.

 Tom unpacked the car while Molly ordered pizza. Tom, Sharon, Jason, Molly,

and Sarah had pizza while Jack was at a party. Jack arrived home around 11:00 pm.

Tom did not give Jack the bat at that point because it was late and time for everyone

to go to bed. Tom and Sharon retreated to the guest room in the basement, which is

just below the bathroom that joins Jason and Molly’s master bedroom.

 Tom testified, “I was awakened from a sound sleep, and I don’t know what time

it was, but I had been asleep for a while. And I heard thumping, like loud foot falls

on the floor above me and I heard a scream and loud voices. There was an obvious

disturbance going on above me somewhere in the house.” Tom got out of bed, grabbed

the baseball bat that was with his luggage on the floor beside his bed, and went

upstairs. He opened the door to Jason and Molly’s bedroom and saw that “Jason had

his hands around Molly’s neck.” Tom went inside the bedroom and closed the door.

 Tom repeatedly told Jason, “Let her go.” Jason repeatedly replied, “I’m going

to kill her.” Tom testified, “I was really scared” and described how Jason, with Molly’s

neck in the crook of his arm, took a step toward the hall that led to the bathroom.

Fearing Jason would get to the bathroom and close the door, Tom testified, “I took a

step to my right and I hit him in the head, the back of the head with the baseball bat.”

But Jason “didn’t waiver. He didn’t go down.” Tom further described the altercation,

 -2-
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

admitting, “I tried to hit him as many times as I could to distract him because he now

had Molly in a very tight chokehold with his forearm . . . .”

 Once they were in the bathroom, Tom angled himself behind Jason and hit

Jason two more times in the head. Tom again stated this “didn’t seem to have any

effect.” Jason then began pushing into the hallway while holding Molly in front of

him. When they were back in the bedroom, Tom swung the bat again, but Jason

caught the bat with his left hand and Molly was able to go free. At this point, both

Tom and Jason had the bat. Jason “cock[ed] his hand,” “punche[d] out,” and shoved

Tom across the bed. Tom ended up “on the floor with [his] back to him and face down

on the carpet.”

 When Tom got up, he saw Jason with the bat and Molly by the nightstand.

Tom decided to “rush” Jason and “try to get ahold of the bat.” When he did so, both

he and Jason ended up with both hands on the bat. Tom testified that he tried to hit

Jason with the end of the bat. In doing so, Jason “los[t] his grip,” and Tom gained

control of the bat.

 Tom did not know how many times he hit Jason. Tom testified, “I hit him until

he goes down. And then I step away. . . . I hit him until I thought that he could not

kill me.” After he gathered his thoughts, he called 911. Tom told the 911 operator,

“My, my, uh, daughter’s husband, uh, my son-in-law, uh, got in a fight with my

daughter, I intervened, and I, I think, um, and, he’s in bad shape. We need help. . . .

 -3-
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

He, he’s bleeding all over, and I, I may have killed him.” While on the 911 call, Molly

and Tom both tried to administer CPR, as guided by the operator. When law

enforcement arrived, Molly and Tom were told to wait outside on the front porch.

 On direct examination, Tom testified, “[Jason] wasn’t my favorite person. I

didn’t like him. I’m sure I said disparaging things about him.” On cross-examination,

Tom acknowledged that prior to marrying Molly, Jason had transferred a “sizeable

amount” of money to America to purchase the Davidson County residence, such that

there was no mortgage on the property. Additionally Jason had transferred

$49,073.39 to Tom “for the marriage[.]” Tom was aware that Jason had a life

insurance policy and that Molly was the beneficiary.

 Barry Alphin’s testimony

 Sergeant Barry Alphin, a paramedic with Davidson County Emergency

Medical Services (“EMS”), received a call at 3:03 am on 2 August 2015 that someone

was in cardiac arrest. Ten minutes later he arrived at the scene in an ambulance

with his co-worker, David Bent. They had arrived at the scene before they received

an update that the call had been changed from cardiac arrest to assault. Alphin went

into the room and “saw blood all over the floor and walls.” He saw a lamp laying on

the floor, and “there was a brick right there in front of it. I noticed there was a small

ball bat leaning up against a dresser. . . . As we walked in, I saw [Jason] supine or

feet laying out on his back with his head around the corner.” Molly and Tom were in

 -4-
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

the room, and Molly was doing chest compressions on Jason. Paramedics took over

the chest compressions; Molly and Tom stepped outside the door. At some point,

Alphin noticed some redness on Molly’s throat or neck.

 Alphin went to the ambulance and retrieved a back board. With the assistance

of other rescue workers, he put Jason on the board and took him to the ambulance.

He attempted to intubate Jason. Alphin testified, “I went to lift the chin. As I did,

my left hand, all of my fingers went inside the skull. My right hand was just mushy.

At that point I realized there was severe heavy trauma to the back of the head.”

Alphin noted Jason’s “eye[] sockets had a lot of gel blood. His ear had a lot of gel.”

He tried to clean Jason up to find the source of bleeding. He also noted dried blood

on Jason’s cheek. At 3:24 am, Alphin concluded that life sustaining efforts were futile

and stopped advanced life support.

 David Bent’s testimony

 David Bent, also a paramedic with Davidson County EMS, arrived at the scene

with Alphin and attempted to get into the master bedroom. They were not able to

open the door completely because Jason was lying naked on the floor, partially

blocking the door. Bent “observed dry blood on” Jason’s body. At some point, he came

into contact with Molly and observed a light redness on the left side of her neck. She

told him she had been choked. She also told him she felt okay and did not want to go

to the hospital.

 -5-
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

 Clayton Daggenhart and Rusty Ramsey’s testimony

 Corporal Clayton Daggenhart with the Davidson County Sheriff’s Office

received a call from the 911 center a little after 3:00 am on 2 August 2015. The call

originally came in as a cardiac incident, but two minutes later was changed to an

assault call. He arrived at the scene at 3:16 am; an ambulance was in the driveway.

Daggenhart went directly inside the house and into the master bedroom. As he closed

the door, he noted blood on the backside of it. A naked white male, who he later

determined was Jason, was lying on his back next to what appeared to be puddles of

congealing blood. Jason appeared to have a pool of blood around his left eye socket

as well as blood on his chest. Daggenhart took some photographs of the scene, and

then EMS personnel loaded Jason onto a portable back board and placed him on a

stretcher to remove him from the residence.

 After Jason’s body was removed, Daggenhart began looking around the room.

Daggenhart testified,

 I noted that there was blood that appeared to be dried or
 drying on the wall. There were several pools of blood next
 to where the body had been. There was blood on the wall
 past where the body had been. I noted more blood that was
 going into what seemed to be and was the master
 bathroom.

He also observed a “brick stone or paving stone and a baseball bat . . . [r]ight next to

a dresser that’s just to the side of the master bedroom area that leads out to the foyer.”

There were areas near the base of the door that were saturated with blood.

 -6-
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

 When Daggenhart exited the bedroom, Defendants were standing just outside

the door. Daggenhart did not notice anything remarkable about either one, except

that Molly had blood on the top of her head. Daggenhart asked them to exit the

house. Daggenhart and Corporal Rusty Ramsey were directed to go retrieve the

children from their bedrooms. Daggenhart testified that Sarah was “asleep in bed

undisturbed, wasn’t affected in any way.” Ramsey testified that when he knocked on

Jack’s bedroom door, Jack was asleep. The officers woke the children up, carried

them down the stairs, and left them with Sharon, who had come up from the

basement.

 Amanda Hackworth’s testimony

 Amanda Hackworth, also a paramedic with Davidson County EMS, was

working with another paramedic, Carley Lane, when they received a cardiac arrest

call a little after 3:00 am on 2 August 2015. When they arrived at the scene to assist,

Jason was already being brought out of the house on the stretcher. Hackworth got

into the back of the ambulance to assist. She was putting a lead on Jason to get a

better cardiac read when she reached across his body and felt his torso was cool. She

turned to Alphin and asked, “How long did you say they waited before they called

911[?]” She said Alphin replied, “‘They said they called as soon as he went down.’”

 David Dillard’s testimony

 -7-
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

 Patrol Deputy David Dillard was called to the scene a little after 3:00 am. After

taping the perimeter of the scene, he escorted Molly to his patrol car. She remained

there for about an hour while he remained beside the car. He testified, “She was

making crying noises but I didn’t see any visible tears. She was also rubbing her neck

(demonstrating). I would say in a scrubbing motion-type thing. It wasn’t a constant.

She would do it and stop and do it and then stop while continuing to make the crying

noises. That was about everything she had done.”

 Frank Young’s testimony

 Lieutenant Frank Young, a Crime Scene Investigations Supervisor, arrived at

the scene at about 4:00 am. He went to the patrol car in which Molly was sitting “to

photograph her for any possible injuries she had received.” Young testified, “as I was

preparing [to take] the photographs, [Molly] continually tugged and pulled on her

neck with her hand. I asked her to please stop doing that.” After several requests,

she stopped. Young did not note any injuries on Molly’s person.

 Young also took photographs inside the master bedroom. One photograph

depicted a brick with hair on it. Young later photographed both Molly and Tom at

the Sheriff’s Department. He did not note any injuries on either individual.

 Molly’s written statement

 Molly gave a written statement to law enforcement officers on 2 August 2015

in which she stated the following:

 -8-
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

 My husband, Jason Corbett, was upset that he awoke and
 an argument ensued with him telling me to “shut up,” (etc.)
 and he applied pressure to my throat/neck and started
 choking me. At some point, I screamed as loud as possible.
 He covered my mouth and then started choking me again
 with his arm. My father, Tom Martens, came in the room
 and I cannot remember if he said something or just hit
 Jason to get him off me. Jason grabbed the bat from him
 and I tried to hit him with a brick (garden decor) I had on
 my nightstand. I do not remember clearly after that.

 Dr. Craig Nelson’s testimony

 Dr. Craig Nelson, Associate Chief Medical Examiner at the North Carolina

Office of the Chief Medical Examiner, performed an autopsy on Jason’s body on 3

August 2015. “The autopsy documented multiple blunt force injuries. These included

ten different areas of impact on the head, at least two of which had features

suggesting repeated blows indicating a minimum of 12 different blows to the head.

Additionally, he had a few other injuries elsewhere on his body, the torso and

extremities.” The bones in Jason’s nose were broken and there were “two large

complex lacerations towards the back of the head” indicating repeated blows to those

areas. Portions of Jason’s skull on both the left and right sides had fractures all the

way around them, such that when the scalp was pulled back in the autopsy, those

portions fell out of place. One laceration on the back of Jason’s head “ha[d] an

appearance of a postmortem injury in that there[] [was] very little bleeding of that

injury, suggesting it happened after the heart had stopped.” Nelson testified, “The

 -9-
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

degree of skull fractures in this case are the types of injuries that we may see in falls

from great heights or in car crashes under other circumstances.”

 Nelson further testified that an abrasion on the right side of Jason’s forehead

had a sharp linear component, consistent with an object that had an edge, that he

would not expect to see from a baseball bat. Jason had a contusion on the back of his

left hand and some blunt force injuries on his right thigh. Jason’s blood alcohol level

was .02% and he tested positive for a low level of Trazadone, an antidepressant

medication that can have some sedative effects. Nelson determined the cause of

death to be “blunt force head trauma.”

 Melanie Carson’s testimony

 Melanie Carson, a forensic scientist with the North Carolina State Crime

Laboratory in the Trace Evidence Unit, testified that one of two hairs recovered from

the end of the baseball bat, as well as twelve of twenty-five hairs recovered from the

brick, were microscopically consistent with a hair sample taken from Jason.

 Wendell Ivory’s testimony

 Wendell Ivory, a forensic scientist with the North Carolina State Crime Lab,

testified that the baseball bat, brick, Molly’s pajama top and bottom, Tom’s shirt, and

Tom’s boxer shorts tested positive for the presence of human blood. Furthermore,

DNA profiles taken from the tissue recovered from the brick, as well as tissue

 - 10 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

recovered from Molly’s pajama top and bottom matched the DNA profile obtained

from Jason.

 Stuart James’ testimony

 Stuart James was accepted by the trial court as an expert in the field of

bloodstain pattern analysis. James reviewed the photographs and videos taken at

the scene, as well as the physical evidence collected by law enforcement, and prepared

a written report on his findings and conclusions. Stuart testified regarding the blood

stains on Tom’s boxer shorts as follows:

 And my conclusions are that the spatters on the front of
 these boxer shorts were confirmed as impact spatters. . . .
 And this had me -- my conclusions then are these impact
 spatters are consistent with the wearer of these boxer
 shorts in proximity to the victim Jason Corbett when blows
 were struck to his head. The head being the source of the
 blood in this particular case.

 ....

 With respect to the small spatters on the front underside
 of the left leg of the shorts, these were consistent with the
 wearer of the shorts close to and above the source of the
 spattered blood. To what extent, I can’t really say. In order
 for the stains to get to that location on the inside of the leg,
 they would have to be traveling, you know, at least
 somewhat upward in order to do that. My conclusion there
 was the source of the impact spatters is most likely the
 head of Jason Corbett while it was close to the floor in the
 bedroom.

 In his report, he concluded, inter alia:

  . . . . Multiple impacts to the source of blood occurred as the
 source of blood was descending to the floor. This resulted

 - 11 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

 in the large accumulation of bloodshed in this area where
 the body of Jason Paul Corbett was discovered on the
 floor. . . .
 ....
  The Louisville Slugger baseball bat with blood transfer and
 hair fragments is consistent with having impacting [sic]
 the head of Jason Paul Corbett.
  The paving brick with blood transfer and hair fragments is
 consistent with having impacting [sic] the head of Jason
 Paul Corbett. The presence of transfer stains on all
 surfaces of the brick is not consistent with a single impact
 to his head.

 Joann Lowry’s testimony

 Joann Lowry, one of Tom’s co-workers, testified that during a conversation she

had with Tom in 2015, Tom said, referring to Jason, “that son-in-law, I hate him.”

 II. Issues

 After considering the parties’ arguments and my partial concurrence in the

majority opinion, I consolidate and structure my discussion of the issues as follows:

whether the trial court erred by (1) excluding from evidence certain interview

statements made by Sarah and Jack; (2) instructing the jury on the aggressor

doctrine as to Tom’s claims of self-defense and defense-of-others; (3) allowing into

evidence certain testimony by the State’s blood spatter expert; (4) excluding from

evidence Tom’s testimony about a statement made by Michael Fitzpatrick; (5)

striking Tom’s testimony about a statement made by Molly during the altercation; (6)

 - 12 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

instructing the jury on the criminal liability theory of concerted action as to Molly;

and (7) denying Tom a fair trial based on cumulative error.

 The majority opinion addresses issues 1, 2, 3, 5, and 7, but does not address

issues 4 and 6.

 III. Discussion

1. Exclusion of the Children’s Statements

 Defendants contend that the trial court erred by excluding from evidence

certain statements made by Sarah and Jack as inadmissible hearsay.

 Before trial, Defendants moved to admit statements made by the children

during 3 August 2015 interviews with a Union County Department of Social Services

(“DSS”) social worker7 (“DSS Interviews”) and 6 August 2015 interviews with a child

forensic interviewer at the Dragonfly House (“Dragonfly House Interviews”), a child

advocacy center, under several hearsay exceptions. The statements concerned the

events surrounding Jason’s killing as well as prior instances of Jason’s violent

conduct. Defendants also moved to determine the unavailability of Sarah and Jack.

The State moved to exclude the statements.

 The trial court conducted an evidentiary hearing on the motion during a special

session of superior court on 8 and 9 June 2017, and continued to consider the

 7 Defendants also moved to admit statements made by the children during 13 August 2015
interviews with a Davidson County DSS social worker. Defendants have made no argument on appeal
that those statements were erroneously excluded and thus the issue is deemed abandoned. N.C. R.
App. P. 28(a).

 - 13 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

admissibility of the proffered statements during the presentation of the evidence at

trial. The trial court excluded the children’s statements from evidence and entered a

written order memorializing its ruling. The trial court found Sarah and Jack

unavailable in that they were “beyond the jurisdiction and process” of the court. The

trial court concluded the children’s statements were inadmissible under Rule 803(4)’s

medical diagnosis or treatment exception because “they were not intended to obtain

a medical diagnosis or treatment” and “they were not pertinent to any medical

diagnosis or treatment.” The trial court further concluded the children’s statements

were inadmissible under Rule 803(24)’s residual exception because they “do not have

circumstantial guarantees of trustworthiness.”

A. Rule 803(4)’s Medical Treatment or Diagnosis Exception

 Defendants first contend that statements made by Sarah and Jack during their

Dragonfly House Interviews were admissible under Rule 803(4)’s medical treatment

or diagnosis hearsay exception.8

 We review de novo a trial court’s determination of the admissibility of an out-

of-court statement pursuant to Rule 803(4). State v. Norman, 196 N.C. App. 779, 783,

675 S.E.2d 395, 399 (2009).

 8 Defendants make no argument on appeal that the trial court erred in excluding under this
exception statements made by the children at the DSS interviews; such argument is thus deemed
abandoned. N.C. R. App. P. 28(a).

 - 14 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

 Rule 803(4) excepts from the general rule against hearsay9

 [s]tatements made for purposes of medical diagnosis or
 treatment and describing medical history, or past or
 present symptoms, pain, or sensations, or the inception or
 general character of the cause or external source thereof
 insofar as reasonably pertinent to diagnosis or treatment.

Id. § 8C-1, Rule 803(4) (2017). “This exception to the hearsay doctrine was created

because of a ‘patient’s strong motivation to be truthful’ when making statements for

the purposes of medical diagnosis or treatment.” State v. Lewis, 172 N.C. App. 97,

103, 616 S.E.2d 1, 4-5 (2005) (citing N.C. Gen. Stat. § 8C-1, Rule 803(4) official

commentary (2003)).

 In State v. Hinnant, 351 N.C. 277, 523 S.E.2d 663 (2000), our North Carolina

Supreme Court created the following two-part inquiry to determine if statements are

admissible under Rule 803(4): “(1) whether the declarant’s statements were made for

purposes of medical diagnosis or treatment; and (2) whether the declarant’s

statements were reasonably pertinent to diagnosis or treatment.” Id. at 284, 523

S.E.2d at 667. “The first part of the inquiry seeks to determine the child’s purpose in

making the statement, not the interviewer’s purpose in conducting the interview.”

Lewis, 172 N.C. App. at 103, 616 S.E.2d at 5 (citing Hinnant, 351 N.C. at 289, 523

S.E.2d at 671).

 9 “‘Hearsay’ is a statement, other than one made by the declarant while testifying at the trial
or hearing, offered in evidence to prove the truth of the matter asserted.” N.C. Gen. Stat. § 8C-1, Rule
801(c) (2017). “Hearsay is not admissible except as provided by statute or by” the Rules of Evidence.”
Id. § 8C-1, Rule 802 (2017). There is no dispute that the statements at issue are hearsay.

 - 15 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

 “[T]he proponent of Rule 803(4) testimony must affirmatively establish that

the declarant had the requisite intent by demonstrating that the declarant made the

statements understanding that they would lead to medical diagnosis or treatment.”

Hinnant, 351 N.C. at 287, 523 S.E.2d at 669. In determining whether a child’s

statements are admissible under this exception, “the trial court should consider all

objective circumstances of record surrounding declarant’s statements in determining

whether he or she possessed the requisite intent under Rule 803(4).” Id. at 288, 523

S.E.2d at 670.

 In Hinnant, statements made by a five-year-old alleged victim of sexual abuse

were not admissible under Rule 803(4) where “there [was] no affirmative record

evidence indicating that [the child’s] statements were medically motivated and,

therefore, inherently reliable.” Id. at 290, 523 S.E.2d at 671. The child was

interviewed by a clinical psychologist two weeks after an initial medical examination,

but just prior to a follow-up examination by a medical doctor. The record did not

“disclose that [the psychologist] or anyone else explained to [the child] the medical

purpose of the interview.” Id. at 289-90, 523 S.E.2d at 671. “In addition, the

interview was not conducted in a medical environment. Instead, it was held in what

[the psychologist] described at trial as a ‘child-friendly’ room, one in which all of the

furniture was child-sized.” Id. at 290, 523 S.E.2d at 671. “In [the Court’s] view, such

a setting did not reinforce to [the child] her need to provide truthful information.” Id.

 - 16 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

Thus, the Supreme Court could not conclude that the child understood that the

psychologist “was conducting the interview in order to provide medical diagnosis or

treatment.” Id. at 289, 523 S.E.2d at 671. Because the record failed to demonstrate

that the child possessed the requisite intent when speaking with the psychologist, the

child’s statements “were not made for purposes of medical diagnosis or treatment.”

Id. at 290, 523 S.E.2d at 671. The trial court thus erred in admitting the statements

under Rule 803(4). Id. at 290-91, 523 S.E.2d at 671.

 In this case, Brandi Reagan, Executive Director of the Dragonfly House

Children’s Advocacy Center and certified child forensic interviewer, conducted

interviews with Sarah and Jack. At trial, Reagan explained that when a child arrives

at the Dragonfly House for an appointment, the child is met by a child advocate who

“talks with th[e] nonoffending caregiver and the child about . . . people they are going

to meet, every service they are going to receive[,] and what would happen at the end

of the appointment.” The child advocate tells the caregiver and the child “that they

are there to receive a forensic interview and a medical exam. . . . [Y]ou are going to

receive an interview and you will do these things in the interview; you will receive a

medical exam and do these things in the medical exam.”

 Heydy Day, the child advocate in this case, testified, “I start off talking to the

child and the caregiver saying, ‘you will be talking with one of my friends today,’

whether that’s our interviewer Kim or interviewer Brandi, you will be talking to that

 - 17 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

lady.” Day testified that she would tell the children that cameras would “record what

you and her talk about because this is really important. This way I don’t have to talk

to all of these different people that you don’t know.” She further testified that she

would tell the children that while they were talking with her friend, their caregiver

would be talking to the doctor. Finally, she testified that she would tell the children,

“Once you finish talking with Miss Kim or Miss Brandi and the doctor finishes talking

with the caregiver, then the doctor will call you back to do a head to toe check-up of

you.”

 Reagan testified that the Dragonfly House is housed in an old home and the

forensic interviews took place in one of the bedrooms that was designed and decorated

to be a “child-friendly” interview room. The interview room was separate from the

medical examination room, but in the same facility. Sarah and Jack were not

introduced to the physician or taken to a medical examination room until after they

had completed their forensic interviews with Reagan.

 At the beginning of the interview, Reagan introduced herself to Sarah in the

following manner, “My name is Brandi, and it is my job to talk to you today, okay?”

In response to Reagan’s specific inquiry, “Tell me why you’re here today[,]” Sarah

responded, “Because my dad died.”

 Similarly, Reagan introduced herself to Jack in the following manner, “And

Jack, my name is Brandi. And it’s my job to talk to you today.” In response to

 - 18 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

Reagan’s specific inquiry, “Tell me why you’re here[,]” Jack responded, “Um, my dad

died, and people are trying – my aunt and uncle from my dad’s side are trying to take

away – take me away from my mom. And – that’s why I’m here. My mom’s trying to

get custody over us.” Toward the end of the interview, Reagan asked Jack, “And since

you found out you were coming here, um, what has been in your mind?” Jack

responded, “I was nervous at first, but then – and then my grandma and mom said

everything’s going to be fine. You’re just going to ask me some questions, and they

wanted me to tell the truth.” Reagan then asked, “What do you want to happen now?”

Jack responded, “Um, to be with my mom.”

 The objective circumstances of record surrounding each child’s interview do not

indicate that Sarah or Jack understood that the purpose of the interview was to gain

information from them for their medical diagnosis or treatment. First, Sarah, almost

8, and Jack, almost 11, were both old enough to understand the purpose of the

interview, and they specifically indicated that they understood the purpose of the

interview was to talk about their dad dying and, in Jack’s case, to help his Mom get

custody of Sarah and him. Cf. Lewis, 172 N.C. App. at 104, 616 S.E.2d at 5 (children

aged 8 and 9 “were old enough to understand the interviews had a medical purpose,

and they indicated as such” by “sign[ing] forms stating they understood that the

registered nurse would share their statements with a medical doctor”). Recognizing

the difficulty of determining whether a declarant understood the purpose of his or her

 - 19 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

statements, courts have attempted to infer a declarant’s understanding from the

surrounding circumstances. Here, however, no such inference is necessary as Sarah

and Jack specifically articulated their understanding of the purpose of the interviews,

which was something other than medical diagnosis and treatment. This record

evidence alone leads to a conclusion that the children’s statements were not medically

motivated and, therefore, not inherently reliable.

 The lack of inherent reliability in Sarah and Jack’s statements is further

demonstrated by additional surrounding circumstances. As in Hinnant, the

interviews took place in a “child-friendly” room, not a medical examination room.

Moreover, neither Reagan, a certified child forensic interviewer, nor Day, a child

advocate, was a medical professional, and neither explained to Sarah or Jack a

medical purpose for the interview or explained that their discussion would be shared

with a doctor. To the contrary, Day explained that their caregiver would talk to the

doctor while they were being interviewed and that after their interview they would

receive a medical examination by a doctor; Reagan explained to each child that during

their interview it was simply her job to talk to them. Compare Hinnant, 351 N.C. at

289-90, 523 S.E.2d at 671 (the Court could not conclude that the child understood the

interviews were conducted in order to provide medical diagnosis or treatment where

the record did not “disclose that [the psychologist] or anyone else explained to [the

child] the medical purpose of the interview”) with Lewis, 172 N.C. App. at 103-04, 616

 - 20 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

S.E.2d at 5 (The record indicated that both children had the requisite intent to make

their statements for a medical purpose where they “were both interviewed by a

registered nurse, at least one of whom was wearing a nurse’s uniform. . . . Both

children signed forms stating they understood that the registered nurse would share

their statements with a medical doctor. Both nurses testified that they also explained

to the children their discussions would be shared with a doctor, who would then

perform a medical examination.”).

 Accordingly, Defendants failed to affirmatively establish that Sarah or Jack

had the requisite intent to make statements during the forensic interview for

purposes of obtaining medical diagnoses or treatment. Thus, the trial court properly

concluded Sarah and Jack’s statements made during the Dragonfly House Interviews

were inadmissible under Rule 803(4)’s medical treatment or diagnosis exception. In

light of this conclusion, I need not analyze whether either of the children’s statements

“were reasonably pertinent to diagnosis or treatment.” Hinnant, 351 N.C. at 284, 523

S.E.2d at 667.

B. Rule 803(24)’s Residual Exception

 Defendants next contend that the trial court abused its discretion by excluding

the children’s statements made during their DSS Interviews and Dragonfly House

Interviews because the trial court improperly concluded those statements lacked

 - 21 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

sufficient guarantees of trustworthiness to be admissible under Rule 803(24)’s

residual exception.

 “[A]dmissibility of hearsay statements pursuant to the 803(24) residual

exception is within the sound discretion of the trial court.” State v. Smith, 315 N.C.

76, 97, 337 S.E.2d 833, 847 (1985). Thus, a trial court’s decision to admit or deny the

admission of evidence under Rule 803(24) may be disturbed on appeal only where an

abuse of such discretion is shown. See id. An abuse of discretion warranting reversal

results only where the trial court’s ruling is “manifestly unsupported by reason or is

so arbitrary that it could not have been the result of a reasoned decision.” State v.

Rollins, 224 N.C. App. 197, 199, 734 S.E.2d 634, 635 (2012) (quotation marks and

citation omitted).

 North Carolina Rule of Evidence 803(24) provides that the following is not

excluded by the rule against hearsay:

 A statement not specifically covered by any of the foregoing
 exceptions but having equivalent circumstantial
 guarantees of trustworthiness, if the court determines that
 (A) the statement is offered as evidence of a material fact;
 (B) the statement is more probative on the point for which
 it is offered than any other evidence which the proponent
 can procure through reasonable efforts; and (C) the general
 purposes of these rules and the interests of justice will best
 be served by admission of the statement into evidence.

N.C. Gen. Stat. § 8C-1, Rule 803(24) (2017). “Because of the residual nature of the

Rule 803(24) hearsay exception and the Commentary’s warning that ‘[t]his exception

does not contemplate an unfettered exercise of judicial discretion,’ evidence proffered

 - 22 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

for admission pursuant to . . . Rule 803(24) . . . must be carefully scrutinized by the

trial judge within the framework of the rule’s requirements.” Smith, 315 N.C. at 91-

92, 337 S.E.2d at 844. Thus, prior to admitting or denying hearsay evidence proffered

under of the residual hearsay exception, the trial court must determine the following:

 (1) whether proper notice has been given, (2) whether the
 hearsay is not specifically covered elsewhere, (3) whether
 the statement is trustworthy, (4) whether the statement is
 material, (5) whether the statement is more probative on
 the issue than any other evidence which the proponent can
 procure through reasonable efforts, and (6) whether the
 interests of justice will be best served by admission.

State v. Valentine, 357 N.C. 512, 518, 591 S.E.2d 846, 852 (2003) (citing Smith, 315

N.C. at 91-98, 337 S.E.2d at 844-48).

 Under the third part of this six-part test, the trial court must determine

“whether the statement is trustworthy.” Id.; see N.C. Gen. Stat. § 8C-1, Rule 803(24)

(proffered hearsay statement must contain “circumstantial guarantees of

trustworthiness” equivalent to those underpinning the remaining exceptions

enumerated in Rule 803). “This threshold determination has been called ‘the most

significant requirement’ of admissibility under Rule 803(24).” Smith, 315 N.C. at 93,

337 S.E.2d at 845.

 In weighing the “circumstantial guarantees of trustworthiness” of a hearsay

statement for purposes of Rule 803(24), the trial court must consider “(1) assurances

of the declarant’s personal knowledge of the underlying events, (2) the declarant’s

motivation to speak the truth or otherwise, (3) whether the declarant has ever

 - 23 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

recanted the statement, and (4) the practical availability of the declarant at trial for

meaningful cross-examination.” State v. Triplett, 316 N.C. 1, 10-11, 340 S.E.2d 736,

742 (1986) (citing Smith, 315 N.C. 76, 337 S.E.2d 833). “Also pertinent to this inquiry

are factors such as the nature and character of the statement and the relationship of

the parties.” Triplett, 316 N.C. at 11, 340 S.E.2d at 742 (citation omitted).

 None of these factors, alone or in combination, may
 conclusively establish or discount the statement’s
 “circumstantial guarantees of trustworthiness.” The trial
 judge should focus upon the factors that bear on the
 declarant at the time of making the out-of-court statement
 and should keep in mind that the peculiar factual context
 within which the statement was made will determine its
 trustworthiness.

Smith, 315 N.C. at 94, 337 S.E.2d at 845. “[I]f the trial judge examines the

circumstances and determines that the proffered testimony does not meet the

trustworthiness requirement, his inquiry must cease upon his entry into the record

of his findings and conclusions, and the testimony may not be admitted pursuant to

Rule 803(24).” Id.

 “When ruling on an issue involving the trustworthiness of a hearsay

statement, a trial court must make findings of fact and conclusions of law on the

record.” State v. Sargeant, 365 N.C. 58, 65, 707 S.E.2d 192, 196 (2011) (citation

omitted). “We are bound by findings of fact supported by competent evidence.” State

v. Brown, 339 N.C. 426, 438, 451 S.E.2d 181, 189 (1994) (citations omitted). “This

holds true even if evidence exists ‘from which a different conclusion could have been

 - 24 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

reached.’” Brown, 339 N.C. at 438, 451 S.E.2d at 189 (quoting State v. Johnson, 322

N.C. 288, 293, 367 S.E.2d 660, 663 (1988)).

 On appeal, Defendants challenge the evidentiary sufficiency underlying the

trial court’s factual findings supporting its conclusion that “[t]he proffered statements

do not have circumstantial guarantees of trustworthiness.” I address each challenged

finding in turn.

 a. Factual Findings nos. 15 & 20

 Factual findings 15 and 20, which address the trial court’s consideration of

“assurances of the [children’s] personal knowledge of the underlying events,” Triplett,

316 N.C. at 10, 340 S.E.2d at 742, state as follows:

 15. The children’s statements did not describe actual
 knowledge of the events surrounding the homicide of Jason
 Corbett. Jack identified the source of the information in
 his statements by saying “my mom told me” and “she
 (defendant Molly Corbett) told us.” Sarah similarly
 described the source of her knowledge, saying the her
 grandmother “told [me] first and then her mother [told
 me].” When speaking of her “grandmother,” Sarah was
 referring to the mother of defendant Molly Corbett and the
 wife of defendant Thomas Martens.

 ....

 20. The statements of the children which the defense
 proffers were not made out of the personal knowledge of
 the declarant children but are instead double hearsay
 declarations of the defendant Molly Corbett and her
 mother.

 These findings of fact are supported by the narrative of the DSS Interviews

 - 25 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

and the transcript of the Dragonfly House Interviews. The DSS Interview narrative

notes, “Sarah states her father screams and yells and states when her mom and dad

goes into the room her dad hurts her mom. She stated her mom told her.” The

narrative also notes, “Sarah stated her mom told her when she was about six or seven

that her dad hurt her mom.”

 In Reagan’s Dragonfly House Interview with Sarah, Reagan told Sarah, “I

want you to think about that day and tell me as much as you can possibly remember

about that day when your dad died.” Sarah responded,

 And then so in the nighttime at night, I was sleeping
 normally, and then this guy came upstairs I didn’t know
 who it was. It was actually an officer. And me, my
 grandma and my brother were shut downstairs.

 Later on, Sarah explained that on the night of the altercation, she fell asleep

on the couch. Then, “my mom brought me up [to bed] – either my mom or my dad, I

don’t know.” The following exchange then took place:

 [Reagan]: All right. So then the next thing you told me
 was that you were sleeping, and the next thing you know,
 a guy came into the room, and he was an officer, and it was
 about 4 a.m.
 [Sarah]: Um-hmm. Yeah, and all I knew - at first I thought
 he was my grandpa, and then I thought it was my bald -
 but I didn’t have a bald grandpa, but I thought my grandpa
 got bald for some reason. And then I knew it was an officer.
 Reagan questioned Sarah about any violence she had witnessed between Molly

and Jason prior to the evening of Jason’s death. Sarah stated that Jason would hurt

Molly. When asked if Sarah saw Jason hurt Molly, Sarah said, “No, not really ever,

 - 26 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

but one time I saw him step on her foot.” Reagan followed up by asking, “So when

you said that he would fight with her and he would hurt her, you said you didn’t really

see it, how would you know about it?” Sarah responded, “Because, um, my mom told

me.”

 When Sarah was explaining how she knew what transpired during the fatal

altercation, she said, “my grandma told me at first, because she said – she said, like

– she said that, like, um, they were having a fight, and then grandpa went upstairs.”

Reagan then asked, “At any time during the night, did you wake up or hear anything

that was going on that night?” Sarah responded, “No. I don’t know what happened

because I had – I was just being a hard sleeper that night.”

 Later in the interview, the following exchange took place:

 [Reagan]: Okay. What would happen when you do wake up
 during the night?

 [Sarah]: I would go downstairs because I usually had a
 nightmare. But I think what caused my dad being really
 mad that night was because, um, my mom kept on coming
 upstairs because I - like I have fairies on my bed, and I
 really get scared of those things, because they like look like
 spiders and lizards on my bed. So that’s why my mom had
 to keep on coming up. I couldn’t fall asleep until my mom
 put another sheet on my bed, and then my dad got mad.

 [Reagan]: Okay. So you told me that you had fallen asleep
 downstairs and someone carried you upstairs. Did you
 wake up at any point after that?

 [Sarah]: Nope.

 - 27 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

 [Reagan]: Okay. So you said your mom had to put another
 sheet on. How did you know that?

 [Sarah]: Because before I went to sleep, she - because I
 woke up, like, in the middle – like not in the middle, but
 like – I’m sorry I said that I didn’t wake up.

 In Reagan’s interview with Jack, Reagan asked him, “How did your dad die?”

Jack responded:

 Okay. Well, my sister had a nightmare about insect
 crawling – she had fairy blankets and insects all over her
 bed. That was a nightmare, though. And my dad got very
 mad, and he was screaming at our mom, and my mom
 screamed, and my grandpa came up and started to hit him
 with a bat. And then my dad grabbed hold of the bat –
 grabbed – held the bat and hit my grandpa with the bat,
 until my mom put a – put – we were going to paint a brick
 that was in there, like a cinder block, and it hit his temple,
 right here, and he died.

When Reagan followed up by asking, “Um, now you said your sister had a nightmare.

How did you know that?” Jack responded, “My parents – my mom told me.” When

asked on several occasions to recount details about Jason’s alleged prior behavior,

Jack could not remember details, admitted he “[didn’t] actually remember[,]” or

stated that he knew about an event because his mom or grandma told him. At the

end of the interview, Reagan asked, “And just to make sure I understand, how did

you find out that your mom hit [your dad] with a brick and your grandpa hit him with

a bat?” Jack responded, “She told me.”

 These exchanges provide competent evidence to support the factual findings

that the children’s “statements did not describe actual knowledge of the events

 - 28 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

surrounding the homicide of Jason” and “were not made out of the personal

knowledge of the declarant children but are instead double hearsay declarations of

the defendant Molly Corbett and her mother.”

 b. Factual Finding no. 21

 Factual finding 21, which addresses the trial court’s consideration of “the

[children’s] motivation to speak the truth or otherwise,” Triplett, 316 N.C. at 10-11,

340 S.E.2d at 742, states as follows:

 21. These same statements were not made at a time when
 the children were motivated to speak the truth but were
 rather motivated to affect future custody arrangements -
 specifically the children feared that they were going to be
 “taken away from their mother” and removed to another
 country by their father’s relatives.

 The Dragonfly House Interviews were set up on 3 August—the same day the

DSS Interviews took place—by the Davidson County DSS and Child Protective

Services. Molly was not permitted to be present at the Dragonfly House Interviews,

but she signed a consent form allowing the interviews to be conducted. Between 3

and 6 August, Sarah and Jack stayed in Molly’s brother’s home in Union County with

their grandmother, Sharon—Molly’s mother and Tom’s wife. During that time, Molly

spent time with the children while actively pursuing custody of them—filing petitions

for guardianship and stepparent adoption on 4 August, and obtaining an ex parte

temporary custody order on 5 August based on her allegation that Jason’s sister was

coming to the United States to take the children back to Ireland with her.

 - 29 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

 On the morning of 6 August, a funeral service was held for Jason. The children

attended the service with Molly and Sharon. Immediately following the service,

Sharon drove Sarah and Jack to the interview at the Dragonfly House. Reagan was

apparently unaware that Jason’s funeral service had been held that morning until

Jack told her as much near the end of his interview.

 Sarah indicated to Reagan that she had “heard people talk about my aunt

trying to come get us, trying to come get me and my brother. . . . And that’s why at

the funeral, I had to (indiscernible) my mother – my mom’s hand the whole time.”

Reagan clarified, “You had to hold your mom’s hand the whole time?” Sarah

responded, “Yes.”

 Reagan asked Jack, “And you said that your aunt and uncle want custody of

you. How did you learn that?” Jack replied, “My mom and my grandma told me.”

Reagan asked, “What did they say?” Jack responded, “They said, Jack, at the service

they’re going to try to take you away. They’re trying to get you and Sarah and trying

to get all of your dad’s stuff and bring him back to Ireland for a funeral.”

 The unique circumstances under which these interviews took place fully

support the trial court’s finding that Sarah and Jack’s statements “were not made at

a time when [they] were motivated to speak the truth but were rather motivated to

affect future custody arrangements” in that “the children feared that they were going

to be ‘taken away from their mother’ and removed to another country by their father’s

 - 30 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

relatives.”

 c. Factual Finding no. 22

 Factual finding 22, which addresses the trial court’s consideration of whether

the children ever recanted the statements, Triplett, 316 N.C. at 11, 340 S.E.2d at 742,

states as follows:

 22. The statements of the children that are offered by the
 defense as pertinent to the relationship between Molly
 Corbett and Jason Corbett have been specifically recanted.
 Sarah Corbett . . . recanted her statements in diary entries
 made after her return to Ireland. Jack Corbett recanted
 his statements in diary entries and during a recorded
 interview with members of the District Attorney’s Office.

 To undermine the trustworthiness of the statements made by Sarah and Jack,

the State proffered a 27 May 2016 videotaped Skype interview of Jack that occurred

in the home of Tracy and David Lynch10 in Ireland and was conducted by a Davidson

County District Attorney, as well as copies of journal entries allegedly written by

Sarah and Jack dating from January to March 2017.

 During Jack’s videotaped Skype interview, he stated that Molly told Sarah and

him what to say during their forensic interviews while Molly and their grandmother

were driving the children to the Dragonfly House on 6 August 2015. Jack stated that

Molly told them what happened during the fatal altercation, about Jason choking her

and Tom coming upstairs to defend her with a bat, and “to tell the DA.” Jack also

 10Tracy Lynch, Jason’s sister, and her husband David are Sarah and Jack’s aunt and uncle,
and were awarded custody of the children after Jason’s death.

 - 31 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

stated that Molly was “making up . . . stories about [Jason], saying that he was

abusive, and she started saying if you don’t lie [she would] never see [us] again.” Jack

further explained that Molly “was telling [Sarah and him] to say that [Jason] was

abusive and saying that he was very mean to Molly.” Jack stated, “I didn’t tell the

truth at Dragonfly. I didn’t tell the truth [during the DSS Interview].”

 Sarah’s diary entries include statements indicating that Molly had told Jack

and her to say that Jason hit and yelled at Molly; that Molly would punch herself;

that Molly told her that Jason had killed Sarah’s mom by putting a pillow over her

mouth; and that Molly punched Jack. To the extent that Sarah had personal

knowledge of violent episodes between Jason and Molly, the entry that Molly had told

Jack and her to say that Jason hit and yelled at Molly tends to recant Sarah’s prior

assertion.

 Thus, this evidence supports the trial court’s finding of fact that the children’s

statements at the DSS and Dragonfly House Interviews “that are offered by the

defense as pertinent to the relationship between Molly Corbett and Jason Corbett

have been specifically recanted.”

 As the findings of fact are supported by competent evidence, they are thus

conclusive and binding on appeal. Brown, 339 N.C. at 438, 451 S.E.2d at 189

(quotation marks and citation omitted). “This holds true even if evidence exists from

which a different conclusion could have been reached.” Id. (quotation marks and

 - 32 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

citation omitted).

 Based on these findings, the trial court made the following conclusions:

 11. The court is not assured of the personal knowledge
 of the declarants as to the underlying events described in
 that both children identified the source of their knowledge
 being nothing more than statements of a defendant and
 that defendant’s mother. The declarations contain no
 reference to seeing, hearing or perceiving anything about
 the events described except these statements of others.

 12. The court is not assured of the children’s motivation
 to speak the truth, but instead finds the children were
 motivated, in the near immediate aftermath of the death of
 their father, to preserve a custody environment with the
 only mother-figure they could remember having known
 during their lives. The children appear to have known that
 if they were not in the custody of defendant Molly Corbett
 they would be taken to live in the Republic of Ireland with
 relatives of their father.

 13. The proffered statements were specifically recanted
 and disavowed.

 14. The proffered statements do not have circumstantial
 guarantees of trustworthiness. Further, this court having
 concluded the statements are not trustworthy, the court
 need not continue to the additional prongs of the Smith
 analysis.

 The findings support the trial court’s conclusions of law, including the

conclusion that “[t]he proffered statements do not have circumstantial guarantees of

trustworthiness.” Based on the record before this Court, the trial court’s

determination that the children’s statements were not admissible under Rule 803(24)

was not “manifestly unsupported by reason” or “so arbitrary that it could not have

 - 33 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

been the result of a reasoned decision.” Rollins, 224 N.C. App. at 199, 734 S.E.2d at

635 (quotation marks and citation omitted). Accordingly, the trial court did not abuse

its discretion in determining that the children’s statements were not admissible

under Rule 803(24) and excluding the statements as inadmissible hearsay.

C. Instances of Jason’s Anger and Violent Character

 Although I conclude the trial court did not err in excluding the children’s

statements, I nonetheless address Tom’s argument that “the trial court erred in

excluding the statements . . . because they offered instances of Jason’s anger and

violent character.”

 Evidence of an individual’s character is generally inadmissible to prove he

“acted in conformity therewith on a particular occasion[.]” N.C. Gen. Stat. § 8C-1,

Rule 404(a) (2017). A criminal defendant may, however, introduce evidence of a

victim’s pertinent character traits. N.C. Gen. Stat. § 8C-1, Rule 404(a)(2).

Nonetheless, “[w]hether character evidence is admissible under Rule 404(a)(2) is

merely a threshold inquiry, separate from the determination of the method by which

character may be proved, which is governed by Rule 405.” State v. Bass, 371 N.C.

535, 543, 819 S.E.2d 322, 327 (2018). “Under Rule 405, character may be

demonstrated by evidence of specific instances of conduct only in cases ‘in which

character or a trait of character of a person is an essential element of a charge, claim,

or defense.’” Id. (quoting N.C. Gen. Stat. § 8C-1, Rule 405(b)). “Otherwise, character

 - 34 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

may be proved only ‘by testimony as to reputation or by testimony in the form of an

opinion.’” Id. (quoting N.C. Gen. Stat. § 8C-1, Rule 405(a)).

 “Although under Rule 404(a)(2), evidence of a violent character is admissible

to prove circumstantially that the victim was the aggressor, Rule 405(b) limits the

method by which that fact may be proved.” Bass, 371 N.C. at 544, 819 S.E.2d at 327.

“[W]ith regard to a claim of self-defense, the victim’s character may not be proved by

evidence of specific acts.” Id.11

 At trial, Tom argued that the excluded statements “were primarily being

offered on the issue of who was the aggressor . . . .” Tom further offered, “in particular,

Jack’s statements about what he saw and what he witnessed and what he heard, as

well as Sarah’s, . . . that that would be relevant to the issue of aggressor.” However,

with regard to Tom’s claim of self-defense and defense of others, evidence of Jason’s

specific acts may not be used to prove circumstantially that Jason was the aggressor.

Id. at 544, 819 S.E.2d at 327. Accordingly, the trial court’s exclusion of the children’s

statements regarding Jason’s prior violent behavior was not erroneous.

3. Aggressor Doctrine

 11 Bass was decided by our Supreme Court during the pendency of this appeal and overruled
this Court’s decision in State v. Bass, 253 N.C. App. 754, 802 S.E.2d 477 (2017), wherein we stated
that “[e]vidence of specific instances of a victim’s character, known or unknown to the defendant at
the time of the crime, may be relevant in establishing that the victim was the aggressor when
defendant claims self-defense[,]” id. at 768, 802 S.E.2d at 485-86 (emphasis, quotation marks, and
citation omitted), and held that defendant was entitled to present evidence of specific instances of
conduct which demonstrated the victim’s violent behavior under Rule 405(b). Id. at 768, 802 S.E.2d
at 486.

 - 35 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

 Tom next argues that the trial court erred by instructing the jury on the

aggressor doctrine as to his claims of self-defense and defense of others because there

was no evidence that Tom was the aggressor.

 A properly preserved objection to the trial court’s jury instructions is reviewed

de novo on appeal. State v. Hope, 223 N.C. App. 468, 471, 737 S.E.2d 108, 111 (2012).

Under de novo review, this Court considers the matter anew and is free to substitute

its judgment for that of the trial court. State v. Williams, 362 N.C. 628, 632-33, 669

S.E.2d 290, 294 (2008).

 A trial court’s jury instructions should be “a correct statement of the law

and . . . supported by the evidence.” State v. Conner, 345 N.C. 319, 328, 480 S.E.2d

626, 629 (1997). The aggressor doctrine provides that a defendant may not receive

the benefit of self-defense if he was the aggressor. State v. Juarez, 369 N.C. 351, 358,

794 S.E.2d 293, 300 (2016). Likewise, a defendant may not receive the benefit of

defense of others if he was the aggressor. See State v. Phifer, 165 N.C. App. 123, 129,

598 S.E.2d 172, 176 (2004) (“The elements of self-defense are applicable to the defense

of others.”). Furthermore, “[a] person is entitled under the law of self-defense to harm

another only if he is without fault in provoking, engaging in, or continuing a difficulty

with another.” State v. Effler, 207 N.C. App. 91, 98, 698 S.E.2d 547, 552 (2010)

(internal quotation marks and citations omitted). An individual is the aggressor if he

or she “aggressively and willingly enters into a fight without legal excuse or

 - 36 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

provocation.” State v. Wynn, 278 N.C. 513, 519, 180 S.E.2d 135, 139 (1971).

Moreover, “even if his opponent starts a fight, a defendant who provokes, engages in,

or continues an argument which leads to serious injury or death may be found to be

the aggressor.” State v. Lee, 258 N.C. App. 122, 126, 811 S.E.2d 233, 237 (2018)

(citations omitted).

 “[W]hen reviewing a trial court’s denial of a defendant’s request to exclude the

aggressor instruction from the jury instruction on self-defense, the appellate court

does not consider the evidence in a light favorable to the defendant, as it is the

province of the jury to resolve any conflict in the evidence in that regard.” Id. at 127,

811 S.E.2d at 237 (citations omitted). Thus, where conflicting evidence was presented

as to which party was the initial aggressor when a person claims self-defense,

instructing the jury on the aggressor doctrine is proper. See, e.g., State v. Cannon,

341 N.C. 79, 83, 459 S.E.2d 238, 241 (1995) (“On the evidence before it, the trial court

properly allowed the triers of fact to determine that defendant was the aggressor.”);

State v. Terry, 329 N.C. 191, 199, 404 S.E.2d 658, 662-63 (1991) (“Although

defendant’s evidence does not support the aggressor instruction, the State’s evidence

supports it. By instructing jurors on the aggressor qualification, the trial court

allowed the triers of fact to determine which testimony to believe.”).

 - 37 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

 Tom argues that “the only accounts given of the incident leading to [Jason’s]

death were [Tom’s] testimony, and [Molly’s] written statement. No contradictory

evidence was introduced by the State.” In his brief, Tom recites as follows:

 [Tom] describes being awakened in the middle of the night
 by a commotion upstairs. He proceeded upstairs in his
 underwear and shirt, carrying a bat for protection in
 anticipation of a potential confrontation. Once he
 ascertained that the commotion originated from his
 daughter’s bedroom, he entered to find [Jason] strangling
 [Molly]. [Tom] testified about what he saw when he
 entered the bedroom, his initial fear that [Jason] would kill
 [Molly] and his stated intention to do just that. He testified
 about his fear that [Jason] would kill him after he wrestled
 the bat from [Jason’s] grasp. Finally, he testified about his
 fear after regaining control of the bat that [Jason] would
 continue to try to kill both [Molly] and him if he did not
 take action.

 The State argues, however, that the circumstantial and physical evidence

contradicts Molly and Tom’s testimonial evidence, thus allowing the jury to conclude

that Molly and Tom’s version of events was not true. The State specifically argues

that “the comparison o[f] the injuries to Jason (extreme) and the injuries to the two

Defendants (none apparent or shown)” was sufficient evidence to support the

aggressor instruction.

 Jason suffered multiple blunt force injuries, including “ten different areas of

impact on the head, at least two of which had features suggesting repeated blows

indicating a minimum of [twelve] different blows to the head. Additionally, he had a

few other injuries elsewhere on his body, the torso and extremities.” On the other

 - 38 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

hand, while Alphin and Bent observed redness on the left side of Molly’s neck, Dillard

observed Molly “rubbing her neck . . . in a scrubbing motion-type thing” and Young

testified that he saw Molly “continually tug[] and pull[] on her neck with her hand.”

This evidence could allow a jury to conclude that the redness on Molly’s neck was self-

inflicted and not a result of Jason’s strangulation. Tom had no visible injuries.

 While the disparity of the injuries in this case does not provide direct evidence

that Tom was the initial aggressor, it provides evidence from which the jury could

determine that Molly and Tom’s version of events was not true. See State v. Mumma,

372 N.C. 226, 242, 827 S.E.2d 288, 298 (2019) (concluding that defendant could not

show that, absent instructions on the aggressor doctrine, the jury would not have

rejected his claim of self-defense where “the record contains no physical evidence

tending to validate defendant’s otherwise unsupported claim to have acted in self-

defense and does contain substantial physical evidence tending to undercut his self-

defense claim including, but not limited to, the evidence that [the victim] sustained

defensive wounds to her hand, that she had sustained stab wounds that had been

inflicted from the rear, and that the wounds that defendant sustained were much less

severe than the wounds that had been inflicted upon [the victim]”); State v. Presson,

229 N.C. App. 325, 330, 747 S.E.2d 651, 656 (2013) (“Further, the lack of injuries to

defendant, compared to the nature and severity of the wounds on [the victim] at his

 - 39 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

death, is sufficient evidence from which a jury could find that defendant was the

aggressor . . . .”).

 Moreover, the State presented the following evidence: (1) one of Jason’s head

wounds was inflicted after he was dead; (2) the blood spatter indicated that Jason’s

head was struck as it was descending and/or was near the ground; (3) the toxicology

report from Jason’s body showed the presence of the drug Trazodone, which induces

sleep; (4) Jason was naked and unarmed when the altercation occurred in his

bedroom at 3:00 am; (5) the children, who were sleeping in their bedrooms up the

stairs from Jason and Molly’s bedroom, were undisturbed; (6) EMS and law

enforcement responders noticed upon their arrival that some of the blood on Jason’s

body had dried; (7) one paramedic testified that Jason’s body felt cool, and asked

another paramedic, “How long did you say they waited before they called 911[?]”; (8)

Tom told a co-worker he hated Jason.

 Although the evidence could allow a jury to determine that Tom armed himself

with a baseball bat when he heard a commotion on the floor above, and came to

Molly’s defense when he saw Jason choking her,12 the evidence could also allow a jury

to determine that Tom armed himself with a baseball bat and aggressively and

willingly entered into the fight with Jason without legal excuse or provocation. As

 12 Tom correctly notes, “In this case, all the evidence and testimony entitled [Tom] to a jury
instruction on self-defense.” Such instruction is not at issue here.

 - 40 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

conflicting evidence was presented as to whether Tom was the initial aggressor, the

trial court did not err in instructing the jury on the aggressor doctrine as to Tom.

4. Blood Spatter Expert Testimony

 Defendants next argue that the trial court erred by admitting into evidence

certain testimony by the State’s blood spatter expert, Stuart James. Specifically,

Defendants argue that the testimony regarding stains on the underside of the hem of

Tom’s boxer shorts should have been excluded as unreliable under North Carolina

Evidence Rule 702(a) because it was not “the product of reliable principles and

methods reliably applied to the facts of the case[.]”

 “In order to preserve an issue for appellate review, a party must have

presented to the trial court a timely request, objection, or motion . . . .” N.C. R. App.

P. 10(a)(1). “To be timely, an objection to the admission of evidence must be made at

the time it is actually introduced at trial.” State v. Ray, 364 N.C. 272, 277, 697 S.E.2d

319, 322 (2010) (quotation marks and citations omitted). “An objection made only

during a hearing out of the jury’s presence prior to the actual introduction of the

testimony is insufficient.” State v. Snead, 368 N.C. 811, 816, 783 S.E.2d 733, 737-38

(2016) (internal quotation marks and citation omitted). Moreover, “[t]he admission

of evidence without objection waives prior or subsequent objection to the admission

of evidence of a similar character.” State v. Walters, 357 N.C. 68, 104, 588 S.E.2d 344,

365 (2003) (internal quotation marks and citations omitted).

 - 41 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

 During James’ voir dire examination, Defendants objected to James’

conclusions that the stains on Tom’s boxer shorts were impact blood spatter arising

from blunt force strikes to Jason’s head while he was on the ground as unreliable

because (1) those particular stains never underwent blood testing, presumptive or

confirmatory, so James could not state with scientific certainty that they were blood;

(2) James never viewed a photograph of Tom wearing the boxer shorts, so he could

not state with certainty the position of Tom’s body when those stains occurred; and

(3) James based his conclusions that the stains were “very characteristic of blood

spatter” and “likely created during the same event” as the confirmed blood stains on

the shorts based solely on his visual observation of “their location, size, shape[,] and

distribution.” The trial court overruled Defendants’ objections, concluding that

James’ testimony was based on sufficient facts and data, was the product of reliable

principles and methods with which he is familiar and with which others in his field

are familiar, and that James had applied those principles to the facts.

 At trial, James testified without objection as follows:

 With respect to the small spatters on the front underside
 of the left leg of the shorts, these were consistent with the
 wearer of the shorts close to and above the source of the
 spattered blood. To what extent, I can’t really say. In order
 for the stains to get to that location on the inside of the leg,
 they would have to be traveling, you know, at least
 somewhat upward in order to do that. My conclusion there
 was the source of the impact spatters is most likely the
 head of Jason Corbett while it was close to the floor in the
 bedroom.

 - 42 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

 Although Defendants objected on reliability grounds during voir dire to the

introduction of James’ challenged testimony, Defendants failed to object to the

testimony when it was elicited by the State at trial. As Defendants did not object

when the State elicited the testimony before the jury, Defendants failed to preserve

the alleged error for appellate review. Snead, 368 N.C. at 816, 783 S.E.2d at 738.

Moreover, the unchallenged admission of James’ testimony “waive[d] prior or

subsequent objection to the admission of evidence of a similar character.” Walters,

357 N.C. at 104, 588 S.E.2d at 365.

 Furthermore, because Defendants failed to specifically and distinctly allege

plain error in their briefs, they have waived their right to have this issue reviewed on

appeal under the plain error standard. See N.C. R. App. P. 10(a)(4); State v. Joyner,

243 N.C. App. 644, 648, 777 S.E.2d 332, 335 (2015). Accordingly, Defendants’

argument should be dismissed.

5. Fitzpatrick Statement

 Defendants next argue that the trial court erred by excluding a statement

allegedly made to Tom by the late Michael Fitzpatrick, the father of Jason’s deceased

first wife, Margaret. Specifically, Defendants argue that the trial court erroneously

determined the statement was inadmissible hearsay and erroneously concluded the

statement should be excluded under Rule 403.

 - 43 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

 Tom sought to introduce a statement allegedly made to him by Fitzpatrick to

help illustrate Tom’s state of mind during the altercation. Tom offered in voir dire

that in an interview he gave his employer on 20 August 2015, he related that he had

asked Fitzpatrick at some point in time what he thought of Jason. Tom stated that

his “memory was [Fitzpatrick] said, ‘I think he killed my daughter.’” Tom further

explained in the interview, “I don’t know if that was a bitter man, he needed someone

to blame for his daughter’s death or he had any basis for this.”

 In response in voir dire, the State proffered the coroner’s report “finding that

Mr. Fitzpatrick’s daughter had died of an asthma attack”; testimony from Jason’s

family of the good relations with Fitzpatrick; and a statement Fitzpatrick gave, before

he passed away, to the Solicitor’s Office in Ireland, averring, “I can also state

categorically that we never discussed my daughter Margaret or the circumstances of

her death nor did I inform [Tom] that Jason had killed my daughter Margaret. Such

statements by [Tom] are totally and utterly untrue and mischievous.” The State

further argued that, despite the fact that Tom, a lawyer with 30 years’ FBI

experience, was interviewed by law enforcement about the incident on 2 August 2015

– the day the incident occurred and 18 days prior to the interview he gave his

employer – and offered, “‘perhaps it would be helpful if I just kind of launched into a

story . . . because it will contribute to my state of mind[,]’” Tom did not mention

Fitzpatrick’s statement at that interview.

 - 44 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

 Tom’s attorney responded in voir dire, “Just so we think it is relevant for state

of mind, we do think we are not saying indeed that’s what was heard. We are saying

it was his state of mind . . . .”

 In ruling on the admissibility of Fitzpatrick’s statement, the court announced:

 All right. I have carefully considered the alleged statement
 of Mr. Fitzpatrick with respect to the cause of Margaret
 Corbett’s death. I have considered the totality of the
 circumstances relating to this hearsay statement. The self-
 serving nature of it, and in my discretion I have determined
 under Rule 403 that the probative value of this evidence
 substantially is outweighed by the danger of unfair
 prejudice, confusion of the issues[,] and misleading to the
 jury, so I will not permit the statement of Mr. Fitzpatrick
 through [Tom].

A. Hearsay Determination

 Tom first argues that the trial court erred as a matter of law in concluding that

Mr. Fitzpatrick’s statement was hearsay as the statement was not being offered to

prove the truth of the matter asserted but was instead being offered to show Tom’s

state of mind. Tom misinterprets the court’s ruling.

 Although in announcing its ruling the trial court referred to “this hearsay

statement[,]” the plain language of the court’s ruling indicates that the trial court did

not exclude Fitzpatrick’s statement under Rule 802 because it was hearsay,13 but

instead excluded the statement, in its discretion, after conducting a balancing test

 13 “Hearsay is not admissible except as provided by statute or by these rules.” N.C. Gen. Stat.
§ 8C-1, Rule 802.

 - 45 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

under Rule 403. Had the court concluded the statement was hearsay, and excluded

it as such, it would not have engaged in a 403 balancing test. See State v. Brown, 335

N.C. 477, 486-87, 439 S.E.2d 589, 595 (1994) (“Assuming, arguendo, that the

statements were not hearsay and that they had relevance when presented in this

manner, we note that they are still subject to exclusion if their ‘probative value is

substantially outweighed by the danger of unfair prejudice, confusion of the issues,

or misleading the jury.’” (quoting N.C. Gen. Stat. § 8C-1, Rule 403 (1992)).

B. 403 Balancing

 Tom further argues that the trial court erroneously excluded the statement

under Rule 403 because the court “fundamentally misunderstood the highly probative

purpose for which it was offered.” (Original in all capital letters). “Despite [Tom’s]

several clarifications that the [] [s]tatement was offered for state of mind and not to

prove its truth,” the argument continues, “the trial court incorrectly concluded that

the statement was hearsay.” “The trial court then excluded the testimony under Rule

403, concluding that potential for prejudice, confusion of the issues, and misleading

the jury outweighed the probative value of the testimony.” Tom thus concludes, “Such

a conclusion indicates that the trial court did not understand the testimony would be

offered for non-hearsay purposes.”

 Relevant evidence is “evidence having any tendency to make the existence of

any fact that is of consequence to the determination of the action more probable or

 - 46 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

less probable than it would be without the evidence.” N.C. Gen. Stat. § 8C-1, Rule

401 (2017). “Although relevant, evidence may be excluded if its probative value is

substantially outweighed by the danger of unfair prejudice, confusion of the issues,

or misleading the jury . . . .” N.C. Gen. Stat. § 8C-1, Rule 403 (2017). The trial court’s

decision to exclude evidence under Rule 403 is reviewed on appeal for abuse of

discretion. State v. Whaley, 362 N.C. 156, 160, 655 S.E.2d 388, 390 (2008). An abuse

of discretion results only when “the court’s ruling is manifestly unsupported by

reason or is so arbitrary that it could not have been the result of a reasoned decision.”

Id. (quotation marks and citations omitted).

 The substance of Tom’s argument concerning the trial court’s Rule 403 analysis

repeats and amplifies his argument that the trial court erred in concluding the

statement was hearsay. However, as indicated above, the trial court did not exclude

Fitzpatrick’s statement under Rule 802 because it was hearsay, but instead excluded

the statement, in its discretion, after conducting a balancing test under Rule 403.

 The trial court could reasonably have concluded that the statement was only

weakly, or not at all, probative of Tom’s fear and apprehension of Jason. According

to Tom’s own explanation, Fitzpatrick’s statement had little, if any, effect on Tom’s

fear and apprehension of Jason where Tom himself questioned the veracity and basis

of the statement. Additionally, in the 2 August 2015 interview, when Tom was

forthcoming with a detailed explanation of the events leading up to and including the

 - 47 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

altercation “‘because it will contribute to my state of mind[,]’” Tom’s omission of

Fitzpatrick’s statement further indicates the statement had little, if any, effect on

Tom’s state of mind as to his fear and apprehension of Jason. On the other hand,

given the nature of the accusation that Jason killed his first wife, the trial court could

have concluded there was a strong danger of unfair prejudice and confusion of the

issues.

 The record shows that the trial court conducted a lengthy voir dire hearing on

the admissibility of the evidence, weighed the probative value of the evidence against

the possibility of unfair prejudice, and specifically found that “the probative value of

this evidence substantially is outweighed by the danger of unfair prejudice, confusion

of the issues[,] and misleading to the jury[.]” The trial court’s ruling was not

“manifestly unsupported by reason” or “so arbitrary that it could not have been the

result of a reasoned decision[,]” id., and thus, the trial court properly exercised its

discretion in excluding Fitzpatrick’s statement. See State v. McCray, 342 N.C. 123,

131, 463 S.E.2d 176, 181 (1995).

6. Molly’s Statement

 Defendants next argue that the trial court erred by striking Tom’s testimony

that he heard Molly scream, “Don’t hurt my dad[,]” during the altercation. Citing

State v. Everett, 178 N.C. App. 44, 630 S.E.2d 703 (2006), Defendants argue that

Molly’s statement was offered to illustrate the reasonableness of Tom’s fear and

 - 48 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

apprehension of Jason—a necessary element of self-defense and defense of others—

and was not inadmissible hearsay.

 Even assuming, arguendo, that the trial court erred by sustaining the State’s

objection, Tom cannot show that he was prejudiced by the error.

 A defendant is prejudiced by errors relating to rights
 arising other than under the Constitution of the United
 States when there is a reasonable possibility that, had the
 error in question not been committed, a different result
 would have been reached at the trial out of which the
 appeal arises. The burden of showing such prejudice under
 this subsection is upon the defendant.

N.C. Gen. Stat. § 15A-1443(a) (2017).

 Tom testified in detail about the altercation prior to when he heard Molly

scream. During this testimony, he indicated three separate times that he was scared.

Immediately prior to the stricken testimony, Tom testified that Jason had just shoved

him across the bed. Tom then testified, “And that’s -- you know, if I can get any more

afraid, that was it.”

 Tom had already testified about circumstances illustrating the reasonableness

of his fear and apprehension, and Molly’s statement—made after the altercation had

been well underway—was of mild, if any, additional value. Defendants’ bare

assertion on appeal that the “error significantly prejudiced” them does not meet their

burden of showing “there is a reasonable possibility that, had the error in question

not been committed, a different result would have been reached at the trial.” Id.

7. Acting in Concert

 - 49 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

 Molly argues that the trial court erred by instructing the jury on the criminal

liability theory of acting in concert. Molly further argues that the trial court’s acting

in concert instruction was incomplete and misleading, and thus prejudicially

erroneous, because the trial court failed to provide the parenthetical explanation on

the “mere presence” component of acting in concert.

A. Acting in Concert Charge

 Molly argues the trial court erred by instructing the jury on acting in concert

because there was no evidence that she shared a common plan or purpose with Tom

to kill Jason.

 As a threshold matter, I first address the State’s argument that this issue has

not been properly preserved for appellate review because, although Molly objected at

the charge conference to the acting in concert instruction, Molly “failed to renew the

objection” “after the jury charge was completed[.]”

 However, “[o]ur Supreme Court has held, and we reiterate, that when a party

has objected to proposed jury instructions during a charge conference, and the trial

court has considered and denied the request, that the party need not repeat its

objections after the jury charge is given.” Wilson v. Burch Farms, Inc., 176 N.C. App.

629, 633, 627 S.E.2d 249, 254 (2006) (citing Wall v. Stout, 310 N.C. 184, 188-89, 311

S.E.2d 571, 574 (1984)). Therefore, by objecting to the proposed acting in concert

instruction at the charge conference and receiving a ruling on her objection, Molly

 - 50 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

has properly preserved this issue for appeal. We review a properly preserved

challenge to the trial court’s decision regarding jury instruction de novo. State v.

Osorio, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009).

 “The trial court must instruct the jury on the law arising on the evidence.”

State v. Simpson, 230 N.C. App. 119, 123, 748 S.E.2d 756, 760 (2013) (quotation

marks and citation omitted). In order to support a jury instruction on acting in

concert, the State must present sufficient evidence that the defendant was “present

at the scene of the crime” and acted “together with another who does the acts

necessary to constitute the crime pursuant to a common plan or purpose to commit

the crime.” State v. Joyner, 297 N.C. 349, 357, 255 S.E.2d 390, 395 (1979). Thus,

“[o]ne of the essential elements of acting in concert is that there is evidence of a

common plan or purpose.” State v. Williams, 299 N.C. 652, 657, 263 S.E.2d 774, 778

(1980).

 While “[i]t is not . . . necessary for a defendant to do any particular act

constituting at least part of a crime in order to be convicted of that crime under the

concerted action principal[,]” Joyner, 297 N.C. at 357, 255 S.E.2d at 395, “[e]vidence

that a defendant did some act forming a part of the crime charged, when considered

together with evidence that others also did acts leading to the crime’s commission,

strongly indicates that the defendant was acting in concert with others to commit the

crime charged.” State v. Diaz, 317 N.C. 545, 547, 346 S.E.2d 488, 490 (1986).

 - 51 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

Moreover, evidence that a defendant was engaged with another pursuant to a

common plan or purpose may be found from the circumstances in which the incident

occurred. State v. Kaley, 343 N.C. 107, 110, 468 S.E.2d 44, 46 (1996).

 The altercation took place in Molly’s bedroom at approximately 3:00 am when

Jason was naked and unarmed. It is undisputed that Molly was present at the scene

while Tom repeatedly hit Jason in the head with a baseball bat. During this time, by

her own admission, Molly tried to hit Jason in the head with a brick, and the evidence

supports a finding that Molly did in fact hit Jason in the head with a brick. This is

evidence from which the jury could conclude that Molly and Tom were engaged in a

common plan or purpose. Accordingly, the trial court did not err by instructing the

jury on acting in concert.

B. Delivery of Acting in Concert Charge

 Molly further contends that the trial court’s acting in concert instruction was

prejudicially erroneous because the trial court failed to instruct that “[a] defendant is

not guilty of a crime merely because the defendant is present at the scene[.]”

 The pattern jury instruction for acting in concert reads as follows:

 For a defendant to be guilty of a crime, it is not
 necessary that the defendant do all of the acts necessary to
 constitute the crime. If two or more persons join in a
 common purpose to commit (name crime), each of them, if
 actually or constructively present, is guilty of the crime
 (and also guilty of any other crime committed by the other
 in pursuance of the common purpose to commit (name
 crime), or as a natural or probable consequence thereof.)

 - 52 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

 (A defendant is not guilty of a crime merely because
 the defendant is present at the scene, even though the
 defendant may silently approve of the crime or secretly
 intend to assist in its commission. To be guilty the
 defendant must aid or actively encourage the person
 committing the crime, or in some way communicate to
 another person the defendant’s intention to assist in its
 commission.)

N.C.P.I.—Crim. 202.10 (2017) (footnotes omitted). “While not mandatory, these

instructions serve as a guide for judges on how a jury should be instructed concerning

a particular crime.” State v. Lineberger, 115 N.C. App. 687, 691, 446 S.E.2d 375, 378

(1994). Moreover, “[o]ptional language is contained in parentheses. The optional

parenthetical phrases should be given only when warranted by the evidence.”

N.C.P.I. Introduction, III. User’s Guide, Use of Brackets, Parentheses, and Type Styles

(June 2016).

 Again, the evidence shows that Tom hit Jason in the head with a baseball bat.

Molly admitted that she tried to hit Jason in the head with a brick, and the evidence

supports a finding that Molly did in fact hit Jason in the head with a brick. Thus, the

evidence did not show that Molly was “merely” present at the scene but instead

showed that Molly actually aided Tom at the scene. As the optional parenthetical

instruction on “mere presence” was not warranted by the evidence, it was not

erroneously omitted. Moreover, given the evidence that Molly was not “merely”

present at the scene, even if the trial court had erroneously omitted the “mere

presence” instruction, Molly cannot show that “there is a reasonable possibility that,

 - 53 -
 STATE V. CORBETT & MARTENS

 COLLINS, J., concurring in part and dissenting in part.

had the error in question not been committed, a different result would have been

reached at the trial . . . .” N.C. Gen. Stat. § 15A-1443(a); see State v. Malachi, 371

N.C. 719, 738, 821 S.E.2d 407, 421 (2018) (applying the harmless error standard to

an alleged error in a jury instruction).

8. Cumulative Error

 Tom next argues that, should this Court conclude that no single error was

prejudicial, the cumulative effect of the errors nevertheless was sufficiently

prejudicial to require a new trial. “Cumulative errors lead to reversal when ‘taken as

a whole’ they ‘deprived [the] defendant of his due process right to a fair trial free from

prejudicial error.’” State v. Wilkerson, 363 N.C. 382, 426, 683 S.E.2d 174, 201 (2009)

(quoting State v. Canady, 355 N.C. 242, 254, 559 S.E.2d 762, 768 (2002)). Although

Tom has contended to this Court that numerous errors were made during trial, I have

found only one instance of potential error, which was nonprejudicial. This

nonprejudicial error did not deprive Tom of his due process right to a fair trial.

 IV. Conclusion

 I conclude that Defendants received a fair trial, free from prejudicial error.

 - 54 -